**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**At Beckley**

**UNITED STATES OF AMERICA**

**CRIMINAL NO. 5:11-CR-00038**
*v.*
**Judge Berger**

**HUGHIE ELBERT STOVER**

**DEFENDANT'S MOTION TO DISMISS**
**COUNTS ONE AND TWO OF THE SUPERSEDING INDICTMENT**

**I. INTRODUCTION**

Performance Coal Company, Inc. operated the Upper Big Branch ("UBB") coal mine.[1]  Inspectors from MSHA periodically make inspections of such mine sites, including the one at UBB.[2]  Federal law prohibits "giv[ing] advance notice of any inspection to be conducted under" title 30, chapter 22 of the Code.  30 U.S.C. § 820(e).[3]  Following a catastrophic accident at the UBB mine, accident investigation teams deposed certain Performance employees, including Defendant Hughie Elbert Stover ("Mr. Stover"), who was head of security at Performance,[4] and various security guards at the site, "about Performance's policy and practices regarding announcing the presence of MSHA inspectors" at the UBB mine.[5]  Investigators with MSHA and the FBI also interrogated Performance employees about "allegations that advance notices of inspections had been given on a regular and continuing basis" at the UBB mine.[6]

On May 17, 2011, the United States filed a three-count superseding indictment against Mr. Stover.  Counts One and Two charge Mr. Stover with making false statements to

---

[1]     (Indictment at Count One ¶ 1.)

[2]     (*Id.* at Count One ¶¶ 5-7.)

[3]     (*See also* Indictment at Count One ¶ 8.)

[4]     (*Id.* at Count One ¶ 2.)

[5]     (*Id.* at Count One ¶ 12.)

[6]     (*Id.* at Count Two ¶ 2.)

federal agents in violation of 18 U.S.C. § 1001.[7]   As demonstrated herein, the Court should

dismiss Counts One and Two because they fail to allege the statutory elements of the crime

charged.  *See* FED. R. CRIM. P. 12(b).

## II. ANALYSIS

Counts One and Two of the indictment are defective because they fail to charge

the elements of the statute allegedly violated.  Those counts accuse Mr. Stover of making false

statements in violation of 18 U.S.C. § 1001(a)(2).  Relevant to this case, that section proscribes

knowingly and willfully making a materially false statement in a federal matter:

> Except as otherwise provided in this section, whoever, in
> any matter within the jurisdiction of the executive, legislative, or
> judicial branch of the Government of the United States, knowingly
> and willfully . . . makes any materially false, fictitious, or
> fraudulent statement or representation . . . shall be [punished] . . . .

18 U.S.C. § 1001(a)(2).  The elements of a § 1001(a)(2) violation, therefore, are:

(1)     that the defendant made a statement or representation;

(2)     that such statement or representation was false, fictitious, or
fraudulent;

(3)     that such false, fictitious, or fraudulent statement was material;

(4)     that the defendant did so knowingly;

(5)     that the defendant did so willfully; and

(6)     that the subject matter of the statement or representation was
within the jurisdiction of the executive, legislative, or judicial
branch of the United States government.

*See United States v. Arch Trading Co.*, 987 F.2d 1087, 1095 (4th Cir. 1993);  *United States v.*

*David*, 83 F.3d 638, 640 (4th Cir. 1996);  *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980).[8]

---

[7]     Count Three is not in dispute in this motion.

[8]     *Arch Trading* correctly observed:  "To establish a violation of § 1001, it must be proved that
(1) the defendant made a false statement to a governmental agency or concealed a fact from it or used a

Courts at every level have repeatedly warned of the harm in allowing § 1001 to be abused to criminalize conduct by the mere artifice of asking about it.  Justice Ginsberg, for example, stated her concern for "the extraordinary authority Congress, perhaps unwittingly, has [in § 1001] conferred on prosecutors to manufacture crimes":

> That encompassing formulation arms Government agents with authority not simply to apprehend lawbreakers, but to generate felonies, crimes of a kind that only a Government officer could prompt.
>
> * * * *
>
> As [several earlier cases with] not altogether uncommon episodes show, § 1001 may apply to encounters between agents and their targets "under extremely informal circumstances which do not sufficiently alert the person interviewed to the danger that false statements may lead to a felony conviction."  Because the questioning occurs in a noncustodial setting, the suspect is not informed of the right to remain silent.  Unlike proceedings in which a false statement can be prosecuted as perjury, there may be no oath, no pause to concentrate the speaker's mind on the importance of his or her answers.  As in [Defendant] Brogan's case, the target may not be informed that a false [statement] is a criminal offense until *after* he speaks.
>
> At oral argument, the Solicitor General forthrightly observed that § 1001 could even be used to "escalate completely innocent conduct into a felony."  More likely to occur, "if an investigator finds it difficult to prove some elements of a crime, she can ask questions about other elements to which she already knows the answers.  If the suspect lies, she can then use the crime she has prompted as leverage or can seek prosecution for the lie as a substitute for the crime she cannot prove."  If the statute of limitations has run on an offense—as it had on four of the five

---

false document knowing it to be false, (2) the defendant acted 'knowingly **and** willfully,' and (3) the false statement or concealed fact was material to a matter within the jurisdiction of the agency."  987 F.2d at 1095 (emphasis added).  By the time of the Court of Appeals' decision in *United States v. Ismail*, 97 F.3d 50 (4th Cir. 1996), however, just three years later, the highlighted conjunction had been misquoted:  "To prove a violation of § 1001, the Government must establish that '(1) the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false, (2) the defendant acted "knowingly **or** [sic] willfully," and (3) the false statement or concealed fact was material to a matter within the jurisdiction of the agency.' "  97 F.3d at 60 (emphasis added).  Notwithstanding the subsequent (and recent) repetition of this error, *see, e.g.*, *United States v. Fondren*, No. 09-5136, 2011 WL 933700, at *6 n.4 (4th Cir. Mar. 18, 2011), the statute is perfectly clear:  The government must prove *both* that the defendant acted knowingly *and* willfully.

> payments Brogan was accused of accepting—the prosecutor can
> endeavor to revive the case by instructing an investigator to elicit a
> fresh denial of guilt.  Prosecution in these circumstances is . . .
> Government generation of a crime when the underlying suspected
> wrongdoing is or has become nonpunishable.

*Brogan v. United States*, 522 U.S. 398, 408-12 (1998) (Ginsberg, J., concurring) (footnotes and

citations omitted).  Ginsberg found it "doubtful Congress intended § 1001 to cast so large a net."

Such is the case here, where the government *did not charge Mr. Stover with*

*violating MSHA's no-notice rule*—undoubtedly because the government is aware that it cannot

do so.  As discussed below, rather than accuse Mr. Stover of warning his coworkers about an

imminent MSHA investigation, he is accused only of stating that his company forbade giving

advance notice of an imminent MSHA investigation by announcing the presence of MSHA

investigators—a statement that is, as will be seen, *completely true*.[9]  The sole purpose of the

indictment against Mr. Stover is to wrongly fabricate a bargaining chip that the government can

cash in—at Mr. Stover's extreme expense—in its investigation of the UBB tragedy.

A.    **The indictment fails to allege a violation of § 1001 because *even as
      characterized there*, Mr. Stover's statements were literally true, *i.e.*, as a
      matter of law, they are consistent with the evidence that he government says
      shows their falsity.**

In an effort to reign in at least some of the danger of 18 U.S.C. § 1001

accusations, courts have imposed several strict requirements.  The first requirement relevant to

the instant case is that—as the terms of the statute make clear—actual falsity is the *sine qua non*

---

[9]     Counts One and Two are also likely inconsistent with the government's own policy on § 1001.
*See* UNITED STATES ATTORNEYS' MANUAL § 9-42.160 ("It is the Department's policy not to charge a
Section 1001 violation in situations in which a suspect, during an investigation, merely denies guilt in
response to questioning by the government.  This policy is to be narrowly construed, however;
affirmative, discursive and voluntary statements to Federal criminal investigators would not fall within
the policy.  Further, certain false responses to questions propounded for administrative purposes (*e.g.*,
statements to border or United States Immigration and Naturalization Service agents during routine
inquiries) are also prosecutable, as are untruthful 'no's' when the defendant initiated contact with the
government in order to obtain a benefit.").  Stover's one-sentence denials that Performance had a policy
of violating 30 U.S.C. § 820(e) were hardly "affirmative, discursive and voluntary," they are not at all like
the "administrative purposes" example, and they arose out of government-initiated contact.

of a § 1001 violation.  Combined with the canon of statutory construction that "ambiguity concerning the ambit of criminal statutes . . . be resolved in favor of lenity," *Rewis v. United States*, 401 U.S. 808, 812 (1971), the Fourth Circuit applies the actual falseness requirement *very* strictly, routinely dismissing indictments charging a violation of § 1001 (and analogous provisions) where the defendant's statement could possibly be called true—even if the court felt that the statement was true in only an ultra-literal or even hyper-technical sense:  "[T]he government must negative ***any*** reasonable interpretation that would make the defendant's statement factually correct."  *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980) (emphasis added) (citation and indentation omitted).

As in many cases, the government has elected here to try to satisfy the actual falseness requirement by alleging (1) a government-tendered question, (2) the defendant's answer thereto that characterized certain circumstances one way, and (3) extrinsic evidence that supposedly supports the inference that the defendant's answer was false by characterizing the same circumstances differently, *i.e.*, in a way that is mutually exclusive with the defendant's. For example, the government might allege that (1) it asked the defendant what color the light was and (2) he said it was red, but (3) someone else said it was green.

In such cases, the rules are clear.  First, the government bears the burden of the most precise questioning, such that any ambiguity in the question falls squarely and entirely on the shoulders of the investigator and must be construed in favor of the meaning that makes the defendant's answer true:  "[A] prosecution for a false statement under § 1001 . . . cannot be based on an ambiguous question where the response may be literally and factually correct." *United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003) (quoting *United States v. Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978)).  "[The perjury statute may not be] invoked simply because a wily witness succeeds in derailing the questioner—so long as the witness speaks the literal truth.  The

burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. . . .   Precise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States*, 409 U.S. 352, 360-61 & 362 (1973).   "[A] literally true but unresponsive answer is to be remedied through the 'questioner's acuity' and not the federal perjury statute."  *United States v. Earp*, 812 F.2d 917 (4th Cir. 1987) (citing *Bronston*).[10]

Indeed, ambiguous questions cannot support a charge requiring proof of a false statement, *regardless* of the answer:

> Where a question is so vague as to be fundamentally ambiguous, however, it cannot be the predicate of a false statement, **regardless of the answer given**.  *Cf. United States v. Watts*, 72 F. Supp. 2d 106, 109 (E.D.N.Y. 1999) (an answer to a fundamentally ambiguous question "may not, as a matter of law, form the basis of a prosecution for perjury or false statement" under 18 U.S.C. § 1014).   This proscription holds even where the answer is unquestionably false or fraudulent.   The determination of fundamental ambiguity is a question of law.
>
> * * * *
>
> In this Circuit, "[a] question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were

---

[10]   *See, e.g.*, *United States v. Baer*, 92 Fed. Appx. 942, 944, 2004 WL 491065, at *1 (4th Cir. 2004) ("In order to obtain a conviction under 18 U.S.C.A. § 1001, the Government must demonstrate, *inter alia*, that the defendant made a false statement.   The Government may not, however, obtain a perjury conviction on the basis of a statement that is literally true, even if that statement is misleading.   The burden of precise questioning lies with the questioner;   the Government may not prosecute for perjury *when an imprecise question results in a true but evasive answer*.")   (emphasis added).  In *Baer*, when asked on a Secure Identification Display Area (SIDA) badge application, "During the previous ten years, have you been convicted or found not guilty by reason of insanity of the following listed crimes [including u]nlawful possession, use, sale, distribution, or manufacture of an explosive or weapon[?]," Baer answered "no," even though he had been convicted of brandishing a firearm.   Although "brandishing" a firearm *might* be understood to be the "use" of a weapon, it need not *necessarily* be so understood.   Thus, the court affirmed dismissal of the indictment.   And in *United States v. Good*, 326 F.3d 589 (4th Cir. 2003), the court affirmed dismissal of an indictment where another SIDA badge applicant answered "No" to, "Have you ever been convicted or found not guilty by reason of insanity of the following listed crimes . . . Burglary, Theft, Armed robbery, Possession or Distribution of Stolen Property . . . Dishonesty, Fraud, or Misrepresentation."  *Good*, 326 F.3d at 590.   She had been convicted of embezzling $100,000 just a year earlier.   Surely, reasoned the government, embezzlement involved dishonesty, fraud, or misrepresentation.   The court rejected this, however, reasoning that because embezzlement was not a "listed crime," Good's answer was literally true.

> defined at the time it were sought and offered as testimony.' "  Of course, "to precisely define the point at which a question becomes fundamentally ambiguous, and thus not amenable to jury interpretation, is impossible."

*United States v. Kerik*, 615 F. Supp. 2d 256, 271 (S.D.N.Y. 2009) (emphasis added) (citations omitted).

Second (and similarly), any ambiguity in the answer must likewise be interpreted in favor of a meaning that makes the defendant's answer true.  Thus, where a defendant's statement is true under *any* reasonable interpretation of the question, he has not violated § 1001—even if the answer would be false under some other interpretations.  A conviction simply "may not stand on a particular interpretation that a questioner places upon an answer."[11]

And third, as a matter of simple logic, no inference of falsity can possibly be allowed where a reasonable finder of fact could accept *both* the defendant's answer to the government's question *and* the supposedly contradictory evidence—*i.e.*, where accepting the latter does not ***necessarily*** lead to rejecting the former because they are not truly contradictory.

In this case, for item (1) above, the government alleges that federal inspectors asked Mr. Stover about allegations that UBB was violating the "no notice" provision of 30 U.S.C. § 820(e)—*i.e.*, "about Performance's policy and practices regarding announcing the presence of MSHA inspectors" at the UBB mine[12] and about "allegations that advance notices of inspections had been given on a regular and continuing basis" at the UBB mine.[13]

For item (2), the government alleges that Mr. Stover

> stated . . . that Performance had a practice and policy that forbade personnel at the [UBB mine] from giving advance notice of an inspection by prohibiting the security guards from notifying

---

[11]     *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1986).

[12]     (*Id.* at Count One ¶ 12;  *accord* Count Two ¶ 3.)

[13]     (*Id.* at Count Two ¶ 2.)

anyone at the mine site of the presence of MSHA inspectors at the [UBB mine]

(*id.* at Count One ¶ 13) and that Mr. Stover:

> stated . . . that Performance had a practice and policy dating back to at least 1999 that forbade security guards at the Upper Big Branch Mine from giving advance notice of inspection by prohibiting the announcement of the presence of MSHA inspectors at the Upper Big Branch Mine over the Montcoal channel [and] that he would have fired any security guard who did not abide by the practice and policy forbidding the announcement of the presence of MSHA inspectors over the Montcoal channel.

(*id.* at Count Two ¶ 5).[14]

And for item (3), the only explanation given for how Mr. Stover's statements are false is that they are, according to the government, mutually inconsistent with statements from the other guards wherein they told the investigators that, for obvious safety reasons, UBB announced over a radio channel the presence of *all* non-employee visitors to the site—coal truck drivers, bulldozer repairmen, deliverymen, caterers, and MSHA personnel.

### 1.    The question (and thus any answer) are ambiguous.

It is entirely unreasonable to expect that questions like, "Do you have a policy of *announcing **MSHA inspections***?" or "Do you have a policy of *announcing **MSHA inspectors***?" or, like the government itself characterized it in the indictment, "Do you forbid security guards from giving advance notice ***of inspection by*** prohibiting the announcement of the presence of ***MSHA inspectors***?" will not be interpreted as meaning exactly what they ask, *i.e.*, inquiring into the existence of a policy forbidding announcing the presence (1) specifically of MSHA inspectors (2) *in order* to warn mine operations personal of an imminent MSHA investigation.

---

[14]    The "Montcoal channel" was a radio channel that, according to the indictment, "could be heard by individuals working in the Upper Big Branch Mine office." (Indictment at Count Two ¶ 4.)

Perhaps it is possible that *an effect* of a policy to announce all visitors to the site could be, when applied to MSHA personnel, the availability of information that might lead mine personnel to infer that an investigation was imminent.  But that is *not what the government asked* Mr. Stover, and that is *not what he said*.  The indictment does not identify exactly what they asked or how Mr. Stover answered.[15]   But it does charge that Mr. Stover stated "that Performance had a practice and policy that forbade personnel . . . from giving **advance notice of any inspection** by prohibiting the security guards from notifying anyone at the mine site of the presence **of MSHA inspectors**"[16] (Count One) and "that Performance had a practice and policy . . . that forbade security guards . . . **from giving advance notice of an inspection** by prohibiting the announcement of **the presence of MSHA inspectors**" (Count Two)[17]

A reasonable interpretation of these questions and Mr. Stover's answers is that they addressed two issues—one subjective and one objective:  (1) whether the company forbade an announcement *in order* to give advance notice of an inspection (*i.e.*, "giving advance notice of an inspection *by* prohibiting the announcement . . ."), and (2) whether the company had any policy *specifically* referring to MSHA investigations or *specifically* referring to the presence of MSHA inspectors (as opposed to *all* site visitors).  Because Mr. Stover was only aware of the company's neutral safety policy to announce all visitors to the site—not to give advance notice of inspections, and not to specifically announce the presence of MSHA inspectors—everything that he said truthfully and accurately described what the company forbade.

---

[15]    Given that in such cases, the government seeks to imprison a man based on the content of his answer to a question, the precise language of the questions asked, the answers given, and the basis for concluding that those answers were false are all critical details.  *Cf. United States v. Clifford*, 426 F. Supp. 696, 703 (E.D.N.Y. 1976) ("Without knowing the question asked or answer given, a finding that a false statement was made is unreasonable.").

[16]    (Indictment at Count One ¶ 13 (emphasis added).)

[17]    (Indictment at Count Two ¶ 5 (emphasis added).)

If the government had asked Mr. Stover whether Performance had a policy of announcing tall men wearing green pants driving yellow spotted trucks, the only reasonable answer would have been "No"—notwithstanding the fact that the mine's policy of announcing everyone would have covered that specific circumstance.  If the government had asked Mr. Stover if it had a policy of announcing that lunch was ready, the only reasonable answer would have been "No"—notwithstanding the fact that the mine's policy of announcing everyone could very well have led someone to draw that inference after hearing the presence of the catering truck on site.  Furthermore, Mr. Stover's statement was rendered all the more true given that the investigators' interrogation of Mr. Stover and the others was in the specific context of alleged investigating violations of the no-announce statute.  Indeed, under the circumstances he faced, Mr. Stover's statement was not just *a* reasonable one;  it was *the **only*** reasonable one.

"The principles underlying the *Bronston* decision" bar convictions "for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness."[18]  Mr. Stover "may not be assumed into the penitentiary."[19] Counts One and Two fail to allege a violation of 18 U.S.C. § 1001 because no jury could possibly find that the statement Stover made is not, at the very least, reasonably consistent with the evidence that the Government advances to prove falsity.[20]

---

[18]    *United States v. Glantz*, 847 F.2d 1, 6 (1st Cir. 1988).

[19]    *United States v. Brumley*, 560 F.2d 1268, 1277 (5th Cir. 1977).

[20]    As shown earlier, it is not enough for the government to respond that a reasonable jury might also find that Mr. Stover's answers are inconsistent with the government's allegedly mutually exclusive evidence under some interpretation of the question, answer, or evidence. *As a matter of law*, if, as here, a reasonable jury could conclude that there is a possibly truthful interpretation, then it does not matter if such a jury might also conclude that there is a possibly truthful one.

**2.     Mr. Stover's answer to the question is not necessarily inconsistent with the government's proffered sole basis for concluding that answer was false.**

For the same reasons, it is illogical to infer that Mr. Stover's answers to the government's questions are false simply by accepting the existence of a neutral safety policy to announce the presence of all non-employee site visitors, because one can believe both pieces of evidence, *i.e.*, notwithstanding the government's argument they are *not* mutually exclusive.

The problem with the government's argument is that the indictment alleges that Mr. Stover stated that:

> Performance had a practice and policy that forbade security guards at the Upper Big Branch Mine from *giving advance notice of inspection by* prohibiting the *announcement of the presence of MSHA inspectors* at the Upper Big Branch Mine.

(emphasis added) and *not* that:

> Performance had a practice and policy that forbade security guards at the Upper Big Branch Mine from announcing the presence of anyone at the Upper Big Branch Mine.

even if such policy swept in, *inter alia*, MSHA inspectors.  The government accuses Mr. Stover of saying the former, while only offering as an explanation for how this is false its suggestion that it will disprove the latter at trial.  There is simply no inconsistency between the Mr. Stover's answers and the guard's explanation of UBB's safety policy.  As a matter of law, the government has failed to allege the making of a false statement under § 1001.

**3.     Conclusion.**

If a person does not like a movie after seeing its trailer, he can safely conclude that there is absolutely no reason whatsoever to waste time watching the movie.  After all, we expect a producer to put his movie's very best material into its trailer.  The same is true in the context of criminal indictments, where we also expect the government to put its "very best

material" into its indictments.  In fact, unlike the producer, who must use real material from his movie, the prosecutor even gets to populate the indictment with his own characterizations of the evidence, unrestrained from having to use the real evidence.  More important than that logical inference, unlike the producer, the Due Process and Indictment clauses *require* prosecutors to allege facts sufficient to satisfy the elements of each crime charged.

Here, the government has alleged that Mr. Stover made a statement—specifically that he gave certain answers to certain questions—and it has alleged that those statements were false—specifically because statements made by others provide what the government says is a factually inconsistent characterization of the same circumstances.  The government has even given in the indictment its own interpretation, its own impression, of those items, *i.e.*, its "very best material."  But even accepting both the accuracy of this "very best material," the government has failed to allege the elements of a § 1001(a)(2) violation because the questions asked and the answers given were too ambiguous to support a conviction for making a false statement, and because a reasonable finder of fact could *simultaneously* accept *both* what the government alleges Mr. Stover said *and* what the government alleges the other guards said.  In other words, the government has failed as a matter of law to allege that what Mr. Stover said was even false.  The trailer unequivocally shows that there is no need to waste time watching the whole movie, and Counts One and Two of the superseding indictment must be dismissed.

**B.      The indictment does not allege any factual basis to meet "knowingly."**

As used in criminal statutes, "knowingly" means that the defendant must have factually known that his conduct would satisfy the elements of the offense (even though in some cases he need not necessarily know that they were elements of the charged offense).  For example, if the law proscribes breaking out of jail, then an incarcerated person need only know that it is substantially certain that his conduct would result in his being out of jail (but, unlike

willfully, not that escape is illegal).  *See Bryan v. United States*, 524 U.S. 184, 192-93 (1998)

("As Justice Jackson correctly observed, 'the knowledge requisite to knowing violation of a

statute is factual knowledge as distinguished from knowledge of the law.' . . .  Thus, unless the

text of the statute dictates a different result, the term 'knowingly' merely requires proof of

knowledge of the facts that constitute the offense.") (footnotes and citations omitted).

    The instant indictment alleges (even if incorrectly) that Stover knew that his

statements were false, meeting the "knowingly" requirement as to falsity.  But the indictment

does *not* allege that Stover knew his statements were material, *i.e.*, that they had the capacity to

deceive someone, as the plain language of the statute requires:[21]

> Except as otherwise provided in this section, whoever, in
> any matter within the jurisdiction of the executive, legislative, or
> judicial branch of the Government of the United States, knowingly
> and willfully . . . makes any materially false, fictitious, or
> fraudulent statement or representation . . . shall be [punished] . . . .

---

[21] The government will undoubtedly point to its parroting of the statutory keywords "knowingly" (and "willfully") in the indictment and say that is enough.  That is not enough.  These *mens rea* requirements are as much a part of the elements of the offense charged in Counts One and Two as actual falsity and materiality are.  They must, therefore, be *properly* alleged in the indictment.  Other than repeating the shibboleths, however, the government has not put Mr. Stover on notice as to what alleged facts constitute evidence of these elements.  *See, e.g.*, *United States v. Adams*, 83 F.3d 1371, 1374 (11th Cir.) ("An indictment . . . is sufficiently detailed if it: (1) contains *the essential facts underlying **each element of the offense***, such that the defendant is properly informed of the proof he must meet, and (2) is specific enough to permit the defendant to use it to protect himself from a subsequent prosecution for the same offense.  *Russell v. United States*, 369 U.S. 749, 763-64 (1962).") (emphasis added) (parallel citations omitted); *cert. denied*, 519 U.S. 973 (1996);  *United States v. Floresca*, 38 F.3d 706, 717 (4th Cir. 1994) (approving indictment as long as it "set out the elements of [the charged] provision, and *alleged facts meeting **each element of the provision**, and therefore constituting a violation of that provision*") (emphasis added);  *United States v. Maney*, 226 F.3d 660, 664-65 (6th Cir. 2000) (finding indictment valid only because it "*provides facts **for each required element*** and includes specific facts, such as the date and place of the attempted escape and that he was in custody pursuant to federal law while awaiting sentencing on federal felony charges, so that Maney was informed of the specific escape charge brought against him and the government's basis for bringing such a charge against him");  *United States v. Atchison*, 524 F.2d 367, 370 (7th Cir. 1975) ("An indictment is sufficient if[, *inter alia*,] it states *the essential facts underlying **each element of the offense charged***") (emphasis added); *cf. United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) ("[S]imply parroting the language of the statute in the indictment is insufficient.").

18 U.S.C. § 1001(a)(2).  It is well-settled that "false" and "material" are elements of a § 1001 violation.  And it is beyond cavil that "knowingly" (and, as discussed later, "willfully") apply to the "false" requirement that follows them in the sentence.  There is simply no reason not to apply them to the "materially" requirement that is in the very same place in the same sentence, or else the statute would say "knowingly makes any false statement, which statement just happens to be material."  Although Defendant acknowledges that the issue is unsettled among the circuits, it is clear that those courts that have concluded that "knowingly" does not apply to "materially" have incorrectly disregarded the clear language of the statute and misapplied the case law.

The confusion flows initially from *United States v. Yermian*, 468 U.S. 63 (1984), where the Supreme Court held that § 1001's federal-government-involvement requirement (*i.e.*, that the conduct be "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States") was merely jurisdictional, assuring the constitutionality of the statute.  Thus, the prosecution need not prove that the defendant knew of the federal government's role in the transaction.[22]

It is clear that the sole focus of *Yermian* was the federal government's role (and the defendant's knowledge thereof), ***not*** the scope of the "knowingly and willfully" requirements any more broadly or generally.  **That is all *Yermian* held.**  Those courts that later went on to rely on *Yermian* for the proposition that the prosecution need not prove knowledge of materiality *at*

---

[22]    A formidable (and curiously-aligned) four-justice minority in *Yermian* expressed grave reservations about allowing § 1001 to be used in cases where the defendant was unaware of the federal government's involvement.  *See Yermian*, 468 U.S. at 82 (Rehnquist, J., dissenting, joined by Brennan, Stevens, and O'Connor) (discussing changes to statute:  "It seems to me highly unlikely that, without so much as a hint of explanation, Congress would have changed the statute from one intended to deter the perpetration of deliberate deceit on the Federal Government, to one intended to criminalize the making of even the most casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function.  The latter interpretation would substantially extend the scope of the statute even to reach, for example, false statements privately made to a neighbor if the neighbor then uses those statements in connection with his work for a federal agency.").

*all* have completely ripped *Yermian* loose from its mooring.  With all due respect—but with nonetheless careful scrutiny—those cases (and the parallel ones regarding "willfully," discussed below) can easily be seen as misapplying a Supreme Court case that simply did not hold what they needed it to hold.[23]

Stated simply, stripping "to the federal government" from "knowledge of materiality to the federal government" does not leave nothing at all.  It still leaves "knowledge of materiality"—*i.e.*, knowledge that the false statement might be harmful in the real world because it had the natural capacity to sway *someone*.  Courts holding otherwise have disregarded both Congress' clear wording and the Supreme Court's careful language.  Indeed, *Yermian* requires **exactly the opposite result**:  *i.e.*, it requires reading the *mens rea* elements as not restricted to "the federal government."   It does not, however, allow—much less require—reading those requirements partially out of the statute.  "Knowingly and willfully" are still there;  it is only the specific jurisdictional involvement of a federal agency alone that we must temporarily put our hand over when reading the *mens rea* requirements.

Because the government failed to allege that Stover knew that his statements were material, the indictment fails to allege an element of a violation of § 1001.

---

[23]     In *United States v. Notarantonio*, 758 F.2d 777 (1st Cir. 1985), for example, decided right after *Yermian*, the First Circuit stated in a footnote:

> The evaluation is with respect to the defendant's knowledge of the falsity of the statements rather than with respect to the defendant's knowledge of the statement's materiality **to the federal agency involved**.  *See* [*Yermian*].

758 F.2d at 785 n.4 (emphasis added).  As completely stated, this summary of *Yermian* is accurate.  But as later restated out of context, it is inaccurate.  *See, e.g., United States v. Boulerice*, 325 F.3d 75, 82 (1st Cir. 2003) (citing footnote 4 in *Notarantonio* for the incorrect proposition that "[a]lthough the government had to prove to the jury the materiality of Boulerice's false statements, the government did not have to prove her knowledge of the materiality.").  Why the *Boulerice* court decided to drop "to the federal agency involved" from its earlier *Yermian*-based formulation is unclear, but it is nonetheless clearly wrong.

**C.**      **The indictment does not allege any factual basis to meet "willfully."**

As used in criminal statutes, "willfully" means more than "knowingly."  And in § 1001, it means two things: (1) that the defendant knew that his conduct was unlawful (and as explained below, that he knew his conduct violated § 1001), and (2) that the defendant had the specific intent to deceive someone.[24]

**1.**      **The indictment does not allege that Mr. Stover knew his conduct was unlawful, much less that it violated § 1001.**

At the very least, "willful" conduct is more culpable than "knowing" conduct. "[T]he criminal law 'willfully' typically narrows the otherwise sufficient intent, making the government prove something extra . . . ."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 60 (2007). That "something extra" is the defendant's knowledge that his conduct was unlawful (even if, in *some* cases, only generally so):

> The word "willfully" is sometimes said to be "a word of many meanings" whose construction is often dependent on the context in which it appears.  Most obviously it differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind. . . .  As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose."  **In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."**  *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

*Bryan*, 524 U.S. at 191-92 (emphasis added) (citations and footnotes omitted).  *See, e.g.*, *United States v. Barham*, 595 F.2d 231, 245 (5th Cir. 1979) (approving jury instruction, "To participate knowingly and willfully means to participate voluntarily and understandingly, and with the specific intent to do what the law forbids, or with the specific intent to fail to do what the law

---

[24]      Defendant accepts *arguendo* that although the government must be the "jurisdictional victim" of such deceit, a § 1001 defendant need not have intended to deceive the government specifically.  That requirement is satisfied as long as he intended to deceive.

requires; that is to say, to participate *with the motive or purpose to disregard the law.*")
(emphasis added).

> Post-*Bryan*, our court of appeals has reiterated this position:
>
> > Moreover, "willfully" has been held to denote a mental state of greater culpability than the closely related term, "knowingly." "Knowingly" typically refers only to one's knowledge of *the facts* that make his conduct unlawful, not to one's knowledge of *the law*. *See Bryan*, 524 U.S. at 193; *United States v. Bailey*, 444 U.S. 394, 404 (1980) (finding that a prison escapee acted "knowingly" because he "knew his actions would result in his leaving physical confinement"). Whereas "willfully," especially when used in a criminal statute, usually requires a showing of a "bad purpose"—proof that " 'the defendant acted *with knowledge that his conduct was unlawful.*' " *Bryan*, 524 U.S. at 192 (emphasis added) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

*RSM, Inc. v. Herbert*, 466 F.3d 316, 320-21 (4th Cir. 2006) (emphasis in original) (citations, parallel citations, and footnote omitted). Thus, at the very least, the government must allege and prove "knowledge that the conduct is unlawful." *Bryan*, 524 U.S. at 196.

In *Bryan*, the Court concluded that under the circumstances of that case (an 18 U.S.C. § 924(a)(1)(D) violation), "knowledge that the conduct is unlawful is all that is required." 524 U.S. at 196. But it was careful to point out that in other cases, "willfully" requires knowledge not just of general illegality but that the conduct violated the statute charged:

> In certain cases involving willful violations of the tax laws, we have concluded that the jury must find that the defendant was aware of the specific provision of the tax code that he was charged with violating. *See, e.g., Cheek v. United States*, 498 U.S. 192, 201 (1991). Similarly, in order to satisfy a willful violation in *Ratzlaf*, we concluded that the jury had to find that the defendant knew his structuring of cash transactions to avoid a reporting requirement was unlawful. Those cases, however, are readily distinguishable. Both the tax cases and *Ratzlaf* involved highly technical statutes **that presented the danger of ensnaring individuals engaged in apparently innocent conduct**. As a result, we held that these statutes "carv[e] out an exception to the

traditional rule" that ignorance of the law is no excuse and **require that the defendant have knowledge** *of the law*.

*Bryan*, 524 U.S. at 194-95 (emphasis added) (parallel citations and footnotes omitted).

As discussed at the outset, Justice Ginsberg's concurrence in *Brogan* could not make it any more perfectly clear that § 1001 is just such a statute, fraught with the danger that an individual will engage in conduct that he is unaware is unlawful, much less a serious felony. If a § 1001 violation does not fall within the exception described in *Bryan*, it is difficult to imagine any other statute doing so.[25]  Therefore, because the indictment does not adequately allege the element of "willfully" making a false statement (either that the alleged conduct violated § 1001 specifically or, at the very least, was unlawful generally), Count One must be dismissed.

### 2. The indictment does not allege that Mr. Stover had the specific intent to deceive *anyone*.

As with the "knowingly material" issue, *supra*, courts held pre-*Yermian* that intent to deceive was an element of a § 1001 violation. *See, e.g.*, *United States v. Dothard*, 666 F.2d 498, 503 (11th Cir. 1982) ("Proof that the defendant has the specific intent to deceive by making a false or fraudulent statement is a prerequisite to a conviction under 18 U.S.C. § 1001. *United States v. Lange*, 528 F.2d 1280, 1286 (5th Cir. 1976).").

After *Yermian*, a few of them incorrectly backtracked based on the same problematic passage discussed above (*i.e.*, "Noticeably lacking from this enactment is any

---

[25]     The Fourth Circuit's last pronouncement on this question is now of uncertain force. In *United States v. Daughtry*, 48 F.3d 829 (4th Cir.), *vacated on other grounds*, 516 U.S. 984 (1995), *adhered to on remand*, 91 F.3d 675 (4th Cir. 1996), the court refused to apply *Ratzlaf* in a § 1001 case, concluding that "[n]othing in the language or structure of § 1001 indicates that one may violate § 1001 only by acting with knowledge of the existence of the law and an intent to violate or disregard it." *Id.* at 831. But this conclusion assumed that "willfully" in a criminal statute did not *already* mean those two things—a position that *Bryan* squarely rejected a few years later. (*Daughtry* also suffers from exactly the same out-of-context extension of *Yermian* already discussed. *See* 48 F.3d at 832.)  Futhermore, *Daughtry* was decided *before* Justice Ginsberg's discussion in *Brogan* of when it is appropriate to require knowledge of the specific legal proscription at issue. *Daughtry*, therefore, is no longer good law to the extent that it holds that "willfully" in § 1001 does not require either an intent to violate the law generally as required by *Bryan*, or a specific knowledge of and intent to violate § 1001, as described in the *Brogan*.

requirement that the prohibited conduct be undertaken with specific intent *to deceive the Federal Government*, or with actual knowledge that false statements were made *in a matter within federal agency jurisdiction*."   468 U.S. at 73 (emphasis added)).   *See, e.g.*, *United States v. Gonsalves*, 435 F.3d 64, 72 (1st Cir. 2006) ("[Previous] cases associate [§] 1001 with an 'intent to deceive' requirement.  Our more recent decisions impose no such requirement but do say that the false statement must be made knowingly and willfully.  Normally, the more recent cases would control, but in this instance they govern also because the Supreme Court has itself rejected the claim that an 'intent to deceive' is required.  *See* [*Yermian*]") (citations omitted).

As discussed, however, the Supreme Court most certainly did ***not*** "reject[] the claim that an 'intent to deceive' is required."  It only rejected the claim that an intent to *deceive specifically the federal government* was required, leaving the intent-to-deceive element otherwise intact.  As discussed earlier, the sole focus in *Yermian* was on whether the defendant need know that the matter was one within the jurisdiction of *the federal government*.  Thus, the passage "specific intent to deceive the Federal Government" should be read with stress on that issue: "specific intent to deceive *the Federal Government*."  That the Court rejected this as a requirement does not then lead to the conclusion that the Court entirely rejected intent to deceive.  The order of the wording of the statute (placing the *mens rea* element ahead of both the materiality and falseness requirements) requires that the former applies to both of the latter.

Furthermore, other courts have gotten this right, saying post-*Yermian* that intent to deceive *is* an element of a § 1001 violation—even if intent to *defraud* (*i.e.*, to specifically deprive someone of a right by such deception) might not be.[26]

---

[26]     *See, e.g.*, *United States v. Shah*, 44 F.3d 285, 289 (5th Cir. 1995) ("With regard to the 'requisite specific intent,' we have observed, 'A false representation is one . . . made with an intent to deceive or mislead.'  In words more relevant to this case, the district court correctly instructed the jury that the government must prove 'that the defendant made the false statement for the purposes of misleading the

Intent to deceive remains a "strict requirement" of "willfully" and thus of a § 1001 violation. Because the indictment fails to allege intent to deceive, Count One fails to allege a § 1001 violation and must be dismissed.

_____

General Services Administration.' ") (citations and parallel citations omitted) (alterations in original); *see also id.* at n.7 ("Section 1001, however, 'does not require an intent to defraud—that is, the intent to deprive someone of something by means of deceit.' ") (citation omitted); *United States v. Boffil-Rivera*, 607 F.3d 736, 741 (11th Cir. 2010) ("For purposes of the statute, the word 'false' requires an intent to deceive or mislead."); *United States v. Geisen*, 612 F.3d 471, 485-88 (6th Cir. 2010) ("Consequently, to establish a violation of § 1001, the Government must prove beyond a reasonable doubt that the statement was made with knowledge of its falsity, and an intent to deceive.") (citations, quotations, and alterations omitted), *cert. denied*, 131 S. Ct. 1813 (2011).

To whatever extent the Fourth Circuit appears to be in the former camp, this position can no longer withstand scrutiny. In *Nilson Van & Storage Co. v. Marsh*, 755 F.2d 362 (4th Cir.), *cert. denied*, 474 U.S. 818 (1985), the Fourth Circuit had said:

> Our very recent decision in *United States v. Norris*, 749 F.2d 1116 (4[th] Cir. 1984) decides . . . both that (1) "[t]here is no requirement that the false statement *influence* or effect the decision making process *of a department of the United States government*," 749 F.2d at 1121, *so that fraudulent intent is not a necessary element of the crime*, and (2) "[m]ateriality is a question of law to be determined by the trial judge," 749 F.2d at 1122.

*Id.* at 367 (emphasis added). The Supreme Court would later reject proposition (2) in *Gaudin*. And proposition (1) is a *non sequitur* for two reasons. First, the absence of a requirement that a statement *did* "influence" the recipient (as stated in *Norris*) is not the same as the absence of a requirement that it was "intended to influence" the recipient. The latter applies to the defendant's desired goal; the former applies only to how good a job he did. And second, as already discussed, the lack of a requirement that a statement was intended to influence *the government* is not the same as the lack of a requirement that it was intended to influence, period—a broader requirement that ensures materiality. The Fourth Circuit would later cite *Nilson Van* as supporting the lack of a requirement that the defendant intended to *deceive*:

> Although we have not previously addressed the question whether lack of intent to deceive is a valid affirmative defense in a prosecution under § 1014, *we have expressly held that intent to deceive is immaterial in a prosecution under the general federal criminal fraud statute*, 28 [*sic*] U.S.C. § 1001. [*Nilson Van*]. The language and purposes of the two statutes provide no apparent reason for reaching a different conclusion here. Moreover, in light of the fact that some of the federal fraud statutes do specifically condition criminal liability on the specific intent to defraud or to deceive, we must assume that the absence of any such requirement in § 1014 reflects a purposeful choice by Congress. *Cf.* [*Yermian*] (reinforcing conclusion that § 1001 lacks requirement of specific intent to deceive by reference to unenacted version of statute that contained such a requirement).

*United States v. Sparks*, 67 F.3d 1145, 1152 (4th Cir. 1995) (citations and footnote omitted).

But this conclusion, too, is also a *non sequitur*. First, *Nilson Van* did **not** hold that "intent to *deceive* is immaterial in a prosecution under the general federal criminal fraud statute." It held that intent to *defraud* was immaterial. The two are very different. Second, the court makes the same *Yermian* mistake as others, improperly focusing on the intent element, rather than the role of the federal government as a jurisdictional element, the issue to which *Yermian* was squarely limited.

## III. CONCLUSION

The indictment alleges that Hughie Elbert Stover told FBI and MSHA investigators that his company forbade providing advance warning of impending MSHA inspections by announcing the presence of MSHA investigators.  The government says this is false because the mine's guards described that the company had a safety policy of announcing site visitors.  The government's questions (and, thus, Mr. Stover's answers thereto) are ambiguous, and they are not necessarily mutually exclusive with the sole basis the government alleges to show falsity—as required to make out a violation of 18 U.S.C. § 1001(a)(2).  Even accepting every factual allegation in the indictment as true, no jury could possibly find that Stover violated § 1001.  Furthermore, the indictment fails to fully allege the "knowingly" or "willfully" *mens rea* elements of § 1001.[27]

Accordingly, Defendant requests the Court to **GRANT** his motion and to **ORDER** that Counts One and Two of the indictment against him be **DISMISSED**.

**HUGHIE ELBERT STOVER,**
By Counsel

/s/ Robert L. Bailey
William D. Wilmoth, Esq. (W. Va. Bar No. 4075)
William J. O'Brien, Esq. (W. Va. Bar No. 10549)
Robert L. Bailey, Esq. (W. Va. Bar No. 8902)
1233 Main Street Suite 3000
P. O. Box 751
Wheeling, WV 26003-0751
Telephone:     (304) 233-0000
Facsimile:     (304) 233-0014
*Counsel for Defendant*

**STEPTOE & JOHNSON PLLC**
*Of Counsel*

---

[27]     *See also Brandon*, *supra*, 298 F.3d at 310 ("[S]imply parroting the language of the statute in the indictment is insufficient.  When the words of a statute are used to describe the offense generally, they 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'  Thus, the indictment must also contain a statement of the essential facts constituting the offense charged.' ") (citations and emphasis omitted).

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**At Beckley**

**UNITED STATES OF AMERICA**

**CRIMINAL NO. 5:11-CR-00038**

*v.*
**Judge Berger**

**HUGHIE ELBERT STOVER**

### CERTIFICATE OF SERVICE

      I hereby certify that on the 21st day of June 2011, I have electronically filed "*Defendant's Motion to Dismiss Counts One and Two of the Superseding Indictment*" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> R. Booth Goodwin, II
> Blaire L. Malkin
> Steven R. Ruby
> United States Attorney
> Southern District of West Virginia
> 300 Virginia Street, East, Room 4000
> Charleston, West Virginia  25301

/s/ Robert L. Bailey

5789786

873440.00001