**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**At Beckley**

**UNITED STATES OF AMERICA**

**CRIMINAL NO. 5:11-CR-00038**

*v.*

**Judge Berger**

**HUGHIE ELBERT STOVER**

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITAL**
**OR IN THE ALTERNATIVE NEW TRIAL**

**I. COUNT ONE**

A.     **Factual Background.**[1]

1.     **Before April 5, 2010.**

In 1999, some thirteen years ago, Performance Coal Company hired Hughie "Elbert" Stover to be the company's chief of security.[2]  One of Elbert's first official acts in that capacity was to put an end to a practice that he believed violated the proscription against advance notice set out in 30 U.S.C. § 820(e) ("§ 820(e)"):[3]  *i.e.*, the guards telephoning the mine to tell them that government inspectors were on their way.[4]  Although the guard on duty at the time that Elbert stopped the practice initially balked, Elbert made it clear that the practice "was not acceptable,"[5] that any guard continuing to do it "will no longer be employed here,"[6] and that if anyone had a problem, they could take it up with Elbert personally.[7]  A week later,

---

[1]     The following evidence was not contradicted at trial.

[2]     (Tr. vol. 3 at 163.)

[3]     "Unless otherwise authorized by this chapter, any person who gives advance notice of any inspection to be conducted under this chapter shall, upon conviction, be punished by a fine of not more than $1,000 or by imprisonment for not more than six months, or both."  30 U.S.C. § 820(e).

[4]     (Tr. vol. 3 at 163-64.)

[5]     (*Id.*)

[6]     (*Id.*)

[7]     (*Id.*)

Performance's then president, Chris Sloan, asked Elbert if he had ordered the practice ended, and

Elbert answered that he had because he believed it to be illegal.[8]  Sloan asked for a copy of the

new written policy, which Elbert provided, and "nothing was ever said after that."[9]

Later that year, the senior vice-president of Massey Coal (Performance's parent

entity) sent Elbert a corporate policy designed to let Performance's security force know about the

presence of all visitors (*i.e.*, persons other than employees of Performance and its affiliates) on

the company's property.[10]   Under this policy, every visitor's name, employer, and destination

were transmitted on the two radio channels that Elbert and his guards monitored[11]—the

"security" channel and the "Montcoal" channel[12]—except that no one was told (in fact, no one

even asked for) the inspectors' destinations in order not to run afoul of § 820(e).[13]  "Vendors,

salespeople, MSHA, state, just anybody that wasn't — I mean, it wasn't anybody in particular.

It was anybody that wasn't an employee of Performance Coal."[14]  Elbert asked whether the new

---

[8]      (*Id.* at 168-69.)

[9]      (*Id.*;  *accord* Tr. vol. 3 at 10-12 (FBI Agent Prudent) (same).)

[10]     (*See, e.g.*, Tr. vol 2 at 155-56 (security guard T. Wingo) ("Q And who is Drexel Short? We saw a
memo, a 1999, I believe, memo from Drexel Short. Who is he?  A: I think Drexel Short's last title was
Senior VP. I, I'm not real sure what his title was. He was upper management.  Q: He was somewhere
above you and Mr. Stover on the organization chart; right?  A: I would consider him the, our upper
echelon management.  Q: Okay. And his was the instruction in writing about what you were to do on the
radio channel; correct?  A: Yes, that was the memo that I looked at earlier.  Q: Right. And you weren't
supposed to call out the location of where the inspector was going, but otherwise you were to announce
them just like a vendor?  A: I announced their last name, the agency they were with, and that they were on
the property, the time and that they were on the property.").)

[11]     (*See id.*;  Tr. vol. 3 at 24 (J. Williams testifying for prosecution about radio practice).)

[12]     The "security channel" was only monitored by the security guards and perhaps a few people in
upper management.   The "Montcoal channel" was a radio channel that, according to the indictment,
"could be heard by individuals working in the Upper Big Branch Mine office." (Indictment at Count Two
¶ 4.)  The guards were occasionally forced to use the Montcoal channel when the security channel went
out of service.  (Tr. vol. 2 at 133 (T. Wingo) ("If our repeater went down, we would use the Montcoal.").)

[13]     (*See, e.g.*, Tr. vol. 2 at 129 (T. Wingo) (for inspectors, listed destination only as "property").)

[14]     (Tr. vol. 2 at 201 (G. Clay testifying for prosecution, describing practice).)

policy complied with the law, and he was again assured by the company's president that Massey's attorneys had blessed it as compliant.[15]

On one occasion many years later, a Mine Safety and Health Administration ("MSHA") inspector named Lyall opined to one of Performance's guards (Charles Lilly) during a visit that the radio transmission policy constituted advance notice, presumably in violation of § 820(e).  Lilly wrote an incident report.  Concerned, Elbert forwarded Lilly's report to the new company president, who also again personally assured Elbert that the corporate attorneys were certain that the MSHA inspector was in err and that the radio transmission policy was lawful.[16] Apparently those attorneys were correct:  There have been MSHA inspectors at Performance's mine site practically every day since at least 1999[17]—inspectors that were, as MSHA's Administrator for Coal Mine Safety and Health, Kevin Stricklin,[18] testified at trial, duty-bound to report and issue citations for *all* violations.[19]  Nonetheless, no Performance employee has *ever* been cited for violating § 820(e), nor has Performance itself ever been so cited.[20]  As far as Elbert knew, that issue, too, never came up again.[21]

---

[15]     (Tr. vol. 3 at 165 ("I took it to my boss which was Chris Slone [*sic*] at the time.  He was president of Performance. I asked him, I said, 'Have you seen this?'  He said, 'Yes.'  I said, 'Is this legal?'  He said, 'Our lawyers told me this was legal.'  I said, 'Well, I just want to make sure because security does not do anything illegal.'. . . Said it was legal.  If we called out everybody that come on the property, then it would — it was — it would be legal to notify them when inspectors come on the property.").)

[16]     (*See, e.g.*, Tr. vol. 2 at 221-22 (Charles Lilly).)

[17]     (*See, e.g.*, Tr. vol. 2 at 46 (Kevin Stricklin) ("Q: So, there would be inspectors — most days there would be some inspector on the UBB property before and after the explosion; correct?  A: Yes, sir.").)

[18]     (Tr. vol. 2 at 31.)

[19]     (Tr. vol. 2 at 47-50 ("Q: And in the Mine Act is there not a requirement that each inspector write up every violation that he or she sees?  A: Yes, sir.").)

[20]     (Tr. vol. 2 at 63 ("Q: Would you agree with me, sir, that if one of your inspectors went through the gate and heard security officers notifying or announcing their presence on the radio that their obligation would have been to write such a citation if they thought one existed?  A: Yes, sir.").)

[21]     (Tr. vol. 3 at 167 ("Q: Did there ever come any other times when your security officers questioned the legality of the announcement plan?  A: Not that I recall.").)

At trial, the government introduced several witnesses who had been employed at the mine (in roles unrelated to the security department) who said that when they overheard one of these radio transmissions, they would surreptitiously signal to the mine the presence of an inspector on site.[22]   During its closing, the prosecution reminded the jury that they had "heard from Mr. Clay and from Ms. Pauley that they listened to those transmissions and they sent the word underground that inspectors were on the property."[23]

While it is quite possible that these dispatchers' practices violated 30 U.S.C. § 820(e),[24] the *sole* evidence—evidence from the government's own witnesses—was that *Elbert had no idea about any of this*:

A    The announcement would come across the radio and just anybody that was there in the office would hear it.  If an inspector come on the property, they would tell me to turn the light on for underground and just let the guys underground know that an inspector was on the property.

Q    Who, who would instruct you to turn the light on?

A    **The superintendent, the mine foreman.**
* * * *
Q    Okay. I believe you told Ms. Malkin that you got your instructions on calling underground **from the superintendent or the mine foreman**.

A    Correct.  That's normally who they traveled with was the mine foreman or the superintendent.

Q    I read the transcript of your Mine Academy testimony, and you said there that those instructions [to call underground] would come **from upper management**.
* * * *
A    Yes.

---

[22]    (Tr. vol. 2 at 183-88 (B. Pauley) & 198-204 (G. Clay).)

[23]    (Tr. vol. 4 at 35 ("You heard from Mr. Clay and from Ms. Pauley that they listened to those transmissions and they sent the word underground that inspectors were on the property.").)

[24]    We will never know, because like many of their witnesses, the government had the luxury of obtaining this testimony in exchange for the witnesses' immunity from prosecution.

> Q     And by upper management, were you referring to the superintendent or the mine foreman?
>
> A     Correct.
>
> * * * *
>
> Q     Would you consider Elbert Stover upper management in that instance?
>
> A     In calling underground?
>
> Q     Yes, sir.
>
> A     **Elbert Stover never had me to call underground.**
>
> Q     Thank you, sir.

(Tr. vol. 2 at 209 (Gregory Clay).)[25]

In fact, as Clay admitted, but for what these two dispatchers said was their own practice of warning the mine about inspectors via clandestinely signaling underground, the mine would never have known of the inspectors' presence, because the security guards' radio transmissions could not possibly reach underground, and the guards had no way to notify the mine about inspectors:

> Q     Do you know whether a security officer ever called underground to announce an inspector?
>
> A     No, not to my recollection, no.
>
> Q     As far as you know, they don't even have the equipment to do that, do they?
>
> A     No, they do not.
>
> Q     Okay. So, but for the dispatchers calling underground, would the miners ever know that an inspector was on the property just by the two-way radio announcement?

---

[25]     (See also Tr. vol 2 at 115 (Quincy Burgess) ("Q: In your testimony you said that you were uncomfortable with the, the idea of making these announcements; correct?  A: Correct.  Q: Did you ever express that discomfort to Mr. Stover?  A: No, sir.").)

5

A       The underground miners, no.

Q       So, they, they can't hear the two-way radio?

A       No.

(Tr. vol. 2 at 206.)

During his opening statement, the prosecutor wrongly suggested that there was some nexus between Elbert and those dispatchers' practice of misusing the all-visitors radio transmissions to warn the underground miners.[26]  But like many of the promises made in that opening argument and in the indictment, the government never delivered.  In fact, as noted, the sole evidence is completely to the contrary.  *All* of this evidence regarding the dispatchers' mischief was completely irrelevant to proving any element of the charges *against Elbert Stover*, because it remains *undisputed* that *as far as Elbert ever knew, no one ever called the mine to advise them of the presence of inspectors*.

### 2.       After April 5, 2010.

On April 5, 2010, the unthinkable happened:  A terrible disaster occurred at the Upper Big Branch ("UBB") mine, an explosion that killed twenty-nine miners and changed the face of coal mining forever.[27]  Immediately, the United States launched an investigation into the tragedy.[28]  Separately, an attorney from Massey's legal department sent out an internal "litigation hold" memorandum in order to preserve any documents that might be relevant to any subsequent

---

[26]     (*See, e.g.*, Tr. vol. 2 at 15-16 ("How does that word get passed?  Well, the dispatchers.  *The dispatchers work at the mine office.  And at the Upper Big Branch property, that mine office, which is right next to the portal or the entrance into the mine, was 1.6 miles away from the gate where the security guard's shack was and his radio*.  When an inspector would show up, it would take a few minutes to get from the shack all the way up to the mine office and then into the, into the mine itself. And during that time, what could happen? Well, dispatchers could announce that — they would hear the transmission on the radio, 'Inspector's on the property.'  And in that interim time until the inspector actually showed up at the portal, they could notify and communicate in some way underground to a working section that an inspector had arrived.") (emphasis added).)

[27]     (Tr. vol. 2 at 10.)

[28]     (*Id.*)

lawsuits.[29]  Elbert read the hold memo and, reasonably believing that it applied to the current year's records—*i.e.*, the ones from around the time of the explosion—and knowing that those records were safely filed in his office, he never gave the memo a second thought.[30]

MSHA eventually conducted hundreds of interviews relating to the UBB explosion,[31] some by having the West Virginia Office of Miners' Health Safety & Training ("WVOMHS&T") issue subpoenas commanding witnesses to appear and testify under threat of punishment, including fines and indefinite incarceration.[32]  Although ventilation was thought to be the cause of the explosion, a prominent issue that arose during MSHA's investigation was whether there had been a violation of § 820(e) at the mine.[33]

On November 30, 2010, MSHA had the WVOMHS&T subpoena Elbert Stover to appear at MSHA's office and testify.  Relevant to this case, the following dialogue took place, on which Count One is based in its entirety:

Q        And how about any specific instructions for visitors?

A        One thing that is hammered in our head, you do not ask inspectors where they're going and you do not call the mines.  You do not *notify* no one when inspectors come on that property.  In fact, that is in our SOP, that you do not *notify* no one.

Q        Can we get a copy of that SOP?

---

[29]      (*Id.* at 19.)

[30]      (Tr. vol. 3 at 153 (H. Stover) ("And, you know, like I said, when I read it, there was just — I file everything anyway, so it just never crossed my mind.").)  (*See also* discussion, *infra* (explaining that this belief would turn out to be eminently well-founded).)

[31]      (*See, e.g.*, Tr. vol. 2 at 88 (T. Watkins testifying to at least 270 interviews).)

[32]      Under West Virginia law, ignoring a (valid) agency subpoena has same results as ignoring a circuit court subpoena.  *See* W. VA. CODE § 29A-5-1(b).  That punishment includes fines and indefinite incarceration.  *See* syl. pt. 7, *State v. Cottrill*, 204 W. Va. 77, 511 S.E.2d 488 (1998).

[33]      (*See, e.g.*, Tr. vol. 3 at 5-6 (FBI Agent Pruden) ("Q: When you came into the case, what particular issues regarding the practices at UBB were on the front burner, so to speak?  A: Well, we were, especially with my assignment, were looking at determining if notification of mine inspectors were being made when they came onto the property.").)

A       I'm sure we, we all have a copy. I know that — I know you-all don't believe this, but as long as I've been with Massey, that's always been the rule.

* * * *

Q       As far as notification when inspectors arrived on the property, I think it was your response that *it's Massey's policy that you don't notify, you don't call ahead of time when inspectors are there*.

A       Yes, sir.

Q       And you said that's in your SOP which Davitt asked for?

A       Yes, sir.

Q       Is [*sic*] there any other instructions that you've been given in that regard?  Is there — did you receive any letter or notification from anybody saying not to do this, e-mails saying —

A       Let me make sure I understand. Are you asking me if I have been instructed in any way, shape, or form to not enforce that rule?

Q       No.  Either way, either to or not to.

A       Yes.  It's in our SOP.

Q       Other than the SOP, is there any other notification that you've been given to either enforce it or not to enforce it either way?

A       The part to enforce it, yes.  That come from upstairs.

Q       Upstairs being?

A       Upper management, Massey Coal Services.

Q       Okay.  Is that a verbal notification or a written notification?

A       It was in writing.

Q       Could you elaborate?  Just — I can go through the question specifically.  You received information from Massey Coal Services with regard to notification issues and with regard to other instructions vis-a-vis inspectors on the property.  Can you tell me what those have been?

A       **It says when inspectors come on the property, you do not call the mines.  You do not notify no one.**

Q        And that's in writing?

A        Yes, sir.

Q        Can we get a copy of that?

A        Yes, sir, as far as I'm concerned.

Q        Are there any other related instructions with regard to inspectors?
         Any other instructions with regard to inspectors?

A        That's it.  **When inspectors come on the job, we do not call the
         mines, do not notify.**

(Tr. vol. 2 at 66-84 (emphasis added) (testimony read into the record by FBI Agent Lafferty).)[34]

As will be demonstrated below, these statements were unequivocally actually true; they were at

the very worst only mistakenly incorrect.

## B.    Procedural Background

On May 17, 2011, the United States indicted Elbert for "False Statement" in

violation of 18 U.S.C. §1001(a)(2) (Count One) and for "Concealment, Cover-Up and

Destination [*sic* Destruction?] of Documents in Federal Investigations" in violation of 18 U.S.C.

§§ 1518 and 2(b) (Count Three), discussed in § II.[35]

Even after the trial and jury verdict against him, it remains unclear precisely what

the government's theory of the case was.  There are two competing candidates, neither of which

was proven at trial.  In the superseding indictment, the government alleged that on November 30,

Elbert "stated and represented . . . that Performance had a practice and policy that forbade

---

[34]      *See also* Superseding Indictment at 4 Count One ¶ 13 (charging that Elbert "stated and
represented to and in the presence of representatives of the Department of Labor and MSHA that
Performance had a practice and policy that forbade personnel at the Upper Big Branch Mine from giving
advance notice of an inspection by prohibiting the security guards from notifying anyone at the mine site
of the presence of MSHA inspectors at the Upper Big Branch Mine") &¶ 14 (alleging that the statements
were false because Elbert "had himself directed and trained security guards at Performance's Upper Big
Branch Mine to give advance notice by announcing the presence of an MSHA inspector on the mine
property over the radio").)

[35]      The government dismissed Count Two immediately before trial.

personnel at the [UBB] Mine from giving ***advance notice of an inspection*** by prohibiting the security guards from notifying anyone at the mine site of the presence of MSHA inspectors at the [UBB] Mine."[36]   The government alleged that it would prove this statement was false by proving that it was inconsistent with reality, which, the government said, was that Elbert "had himself directed and trained security guards at [the UBB] Mine to give ***advance notice*** by announcing the presence of an MSHA inspector on the mine property over the radio."[37]   The government carefully chose to repeat the phrase "advance notice"—the same phrase used in § 820(e)—in both the allegation of Elbert's statement and the allegation of the purportedly inconsistent fact.

By necessity, one of two things is necessarily true.  Either (a) the government intended the phrase "advance notice" in both places in the indictment to have the same meaning it does in § 820(e)—*i.e.*, the government's theory was that Elbert testified that nothing at Performance violated § 820(e)'s proscription against advance notice, but that the all-visitor radio transmission policy actually did violate § 820(e)[38]—or (b) the government did *not* mean this, but instead intended by the term something far broader and less technical—*i.e.*, the government's theory was that Elbert's statement on November 30 was intended to assert that nothing at Performance gave any kind of "notification" whatsoever—no matter how broad, no matter how indirectly, no matter how unintentionally from the guards' perspective—but that the all-visitor radio transmission actually did result in such "notification."[39]

---

[36]     Superseding Indictment at 4 Count One ¶ 13 (emphasis added).

[37]     *Id.* ¶ 14 (emphasis added).

[38]     Suggesting theory (a)'s narrow meaning of "advance notice" are the language of the indictment itself, where the government deliberately chose to use the terminology from § 820(e), and the fact that § 820(e) violations specifically were a focal point of the investigation.

[39]     Suggesting the broader theory (b) on what "advance notice" and "announce" mean are the prosecutor's opening statement and the fact that the government made no effort whatsoever to prove that anything Performance was doing was an § 820(e) violation:

Fatal to its case, though, is that at trial the government *at best* only proved *half* of each theory. The first half of the first theory ("theory (a)") is undisputedly true: *All* of the evidence at trial showed that Elbert intended his statements to mean that as far as he understood the facts, the law, and the terminology and as it all had been explained to him by corporate management and legal counsel, nothing at Performance—including the all-visitor radio transmission policy—gave "advance notice," *i.e.*, violated 30 U.S.C. § 820(e).

And arguably, the government introduced enough evidence for the jury to conclude that the second half of the second theory ("theory (b)") was true: *i.e.*, it is possible that, wholly unknown to Elbert (and certainly wholly unintended by him), some of the mine's dispatchers were misusing the guards' radio transmissions as the first step in a chain of subsequent intervening bad acts that ultimately resulted in miners knowing about the presence of inspectors, such that the radio practice did, if only in this very broad and loose sense, provide some with "notice" of an inspection.

---

What was the truth about the announcement of inspectors? The evidence will show that, in fact, Mr. Stover's security guards did announce the arrival of inspectors. They did that because he trained them to do it. The security guards had been instructed that whenever a state or federal inspector, someone from MSHA, showed up at the main gate at the Upper Big Branch property, they were *to get on a radio and announce* over two different channels, the security channel that Mr. Stover monitored and a channel known as the Montcoal channel which everyone, many people at the mine monitored, including dispatchers at the mine office. And they were to *announce, "MSHA inspector on the property."* They were not to call on the telephone and pick up the phone to the dispatcher and say, "MSHA inspector on the property." That was a no-no. But they were to *call* on the radio. And they justified this by saying, "*We'll just announce everyone* who is not a Massey employee.

\* \* \* \*

And not only did he train his guards to do the *announcement*, he enforced this policy. On February 14th, 2007, he issued a memo that reminded everyone. "Anyone who is not a Massey member has to be *called* out over the radio, not just the inspectors."

(Tr. vol. 2 at 14-16 (emphasis added).) Mr. Stover believes that the government likely intended to pursue theory (b). As demonstrated herein, if that is true, the government failed to prove several elements of its charge (and its theory at trial varied from the one that it gave in the indictment).

But what the government cannot escape is that it introduced *no evidence* at trial to prove the other half of either theory.  Worse than that, the *sole* evidence at trial undeniably *disproved* the other half of *both* theories.

If the government was pursuing theory (a)—*i.e.*, if the government meant "advance notice" in the indictment to mean that the radio policy constituted a § 820(e) violation such that Elbert's statement to the contrary was false—it failed to prove that what Elbert said was in fact false, because it never proved (in fact, it never even tried to prove) that the radio policy did in fact constitute an § 820(e) violation.  Furthermore, it failed (again, it did not even try) to prove that Elbert "knew" that that the radio policy violated § 820(e).[40]

If on the other hand the government intended to press theory (b)—*i.e.*, if the government intended "advance notice" and "notification" and "call" to mean "*any kind*" (words the government used at trial)[41] of heads-up whatsoever no matter how unintended and no matter how many intervening bad actors were required to convert it into something harmful—then Count One still fails, because the government failed to prove that Elbert meant anything nearly so broad (the *only possible* reasonable interpretation of the *sole* evidence being that he did not), the result of which is that the government has again failed to prove actual falsity (because it failed to prove a statement that was inconsistent with its version of the facts).

The Court has thus undoubtedly already picked up on the government's problem: The government impermissibly glued the first half of theory (a) onto the second half of theory (b) in its inexplicable campaign to send Elbert Stover to prison.  Regardless of which theory the government intended to press, Mr. Stover is entitled to be acquitted of the charge in Count One, because it is inescapable that at trial the government necessarily either failed to prove the

---

[40]     Of course, Elbert could not "know" this because it was untrue.

[41]     (*See* discussion *infra* at 30).

eponymous element of making a false statement, *i.e.*, that Elbert made a false statement, or it failed to prove Elbert's knowledge, or both.

### C.    The elements of a § 1001(a)(2) violation.

The United States Code proscribes knowingly and willfully making a materially false statement in a matter within the jurisdiction of the federal government:

> Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be [punished] . . . .

18 U.S.C. § 1001(a)(2).  In a § 1001(a)(2) charge, therefore, the government must prove beyond a reasonable doubt:

> (1) that the defendant made a materially false, fictitious, or fraudulent statement or representation;

> (2) that the defendant did so knowingly and willfully; and

> (3) that the subject matter of the falsity was within the jurisdiction of the executive, legislative, or judicial branch of the United States government.

*See United States v. Arch Trading Co.*, 987 F.2d 1087, 1095 (4th Cir. 1993).[42]

Courts have repeatedly warned of the harm in allowing § 1001 to be used to criminalize conduct by the mere artifice of asking about it:

> I write separately . . . to call attention to the extraordinary authority Congress, perhaps unwittingly, has [in § 1001] conferred on prosecutors to manufacture crimes. . . .   That encompassing formulation arms Government agents with authority not simply to apprehend lawbreakers, but to generate felonies, crimes of a kind that only a Government officer could prompt.
> * * * *
> As [several earlier cases with] not altogether uncommon episodes show, § 1001 may apply to encounters between agents

---

[42]        *See also United States v. David*, 83 F.3d 638, 640 (4th Cir. 1996);  *United States v. Race*, 632 F.2d 1114, 1116 (4th Cir. 1980).

and their targets "under extremely informal circumstances which do not sufficiently alert the person interviewed to the danger that false statements may lead to a felony conviction."  Because the questioning occurs in a noncustodial setting, the suspect is not informed of the right to remain silent.  Unlike proceedings in which a false statement can be prosecuted as perjury, there may be no oath, no pause to concentrate the speaker's mind on the importance of his or her answers.  As in Brogan's case, the target may not be informed that a false [statement] is a criminal offense until *after* he speaks.

At oral argument, the Solicitor General forthrightly observed that § 1001 could even be used to "escalate completely innocent conduct into a felony."  More likely to occur, "if an investigator finds it difficult to prove some elements of a crime, she can ask questions about other elements to which she already knows the answers.  If the suspect lies, she can then use the crime she has prompted as leverage or can seek prosecution for the lie as a substitute for the crime she cannot prove."  If the statute of limitations has run on an offense—as it had on four of the five payments Brogan was accused of accepting—the prosecutor can endeavor to revive the case by instructing an investigator to elicit a fresh denial of guilt.  Prosecution in these circumstances is . . . Government generation of a crime when the underlying suspected wrongdoing is or has become nonpunishable.

*Brogan v. United States*, 522 U.S. 398, 408-12 (1998) (Ginsburg, J., concurring) (footnotes and citations omitted).

Justice Ginsburg found it "doubtful Congress intended § 1001 to cast so large a net."  But that is exactly what has happened here, where the government did not charge Mr. Stover (or anyone else) with violating MSHA's no-notice rule—undoubtedly because the government is aware that it cannot do so (having immunized practically every real wrongdoer that it might have ever prosecuted).  As discussed below, rather than accuse Mr. Stover of warning his coworkers about an imminent MSHA investigation, he is accused only of stating that his company forbade "notifying" or "calling" anyone to warn them of an imminent MSHA investigation—a statement that is, as will be seen later, true.  Instead, the sole purpose of the

indictment against Mr. Stover is to fabricate a bargaining chip that the government can cash in—at Mr. Stover's expense—on its way up the UBB ladder.

> ### D.    The government failed to prove that Mr. Stover's statement was actually false.

Actual falsity is the *sine qua non* of a charge of making a false statement.  In nearly every false statement case, the government opts (as it did here) to prove the falsity of the defendant's statement by trying to prove that accepting the defendant's statement as true is necessarily mutually inconsistent with accepting the government's version of reality as true.[43]  In a hypothetical case, for example, the government might offer evidence that when asked what color the light was when he entered the intersection, the defendant said the light was green, followed by evidence that at the time the light was actually red.  Because the light could not have been both green and red at the same time, the prosecution would then argue, the jury cannot accept both the defendant's assertion and the government's proof.  So if the jury believes the government's version of reality (that the light was red), it must necessarily find the defendant's assertion (that the light was green) to be actually false.

In such a case, the prosecution must first prove what the *defendant* meant to assert—*not* how the *government* interpreted what the defendant said:[44]

> In construing [the defendant's] statements it is well established that we must look to the meaning intended by the appellants themselves, rather than to the interpretation of the statements which the immigration authorities did in fact make, or even to the interpretation which the authorities might reasonably have made.  Under 18 U.S.C. § 1001 a person does not answer official questions at his peril.

---

[43]    *Compare* Superseding Indictment Count One ¶ 13 (alleged statement) with *id.* ¶ 14 (alleged fact).

[44]    Even though the subjective prong of this inquiry is related to the *mens rea* question of whether the defendant knew his assertion was false (indeed, it will likely be inextricably intertwined), the two are not the same.  The former asks what he subjectively meant to assert based on the words he used;  the latter asks whether, accepting what he actually meant to assert, he knew that assertion to be false.

*United States v. Diogo*, 320 F.2d 898, 905 (2d Cir. 1963) (footnote and citations omitted).

>    The *Diogo* panel discussed a good example:

>    Thus, in [*United States v. Lattimore*, 127 F. Supp. 405 (D.D.C.), *aff'd*, 232 F.2d 334 (D.C. Cir. 1955)], the defendant was charged with having perjured himself before a congressional committee when he denied that he was a 'follower of the Communist line' or a 'promoter of Communist interests.'  Dismissing the indictment as unconstitutionally vague the court stated:

>> 'For a jury to conclude that perjury has been committed, in fact, *it must determine what the words meant* **to the defendant** *at the time he offered them as his testimony*, and then conclude that the defendant did not at that time believe in the truth of such testimony according to the meaning he ascribed to the words and phrases he used.
>>                                   * * * *
>> 'While the proper test of perjury is subjective, insofar as it is based upon the understanding of the witness himself regarding the words that he used, a criminal prosecution must have certain objective standards.  Most often in perjury cases the objective standard is not hard to come by;  what the accused considered his statements to mean is not in issue since the words or phrases involved have one clear, accepted and recognized meaning.  *Here, the phrase 'follower of the Communist line' is subject to varying interpretations.  It has no universally accepted definition.  The Government has defined it in one way and seeks to impute its definition to the defendant.  Defendant has declined to adopt it, offering a definition of his own.  It would not necessitate great ingenuity to think up definitions differing from those offered either by the Government or defendant.  **By groundless surmise only could the jury determine which definition defendant had in mind.'**

*Diogo*, 320 F.2d at 905-07 (emphasis added) (footnote and citations omitted).  As explained below, in this quest to ascertain what the defendant meant, any ambiguity in what the defendant said must be resolved in favor of the interpretation that is consistent with the actual facts.

Where (as here) they are available, the defendant's exact words will certainly be important evidence of what he meant.  But because this element requires proving what the defendant subjectively meant, they might not be the only such evidence.  Most obviously, where the statement was solicited by the government's questioning, then the question and the circumstances surrounding its asking, too, must be examined, as must the other circumstances and context, both before and after the statement.

Second, the prosecution must prove the actual state of reality, again applying the parallel rule that any ambiguity therein must be resolved in favor of the interpretation that is consistent with the defendant's intended assertion.[45]  And finally, the prosecution must show that these two things—what the defendant actually meant and what is really true—are *necessarily* inconsistent, thereby inexorably leading to the conclusion that what the defendant meant to assert must *necessarily* be actually false.  Due process and the rule of lenity[46] impose these "necessarily false" requirements.  The prosecution must thus negate any reasonable interpretation of what the defendant said that is consistent with any reasonable interpretation of the facts.  Stated otherwise, if (as here) the government fails to disprove that a reasonable interpretation of the defendant's statement is consistent with a reasonable interpretation of the facts, then any § 1001 charge based thereon necessarily fails.

Here, not just *a* reasonable interpretation of what Elbert Stover said but *the only* reasonable interpretation of what Elbert Stover said is perfectly consistent with not just *a* reasonable interpretation of the facts but *the only* reasonable interpretation of the facts.  Here, all

---

[45]     (*See* discussion *supra*.)

[46]     *Rewis v. United States*, 401 U.S. 808, 812 (1971) ("ambiguity concerning the ambit of criminal statutes . . . be resolved in favor of lenity").

of the evidence showed that Elbert's statement was actually true (but at the very least that if he was wrong, he did not know it).

1.   **The *only possible* reasonable interpretation of what Elbert meant is that as he understood it, nothing at Performance—including the guards' all-visitor radio policy—violated § 820(e).**

The sole evidence at trial was that the first half of theory (a) is unequivocally correct—*i.e.*, that based on the clear meaning of the words that he used and on all of the other evidence at trial—the *only possible* reasonable interpretation of Elbert's statement is that as he understood everything, nothing at Performance, including the guards' all-visitor radio transmission policy, violated § 820(e).

a.   **Any reasonable ambiguity in the government's questions or the defendant's answers must be resolved in favor of the meaning that reconciles his answers with the truth, because the burden of precise questioning is always the government's.**

In order to avoid convicting someone for giving an answer that is only arguably false (*i.e.*, what was done here), "[t]he burden of precise questioning lies with the questioner . . . ."[47]   In *Baer*, for example, when asked on a Secure Identification Display Area ("SIDA") badge application, "During the previous ten years, have you been convicted or found not guilty by reason of insanity of the following listed crimes [including u]nlawful possession, use, sale, distribution, or manufacture of an explosive or weapon[?]," the defendant answered "no," even though he had been convicted of brandishing a firearm.  Although "brandishing" a firearm *might* be understood to be the "use" of a weapon, it need not *necessarily* be so understood.  Thus, the court affirmed dismissal of the indictment.

---

[47]   *United States v. Baer*, 92 Fed. Appx. 942, 944, 2004 WL 491065, at *1 (4th Cir. 2004).

And in *United States v. Good*,[48] the court affirmed dismissal of another indictment where a different SIDA badge applicant answered "No" to, "Have you ever been convicted or found not guilty by reason of insanity of the following listed crimes . . . Burglary, Theft, Armed robbery, Possession or Distribution of Stolen Property . . . Dishonesty, Fraud, or Misrepresentation."[49]   Good had been convicted of embezzling $100,000 just a year earlier. Surely, reasoned the government, embezzlement involved dishonesty, fraud, or misrepresentation.  The court rejected this, however, reasoning that because embezzlement was not a "listed crime," *i.e.*, it was not *necessarily* on the list, Good's answer was literally true, and that charge, too, must fail.[50]

Courts jealously adhere to this rule that the burden of precise, unambiguous questioning and the risk of accepting an answer containing any ambiguity fall squarely and entirely on the shoulders of the investigator to clear up:  "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. . . .  Precise questioning is imperative as a predicate for the offense of perjury."[51]   "[A] literally true but unresponsive answer is to be remedied through the 'questioner's acuity' and not the federal perjury statute."[52] "[A] prosecution for a false statement under § 1001 . . . cannot be based on an ambiguous question where the response may be literally and factually correct."[53]   Where any reasonable

---

[48]      326 F.3d 589 (4th Cir. 2003).

[49]      *Good*, 326 F.3d at 590.

[50]      *See also Bronston*, 409 U.S. at 360-61 ("The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.").

[51]      In this regard, courts apply the same standard to perjury and false statement charges.  *See Good*, 326 F.3d at 592 ("The principle articulated in *Bronston* holds true for convictions under Section 1001 and in this case today.").

[52]      *United States v. Earp*, 812 F.2d 917 (4th Cir. 1987) (citing *Bronston*).

[53]      *Good*, 326 F.3d at 592 (quoting *United States v. Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978)).

interpretation of the question and the defendant's answer thereto are true, he has not violated § 1001—even if a jury could find his answer false under another interpretation.

Imprecise questioning and an ambiguous answer (here, both known only by the government) are precisely what happened in this case.  Where, as here, "the government has created an ambiguity upon which the defendant has reasonably relied in making his statement, the government will ordinarily be unable to negative the defendant's interpretation."[54]

> **b.    No rational jury could have found that Elbert Stover meant anything other than that as he understood the law and meant the terms, nothing at Performance—including the guards' all-visitor radio policy—provided advance notice.**

In the determination of what Elbert's answers to the government's questions meant, we are fortunate to have the exact words:

Q    And how about any specific instructions for visitors?

A    One thing that is hammered in our head, you do not ask inspectors where they're going and you do not call the mines.  You do not *notify* no one when inspectors come on that property.  In fact, that is in our SOP, that you do not *notify* no one.
* * * *
Q    As far as notification when inspectors arrived on the property, I think it was your response that *it's Massey's policy that you don't notify, you don't call ahead of time when inspectors are there*.

A    Yes, sir.
* * * *
Q    Could you elaborate?  Just — I can go through the question specifically.  You received information from Massey Coal Services with regard to notification issues and with regard to other instructions vis-a-vis inspectors on the property.  Can you tell me what those have been?

A    **It says when inspectors come on the property, you do not call the mines.  You do not notify no one.**
* * * *
Q    Are there any other related instructions with regard to inspectors?  Any other instructions with regard to inspectors?

---

[54]    *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991) (citing *Race*).

A  That's it.  ***When inspectors come on the job, we do not call the mines, do not notify.***

(Tr. vol. 2 at 66-84 (emphasis added).)

   It is clear from the face of this testimony that the only possible reasonable interpretation of what Elbert said is that as far as he knew and as had been explained to him by the company's management and attorneys, "notify" and "call" were terms that Elbert understood meant calling someone in the mine to warn them that inspectors were coming in a way that violated § 820(e).  His meaning is thus consistent only with the first half of theory (a), and far narrower than the one that the government apparently assigned to those terms under theory (b) (*i.e.*, a broader lay meaning that might arguably sweep the all-visitor radio transmission practice in, regardless of whether or not it constituted an § 820(e) violation).

   While there was no need to look beyond the November 30 transcript, all of the remaining evidence at trial as to the context and circumstances of Elbert's statements also supported only this interpretation.  Elbert had, for example, personally ended the only practice of "calling" the mine and "notifying" them—the only practice that might have caused any possible violation that he knew about—more than a decade earlier.

   He and the interviewers had just been discussing that practice in the November 30 interview, and that was what he thought he was still talking about:

A  The way I look at it, when the inspectors come on the property — and back when I took over, when they was called, picking the phone up and calling the, whoever answered the phone, superintendent or whoever was at the mines, you know, when you pick the phone up and call a number and somebody answers on the other end and you tell them the inspector's on the property, to me that is advance notice.  When they would notify me on the radio on both channels, you know, there was the opportunity for people to hear what was being said.  But the only person that was notified was me on both channels.

         \* \* \* \*

Q      Okay.  And, so, when you say, "We don't give advance notice,"
       you're telling us your understanding of advance notice; correct?

A      Yes, sir.  To me, advance notice is when they pick them up on the
       telephone and call the mines and actually talk to somebody, tell
       them that the inspector is on the property.

(Tr. vol. 3 at 168.)  The only reasonable interpretation of what Elbert meant by "notify" and

"call" was that they contained an element of intent or directedness, such that even though calling

the mine on the phone might "notify" the mine of the presence of inspectors, someone

eavesdropping on a radio transmissions intended for others did not—especially since it is

undisputed that Elbert was unaware of what the eavesdropper was doing with the information.

       The other guards (*i.e.*, the prosecution's witnesses) shared Elbert's understanding:

Q      Mr. Wingo, I'm going to ask that you turn to Page 16, but we'll do
       it on the screen.  Do you see the second paragraph where it says,
       "At no time will the officer ask the destination of an inspector"?
       Do you see that?

A      Yes, I do.

Q      Then the next line, "The officer will not call any mine operation."
       Do you see that?

A      Yes.

Q      Did you discuss that with the defendant?

A      I haven't discussed this particular paragraph.  I have had
       discussions with Elbert Stover about the announcement of
       inspectors.  It was always practice that we contacted — that we
       announce them over the Montcoal and security frequency.  And at
       no time did he want us to pick up the telephone and advise the
       mine operator.

Q      So, where it says, "The officer will not call any mine operation,"
       what did that mean?

A      To me, that meant by telephone.

Q      Did anyone tell you that?

A      I have spoke [*sic*] to Mr. Stover, and Mr. Stover has stated that.

(Tr. vol. 2 at 135-36 (T. Wingo).)[55]

> Jonathan Williams said the same thing:

Q      Do you recall something in the standard operating procedures or a memo that said the officer will not call any mine operation and inform them that there is an inspector on the property?

A      Yes.

Q      What did you take the call part of that to mean?

A      On the telephone.

Q      So, you didn't think that that included calling out over the radio?

A      Yes.

Q      You, you thought it just meant the phone?

A      Yes.

Q      You were, in fact, trained to use the radio and trained not to call on the phone; isn't that right?

A      Yes.

Q      Did there come a time when you began to think that maybe calling the inspectors along with the visitors on the radio, calling them out on the, on the radio was inappropriate in some way?

A      No. I never thought it was inappropriate myself, but I know there was an issue come up about it or something and whether it was legal or not. . . .

Q      But you never thought it was inappropriate when you did it?

A      No.

---

[55]      (*See also* Tr. vol. 2 at 139 (T. Wingo) ("Q: Were you troubled by the [radio] policy?  A: I didn't understand the law.  I'm not a coal miner.  I wouldn't say I was troubled by it. I would say I was a little concerned about it because, obviously, there was an issue.  Q:  Did you ever voice those concerns to the defendant, Mr. Stover?  A: I didn't ever voice the concerns to him.  It was always okayed — presented to us that it was okayed by the Massey legal team.").)

(Tr. vol. 3 at 66-68.)

        Finally, the guards testified that this was, indeed, Elbert's own true belief:

Q      Okay. Have you ever had a conversation with Mr. Stover in which he expressed his state of mind about whether he approved of calling the information out over the, the radio channels?

A      Yes.

Q      And what did he tell you?

A      Again, he told me that that was something that was approved by Massey attorneys; that we was authorized to do it and that he disagreed with it. He did not like us calling out inspectors on the property.

(Tr. vol. 2 at 155 (T. Wingo).)

        The government hardly exercised "precise questioning" on November 30, and on cross-examination at trial, the fact that Elbert and the government had been, and still were, talking cross purposes over "notify" and "call" became even more clear, giving them another opportunity to resolve what they alone knew was a potential problem:

Q      And you told him that you don't ***inform*** anyone of a mine inspector coming onto the property; isn't that right?

A      That's correct.

Q      In fact, what you told him was that you're the only person ***notified*** about the arrival of an inspector; is that right?

A      That's correct. There was — my officers ***notified*** me on both channels when anybody come on the property.

Q      So, you hear transmissions over the Montcoal radio channel?

A      If I'm on that channel.

Q      But you say they ***notify*** you over both channels.

A      Yes, sir.

Q      Both being the security channel and the Montcoal channel?

A       That's correct.

Q       And as far as you knew, what you told Special Agent Pruden was that you were the only one who was *informed* of the arrival of an inspector on the property?

A       I was the only one *informed* when anybody comes on the property that's not a Massey member.

Q       What about when inspectors came on the property? Who was informed?

A       Just me.

Q       So, your guards would *notify* you and no one else; is that correct?

A       That's correct.

(Tr. vol. 3 at 186-87.)  Again, we see that the only reasonable interpretation of this (especially given that Elbert also accurately and honestly testified about the radio policy) is that Elbert understood and meant terms like "inform" and "notify" to be active and intentional, and to exclude passive eavesdropping.

        Even though Elbert's government questioners were all well aware of the fact that their definitions of "notify" and "call" were far broader than Elbert's obviously were,[56] they still failed to ask him the one question that would have cleared up what *they alone* perceived as an inconsistency with Elbert's answers:  *i.e.*, how did he "reconcile" his statement about no "notification" or "calling" with what they knew about the radio transmission policy?  Had the government asked that one, simple question, Elbert Stover would not be facing years in prison:

        [W]e perceive no reason why Congress would intend the drastic
        sanction of a perjury prosecution to cure a testimonial mishap that
        could readily have been reached with a single additional question
        by counsel alert—as every examiner ought to be—to the

---

[56]     It is undisputed that MSHA was well aware of the radio transmission practice well before November 30 and thus was well aware of what *it alone* perceived of an inconsistency between Elbert's statement that no "advance notice" was being given and the radio policy.

> incongruity of petitioner's unresponsive answer.    Under the
> pressures and tensions of interrogation, it is not uncommon for the
> most earnest witnesses to give answers that are not entirely
> responsive.    Sometimes the witness does not understand the
> question, or may in an excess of caution or apprehension read too
> much or too little into it. . . .   It is the responsibility of the lawyer
> to probe; testimonial interrogation, and cross-examination in
> particular, is a probing, prying, pressing form of inquiry.   If a
> witness evades, it is the lawyer's responsibility to recognize the
> evasion and to bring the witness back to the mark, to flush out the
> whole truth with the tools of adversary examination.

*Bronston v. United States*, 409 U.S. 352, 358-59 (1973).

Reluctant to do as the government has so plainly done to him and ascribe to malice what should be blamed on incompetence, Mr. Stover is hesitant to suggest that his interrogators intentionally manufactured this inconsistency or that they were at least motivated to leave it unresolved so that they could charge him.  There would be, however, ample justification to draw such a conclusion.

MSHA district manager Watkins testified that no government questioner ever bothered to clear up what they (but not Elbert) perceived as an inconsistency:

Q     Did you know at the time of your participation in the investigation that people at the security guard shack were announcing inspectors along with everybody else who was not a Massey employee over the radio?

A     We had heard — I'd been present for some testimony that they were notifying the mine that they were, of who was at the guard shack.

Q     Okay. So, so, you and the others who were conducting this investigation knew about that practice at the time you interviewed Mr. Stover; correct?

A     We knew from the testimony that that might be a possibility that they were doing that, yes.

Q     Okay. Do you recall either in the parts of the transcript that were selected out to be read or the whole rest of the transcript whether anyone ever said to Elbert, "Elbert, in fairness to you, it seems like

> we're hearing a lot of people say that your guards are calling on the radio and we think that's advance notice.  How is it that you say that there's no advance notice?"  Did anyone ever ask him a question like that?
>
> A       Not that I recall, no.
>
> Q       I didn't see it either.  That's why I wanted to ask you that.  So, no one ever asked him for an explanation?
>
> A       Not a particular question, no, sir.

(Tr. vol. 2 at 96-97.)  During the prosecution's effort to rehabilitate Mr. Watkins's testimony, Watkins stated that they asked Elbert the same questions "several times."  (*See, e.g.*, Tr. vol. 2 at 100.)  But a question not directed at getting to *the point* is not a fine wine that might improve with either age or repetition.  It was not the burden of a high-school educated coal mine security guard to finally figure out what his college-educated government interrogators already knew and explain away their misperception.  It was the burden of those investigators to ask direct, pointed questions and accept only clear, responsive answers.

FBI agent Pruden also testified that when he questioned Elbert, he failed to resolve this ambiguity, even though it is clear that Pruden perceived it:

> Q       Did you ask him about the, calling out the inspectors and the vendors over the radio?
>
> A       We asked him — we didn't use specific terminology or way.  We just asked him were notifications being made at all.
>
> Q       Did you ask him specifically if, if his guards were picking up the phone and calling the dispatcher or calling underground or anything like that?
>
> A       No, sir.
>
> Q       You just asked him the general question?
>
> A       Correct, sir.  We just asked him if notifications were being made.

27

(Tr. vol. 3 at 17.)[57]

Even worse, every time Elbert *did* try to say something that would have disabused the government of its unilateral confusion, he got cut off.  On the stand, Elbert tried to testify in a way that might have resolved the government's misunderstanding—even though the burden was not on him to have either recognized this or to have done so.  That one sentence could have obviated this entire proceeding and the accompanying disastrous disruption to Elbert's and his family's lives.  But we will never know, because the prosecutor cut him off mid-sentence:

> Q      The sentence, 'You do not notify no one when inspectors come on that property.'  Do you see that?
>
> A      Yes, sir.  *That right before it says you do not call the mines*.
>
> Q      Right. But you also said — and my question to you, sir, is where it says, "You do not notify no one when inspectors come on that property," is that your statement?
>
> A      Yes, sir.  ***That pertains to —***
>
> Q      Sir, were you under oath at the time?
>
> * * * *

(Tr. vol. 3. at 187 (emphasis added).)

Also during the trial, FBI agent Lafferty read Elbert's November 30, 2010, testimony.  But an important sentence from Elbert's testimony was omitted in the part read at trial.  After Elbert said that there was a policy that came from "upstairs" stating, as he understood

---

[57]      (*Cf.* Tr. vol. 2 at 148-50 (T. Wingo) ("Q: Mr. Wingo, did there come a time when you were interviewed by the FBI?   A: Yes.   Q: Do you recall approximately how many times you were interviewed?   A: I can remember two, two times. . . .   The first interview was about how we handled procedures on state and federal inspectors entering and leaving the property. . . .   Q: Entering and leaving. Was the discussion — was there any discussion with the FBI about announcing inspectors?   A: Yes.   Q: After that interview in the fall of 2010, can you tell us whether or not you said anything to the defendant about your being interviewed?   A: Yes, I did.   Q: What did you say to him?   A: It was in general conversation at the post I was working on.   I advised him that I was interviewed by the FBI.   We talked about what the interview was about.   I told him that it was — the main concern of that interview was how we handled radio procedures with the inspectors.   And I told him that — I told him about the inspectors' log and that we notified them by Montcoal and security frequency on the radio, and at no time was we to announce it by telephone to the mine operation.   **Q: What did Mr. Stover say about that?   A: Mr. Stover agreed and said, 'Just never lie.'** ") (emphasis added).)

28

it, that "no advance notice" meant "you don't call ahead of time when inspectors are there,"[58] Elbert started to explain: "If I may elaborate. When I —".[59]  But again we will never know how he was going to elaborate, because he was cut off mid-sentence when the interviewers and lawyers began a discussion about helicopters.  Although he eventually was able to repeat his understanding that "[y]ou do not notify no one" meant "when inspectors come on the property you do not call the mines."[60]  he was effectively prevented—through no fault of his own—from definitively clearing up any miscommunications.

The Fourth Circuit has specifically recognized that the government's burden to clear up ambiguities is especially heightened where, as here, the government alone is aware of what it perceives as an inconsistency between the defendant's statement and the "facts":

> [T]he Navy was on notice, even before work under the contract began, and continuously during performance, exactly how CSI interpreted the pertinent clause as well as evidence how the issuing officer of NAVELEX, acting under the advice of a representative of the Contracting Officer (Mrs. Walsh) interpreted it.  This put the Navy as much on notice as if CSI had actually brought the matter up with the Navy.  If that construction were wrong, the Navy should have so advised CSI.  Not having done so, it has no right to complain of any failure of CSI to bring to its (the Navy's) attention the construction adopted by it (CSI).

*United States v. Race*, 632 F.2d 1114, 1121 (4th Cir. 1980).

Reflection about the government's motivation aside, the government's (especially at least knowing) failure to have followed up on, much less ruled out, a facially obvious, objectively reasonable way to interpret Elbert's statements consistent with the actual practice is an independently adequate basis to acquit Elbert of intentionally making a knowingly false statement.   The *government* chose to interpret its questions and Elbert's responses—and

---

[58]     (Tr. vol. 2 at 79;  *accord* 11/30/2010 Tr. at 68.)

[59]     (11/30/2010 Tr. at 69.)

[60]     (*Id.* at 70.)

specifically his use of "notify" and "call"—far more broadly than Elbert did, such that under *the government's* interpretation (*i.e.*, theory (b)), "notify" or "call" included Performance's all-visitor radio transmission practice, thereby leading to an apparent inconsistency between Elbert's statement and the actual practice.

But as shown, the *government's* interpretation is irrelevant:  A conviction "may not stand on a particular interpretation that a questioner places upon an answer."[61]   And the government failed to prove that its interpretation was *Elbert's* intention—the only relevant one. FBI Agent Pruden made this statement:

> Q        Okay. Did, did Mr. Stover deny to you that his guards were announcing vendors and inspectors over the shortwave radio or CB radio at the mine?
>
> A        Mr. Stover stated that no notification ***of any kind*** was being made.

(Tr. vol. 3 at 17 (FBI Agent Pruden) (emphasis added).)  But that is *not* what Elbert said, as the transcript of his November 30 testimony makes perfectly clear.[62]  Misinterpreting a defendant's statement in a § 1001 case is bad enough;  misquoting it is even worse.

The government offered *no* evidence at trial to show that its interpretation was Elbert's intention—the only one that matters.  Here, the government left the jury to engage in "groundless surmise" about what Elbert meant,[63] and that is not allowed.  The law required the prosecution to prove *Elbert's* interpretation of his interrogators' questions and what *Elbert* meant in his responses.  As shown, the sole evidence on this point—most clearly his words, but also all of the explanatory extrinsic evidence—was that he meant to say only that as far as he understood

---

[61]        *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1986).

[62]        At trial, for example, the prosecuting attorney asked Tim Watkins, an MSHA district manager, to tell the jury what he had meant when he questioned Elbert on November 30.  (*See* Tr. vol. 2 at 91.)  The answer to that question was irrelevant.

[63]        *Diogo*, 320 F.2d at 907.

it all, Performance was not "notifying" or "calling" the mine to warn them that inspectors were on the way, *i.e.*, to violate § 820(e)—a statement that remains true.

      2.    ***None* of the evidence as to what the true facts were proved anything inconsistent with what Elbert said.**

Defendant recognizes that the government introduced adequate evidence at trial to prove one thing:  that the all-visitors radio transmission policy did have the effect of making at least one other person aware of the presence of inspectors at the mine site (*i.e.*, the second half of theory (b), *supra*).  As shown, however, that does not advance Count One at all because the only conceivable interpretation of Elbert's November 30 statement does not contradict this.  So if the government intended to pursue theory (b), they failed.

But if it intended to pursue theory (a), Count One still falls, because the government also failed to prove that anything in reality contradicted what Elbert said on November 30, *i.e.*, the government failed to prove that anything going on at Performance Coal constituted "advance notice" as Elbert intended that term (or that Elbert "knew" that it did).

      a.    **Any ambiguity in the facts of a § 1001(a)(2) case must be resolved in favor of the meaning that reconciles the defendant's statements with those facts.**

For the same reasons that the government must prove that no reasonable interpretation of what the defendant said is consistent with the facts (once they have been established), the government must also prove that what the defendant said (once that has been established) is inconsistent with any reasonable interpretation of the facts.  This test is even more strongly intertwined with the "knowingly" element and requires that any ambiguity in the facts be resolved in favor of the meaning that reconciles with what the defendant stated.

In *Race*, *supra*, for example, Race was charged with making a false statement in bills that he submitted based on his understanding of the terms of a contract.[64]   Although the Court of Appeals found that the contract meant what the defendant had understood it to mean,[65] the court was clear that this did not matter and that under the circumstances of the case, even if that had not been true, the defendant still would have been entitled to acquittal.   As long as the defendant's interpretation of the facts, as proven, was a reasonable one among those possible, the court said, no § 1001 charge could lie:

> Even if we were to accept the Government's argument that the per diem clause is ambiguous, which would be the best that could be said for the Government's argument, the result would not be different.   To be ambiguous a contract must be susceptible of at least two reasonable constructions.   When the Government concedes that the clause is ambiguous, it necessarily concedes that the defendants' construction of the per diem clause, which is one of the constructions, is reasonable.   Such a conclusion requires a ruling that the defendants cannot be convicted under § 1001 for a statement or billing which may be said to be accurate within a reasonable construction of the contract.   This is so because one cannot be found guilty of a false statement under a contract beyond a reasonable doubt when his statement is within a reasonable construction of the contract.   This was clearly stated in the recent case of [*United States v. Anderson*, 579 F.2d 455, 460 (8th Cir.), *cert. denied*, 439 U.S. 980 (1978)].

*Id.* at 1120.   What the defendant in *Race* had said was not ambiguous;   the problem was that the government's evidence as to what was true was ambiguous.

*Anderson*, the Eighth Circuit case that *Race* adopted, was similar.   There, the Court of Appeals held:

> In light of these ambiguities [in the relevant contract clause], . . . *it was incumbent upon the government* to introduce proof sufficient to establish the falsity of the statements as well as the defendant's knowing and willful submission of the statements.

---

[64]     *Id.* at 1117.

[65]     *Id.* at 1119-20.

> *In carrying out that burden the government must negative any reasonable interpretation that would make the defendant's statement factually correct*.  Our review of the record compels us to find that the government failed to clarify the facial ambiguities in the certification clause, and therefore failed to establish that Leslie Anderson willfully submitted the reimbursement invoices knowing the certifications to be false.  We thus reverse [the] conviction . . . .

*Anderson*, 579 F.2d at 460 (emphasis added) (citations omitted) (citing *Diogo*, *supra*).

Where, as here, a defendant's statement was based on his assessment of the meaning and application of the law, any ambiguity in the meaning and applicability of that law must also be resolved in the defendant's favor, *i.e.*, in favor of finding no inconsistency between the statement and the truth:

> In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, *the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous*.  [*Anderson*].  *See* [*Race*, 632 F.2d at 1120] (adopting *Anderson* to hold that **one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction**).  *See also* . . . *United States v. Barsanti*, 943 F.2d 428, 432 (4th Cir. 1991) (following *Anderson* and *Race*)[, *cert. denied*, 503 U.S. 936 (1992)] . . . .

*United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) (emphasis added) (reversing for failure to give a "good faith" instruction).

Whether the problem is analyzed as one of falsity or one of culpability does not matter;  the result is that if the defendant's statement is consistent with any interpretation of the law and application of the facts thereto, he has not lied:

> "In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." . . .  In other words, if the law that makes a statement false is ambiguous and the defendant's statement was consistent with one reasonable interpretation of the law, the government must rule out the

possibility that the defendant was acting in reliance on that interpretation. Some courts analyze the question as going to the element of false statement . . . and some as going to the element of *scienter* . . . .

*United States v. Mitchell*, 165 Fed. Appx. 821 (11th Cir. Feb. 3, 2006).

The Fourth Circuit wholeheartedly applies this rule:

[T]he prosecution and the defense can in this situation both offer plausible support for their positions. . . . Contrary to the conclusion of the government, . . . a determination that the prosecution theory of [the underlying law] is "reasonable and well-supported" does not prove that "defendants' claim that they could not have known what the law required is frivolous." Defendants, too, advance a "reasonable and well-supported" reading of [the law]. . . .

*United States v. Mallas*, 762 F.2d 361, 364-65 (4th Cir. 1985).

Because no one could seriously argue that what 30 U.S.C. § 820(e) purports to outlaw is not subject to reasonable differences of opinion, Elbert's assessment of whether the radio transmission policy gave "advance notice" is simply not subject to such painful scrutiny.[66]

### b.      Application.

As the trial transcript made clear, the government here did not even try to prove the second half of theory (a), that anything at Performance violated § 820(e) (*i.e.*, the allegation made in the indictment).[67] But even if the Court disagrees and finds that the government at least tried to do so, it is clear from the evidence that it failed to do so.

---

[66]      The government has, for example, proposed a new "advance notice" law calculated to (hopefully) resolve the ambiguity in what § 820(e) proscribes. (*See* Tr. vol. 2 at 59 (K. Stricklin) ("Q: Okay? Am I correct, sir, that MSHA has a proposed regulation more clearly defining advance notice that it would like to get enacted, but that it does not yet have in its — what did you say? Toolbox? A: Yes, sir. Q: Tool bag. You don't have that in your tool bag yet? A: I'm not — it's not an MSHA proposed regulation. What it is is Congress had drafted a change to regulations that would include more stronger and stringent applications of advance notice. Q: And it does define exactly what advance notice means and exactly whom is not to give — exactly who is not to give advance notice; correct? A: That is correct.").)

[67]      Mr. Stover does not dispute that at least some people other than security guards had the ability to overhear to the Montcoal channel (or that he was unaware of this). That fact, however, is far from proof of "actual notice." So if the government intended to pursue theory (b) at trial, Mr. Stover does not assert

For example, Kevin Stricklin, MSHA's Administrator for Coal Mine Safety and Health, testified that there were MSHA inspectors at Performance practically every day since at least 1999,[68] and that those inspectors were duty-bound to cite any and all violations of the mining laws that they found.[69]  District manager Watkins said the same thing:  inspectors are required to write up every violation, including any § 820(e) violations that they might see.  "Yeah.  The inspection begins when they get on mine property."[70]  But Performance had only been issued a hand-full of citations, and *none* of them have ever been for a violation of § 820(e).

> ### c.     Elbert Stover's § 1001 trial was not the right forum to test the government's theories about whether anyone at Performance Coal was violating § 820(e).

Perhaps someday the government might try to disprove the merit of Elbert's assessment—*i.e.*, perhaps someday it might decide to cite somebody at Performance for giving "advance notice" violating § 820(e).  But it has to date (for obvious reasons) chosen not to do so.  In any event, that would be the only proper forum to resolve any doubt about whether the law has been broken in the first instance, not by using a layman's opinion to charge him with making a false statement:

> Nothing here is meant to imply that one of these [interpretations] is not a better construction of . . . law, or that civil

---

that *nobody* listened to the Montcoal channel (or that he believed this), but only that the all-visitor radio transmission policy did not constitute "notification" or "calling" as he intended those words in his statement (and also does not constitute "advance notice" as he understood that term).

[68]     (*See* Tr. vol. 3 at 157 (H. Stover) ("Q: Well, even before the blast, there's been some testimony, hasn't there, that there were inspectors there virtually every day?  A: Just about every day, yes, sir.").)

[69]     (Tr. vol. 2 at 46-64 (K. Stricklin) (even though Mine Act requires that each inspector write up every violation that he or she sees, there have only ever been around three or four citations written for violation of the advance notice regulations *anywhere*, and none of these at Performance.)

[70]     (Tr. vol. 2 at 97) (T. Watkins);  *accord* Tr. vol. 2 at 153 (security guard T. Wingo) ("Q: Sure.  To the best of your recollection, do you recall Mr. Akers or any other MSHA or state inspector ever writing a citation against Performance Coal or any of the security officers there for announcing the inspectors' presence over the radio channels as you have described?  A: I have no knowledge of that, of anybody receiving a citation.").)

liability—with appropriate civil penalties—may not be imposed on these defendants for [their conduct] without a foundation in [the facts].  We merely find that there has been no "fair warning . . . given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."  *McBoyle v. United States,* 283 U.S. 25, 27 (1931) (Holmes, J.). . . . [W]ithout that fair warning, the government may not institute criminal proceedings.  As this court noted . . . , "the appropriate vehicle to decide this pioneering interpretation of [civil penalty] liability is the *civil* procedure of administrative assessment," not a criminal prosecution.  We therefore reverse these judgments of conviction and remand the case for proceedings consistent with this opinion.

*Mallas*, 762 F.2d at 364-65 (citations and parallel citations omitted).

The same is true here:  If the government wished to prove that "advance notice" occurred at Performance Coal, it should have done so by citing the company or its dispatchers, recommended initiation of criminal charges for an § 820(e) violation, or both.  But it did none of these, instead choosing to send a high-school educated small-town police officer to federal prison for saying a few of the words that his government interrogators knowingly misinterpreted.

> **3.  Because the government failed to adduce any evidence proving the actual falsity of Elbert's statements—*i.e.*, because it failed to prove that any reasonable interpretation of what Elbert meant was necessarily consistent with any reasonable view of the facts—Elbert must be acquitted on Count One.**

In closing, the prosecutor said that Performance's all-visitor radio transmission policy "cannot be reconciled with [Elbert's] testimony in the MSHA hearing."[71]  As has been thoroughly demonstrated herein—under any conceivable standard of evaluating Elbert's statement, the evidence, reality, or even the jury's verdict—that statement was irrefutably wrong.  "The principles underlying the *Bronston* decision" bar convictions "for arguably untrue answers

---

[71]  (Tr. vol. 4 at 61.)

to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness."[72]  Mr. Stover "may not be assumed into the penitentiary."[73]

Count One failed to allege a violation of 18 U.S.C. § 1001, and the government failed at trial to meet its burden of proof for Count One, because no reasonable jury could possibly have found that the statement Elbert made was not, at the very least, reasonably consistent with the evidence that the government advanced to prove its falsity.

### E.    The government failed to prove that Elbert knew that anything he said was false.

In order to prove a § 1001(a)(2) conviction, the government must also prove that a defendant acted "knowingly."[74]  Specifically, the government must prove that the defendant had "factual knowledge,"[75] that is, "knowledge of the facts that constitute the offense."[76]  If it was the government's intention at trial to pursue theory (a), then the government was therefore required to prove Elbert knew that his statement that no "advance notice" as that term is used in § 820(e) was taking place at Performance Coal was false.[77]  Since the government chose to prove the falsity of this statement solely by offering the existence of the all-visitor radio transmission policy, the government was thus required to prove that Elbert knew that this policy violated that "no advance notice" proscription.

As demonstrated, though, the government did not even prove that Elbert's statement *was* false.  *A fortiori*, then, Elbert could not possibly "know" that the radio policy provided "advance notice."  But even assuming that that policy did provide such "advance

---

[72]     *United States v. Glantz*, 847 F.2d 1, 6 (1st Cir. 1988).

[73]     *United States v. Brumley*, 560 F.2d 1268, 1277 (5th Cir. 1977).

[74]     18 U.S.C. § 1001(a)(2).

[75]     *Bryan v. United States*, 524 U.S. 184, 192-93 (1998).

[76]     *Id.* (footnotes and citations omitted).

[77]     (*See also* discussion, *supra* at n.67.)

notice," the government offered absolutely no evidence that Elbert knew this.  Indeed, far worse for the government's position, the sole evidence was to the contrary.  First (with one ultimately irrelevant exception, *infra*), *all* of the evidence going to whether there *was* any "advance notice" showed there was not.  So that same evidence only supported the objective reasonableness (and thus the subjective truth) of Elbert's statement that he was unaware of any such "advance notice" going on.  In other words, even if it turns out to be incorrect, all of the evidence objectively showed that Elbert indeed subjectively believed that there was no advance notice.

Second, the only evidence that was ever even headed in the direction of supporting a conclusion that "advance notice" was ultimately being provided (in the broad sense) came from the testimony of Bobby Pauley and Gregory Clay, the two dispatchers who claimed to have clandestinely signaled the mine when they overheard the all-visitor radio transmissions mention inspectors.  But as discussed earlier, those prosecution witnesses (and Elbert) made clear that Elbert had no idea about any of this.[78]  Finally, all of the other guards testified that they either had no problem with the radio practice, that they had a problem but never brought it to Elbert's attention, or that they had a problem and brought it to Elbert's attention but Elbert had been assured of the practice's legality.  This evidence stood uncontradicted at trial.

Because the government failed to introduce any evidence that Elbert knew that the all-visitor radio policy provided "advance notice," he is entitled to acquittal on Count One.

**F.    The government illegally compelled Elbert Stover to give the statements on which it solely based the charge in Count One.**

After the UBB disaster, the United States government began several parallel investigations, including one by MSHA and one by the FBI, and the WVOMHS&T also began

---

[78]       A rebuttal witness, Andrew Coalson, a foreman said the same thing.  (Tr. vol. 3 at 203-04.)  But the prosecution again failed to elicit *anything* from Coalson to show that Elbert had any idea about this.

an investigation.   Neither MSHA nor WVOMHS&T had the statutory authority to issue subpoenas compelling the attendance of witnesses to closed-door, under-oath examinations.

Nonetheless, WVOMHS&T did issue several such subpoenas.  One of those subpoenas commanded Elbert Stover to appear on November 30, 2010, at MSHA's office in Beaver, West Virginia, under threat of contempt should he refuse, and be examined under oath, in private—*i.e.*, not at a "hearing" of any sort—and answer questions focused on whether violations of § 820(e) had occurred at the mine.  The responses that Mr. Stover gave to MSHA's questioning that day form the sole basis for the government's accusations in Count One of the superseding indictment.

The subpoena commanding Mr. Stover to attend the November 2010 examination under penalty of contempt, however, was invalid, first because the WVOMHS&T itself lacked the power to issue it, and second because even if the WVOMHS&T had such power, it is clear that MSHA was the real subpoenaing agency, using the state agency as its cat's paw to evade (similar) Congressional limits on MSHA's power.  Because compelling Elbert's presence to the November 2010 interview under penalty of punishment was illegal and *therefore unconstitutional*, the statements that Elbert gave at that time should have been excluded from the trial of this matter, leaving the government with no basis for sending Count One to the jury.

1.      **The WVOMHS&T subpoena was invalid because it exceeded that agency's statutory authority.**

WVOMHS&T has the power:

> to . . . [c]all or subpoena witnesses, for the purpose of conducting *hearings* into mine fires, mine explosions or any mine accident;  to administer oaths and to require production of any books, papers, records or other documents relevant or material to any *hearing, investigation or examination* of any mine permitted by this chapter. . . .

W. VA. CODE § 22A-1-4(b)(9) (emphasis added).

On its face, this section expressly creates *two separate powers*:  (1) to subpoena witnesses, but only *to hearings*, and (2) to administer oaths and require production of things to a broader category of events, *i.e.*, *to any hearing, investigation, or examination of any mine*.  The Legislature did not, in this statute or elsewhere, authorize the WVOMHS&T the power to compel the presence of a witness by subpoena to anything other than a hearing.

In commanding Mr. Stover's presence on November 30, 2010, however, WVOMHS&T inappropriately grafted half of power (1)—*i.e.*, to "subpoena witnesses" (but only "for the purpose of conducting hearings into mine fires, mine explosions or any mine accident")—onto half of power (2)—*i.e.*, "to any hearing, investigation or examination of any mine permitted by this chapter" (but only "to administer oaths and to require production of any [relevant or material] books, papers, records or other documents")—to create a new, non-existent power—*i.e.*, the power to subpoena witnesses to something other than a hearing.

But this was a "power" that the Legislature never granted the agency, and it is well-settled that an agency is not free to do this:

> Administrative agencies and their executive officers are creatures of statute and delegates of the Legislature.  Their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim.  They have no general or common-law powers but only such as have been conferred upon them by law expressly or by implication.

Syl. pt. 3, *Mountaineer Disposal Serv., Inc. v. Dyer*, 156 W. Va. 766, 197 S.E.2d 111 (1973).

"[A]n administrative agency . . . can exert only such powers as those granted by the Legislature and that if such agency exceeds its statutory authority, its action may be nullified by a court."[79]

---

[79]     *State Human Rights Comm'n v. Pauley*, 158 W. Va. 495, 497-98, 212 S.E.2d 77, 78 (1975).  As discussed in Mr. Stover's pre-trial motion and briefly below, this is this *very same statutory distinction* that prevented MSHA from subpoenaing Mr. Stover itself.  It is wholly disingenuous for the government to now argue that West Virginia's legislature did not mean to impose the same limitation using the same choice of different words that Congress imposed.

Before trial, the government contended that the clear statutory grant of authority to the agency to do two different things was just sloppy drafting on the Legislature's part, saying that "[t]he statute does not draw that distinction . . . ."[80] But this is not a conclusion that we are free to make here, because the language of the statute is clear and unambiguous, and "[c]ourts are not free to read into the language what is not there,"[81] any more than they are free to read out something that is there.[82]

Furthermore, contrary to the government's position, there is excellent evidence that the Legislature *did* expressly intend to separate the WVOMHS&T's authority to subpoena witnesses to hearings from its other powers.   In *Carpenter v. Miller*,[83] the West Virginia Supreme Court of Appeals said the following about the powers of the person who was at the time the Director of the Department of Mines:

> Under West Virginia Code § 22-1-4(10) (Supp. 1984), the Director of the Department of Mines has a mandatory duty to call or subpoena such witnesses as are relevant or material to any hearing, investigation or examination of any mine or well permitted by Chapter 22 of the Code.

Syl. pt. 2, *id.*   At first blush, this certainly seems to support the government's position here—*i.e.*, that the WVOMHS&T has a monolithic power to subpoena witnesses to hearings, investigations, or examinations.

But the holding in *Carpenter* was based on the *previous version of the statute*, which clearly *did* create such a unitary power:

---

[80]     (Resp. of the U.S. to Def.'s Mot. to Suppress & Mot. In Limine to Def.'s Stmts. at 8, Dkt. #41.)

[81]     *State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 24, 454 S.E.2d 65, 69 (1994).

[82]     *Accord Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 485 (4th Cir. 1990) (recognizing undisputed maxim that "courts are simply not at liberty to ignore the plain language of the statute"), *cert. denied*, 499 U.S. 959 (1991).

[83]     174 W. Va. 333, 325 S.E.2d 123 (1984).

> The director of the department of mines . . . shall have the
> power and duty to . . . [c]all or subpoena witnesses, to administer
> oaths and to require production of any books, papers, records, or
> other documents relevant or material to any hearing, investigation
> or examination of any mine or well permitted by this chapter. . . .

W. VA. CODE § 22-1-4 (1984)(10) (repealed).[84]

In the following year, however, 1985, the Legislature merged the Department of
Mines with the West Virginia Department (later Division) of Energy, and in 1991 created the
WVOMHS&T, with the authority not as described by the now-repealed W. VA. CODE
§ 22-1-4(10) and its broader subpoena powers, but as now stated in W. VA. CODE
§ 22A-1-4(b)(9) and its two now expressly separate and different powers. It is clear that the
Legislature now expressly and unequivocally limits the power of WVOMHS&T to subpoena
witnesses only to hearings.

The government also argued that Mr. Stover "was subpoenaed for the purpose of
conducting a hearing into a mine explosion . . . ." (Resp. of the U.S. to Def.'s Mot. to Suppress
& Mot. In Limine to Def.'s Stmts. at 8, Dkt. #41.) This, too, is false. There is no evidence that
Elbert Stover's November 30, 2010, interview bore any indicia whatsoever of a "hearing." The
inquisitors at the November 30 meeting, themselves, described the proceedings as an "interview"
and part of an "investigation." The meetings were, by request of the government, to remain
confidential, and they were not open to the public. Allowing MSHA to say that this somehow
constituted a "hearing" would require letting that term mean anything.

Because this unlawful subpoena, commanding Mr. Stover to appear on November
30, 2010, under threat of punishment for disobedience, directly resulted in Elbert making the
statement that forms the sole basis of Count One, but the subpoena was illegal, Elbert's
statements on that day should have been stricken, and Count One dismissed.

---

[84]     *See* 174 W. Va. at 336, 325 S.E.2d at 126.

2.      **MSHA's use of WVOMHS&T as a cat's paw to issue subpoenas that MSHA itself cannot issue was an unlawful attempt to evade clear limits on MSHA's own subpoena power.**

Like WVOMHS&T, MSHA also cannot lawfully compel the appearance of a witness to anything other than a public hearing:

> For the purpose of making any investigation of any accident or other occurrence relating to health or safety in a coal or other mine, the Secretary may, after notice, **hold public hearings**, and may sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths.

30 U.S.C. § 813(b) (emphasis added). "Although the Secretary is given the power to subpoena documents to investigate an accident, this power has been explicitly limited to investigations in connection with public hearings. *United States v. Consolidation Coal Co.*, 560 F.2d 214, 219 n.10 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942 (1978), *judgment reinstated*, 579 F.2d 1011 (6th Cir. 1978), *cert. denied*, 439 U.S. 1069 (1979)."[85] "The Secretary's subpoena power under 30 U.S.C. § 813(d) is limited to compelling the production of records and witnesses *at public hearings*."[86] MSHA clearly recognizes this limitation on its subpoena power.[87]

Notwithstanding that WVOMHS&T played some nominal role on November 30, 2010, it is clear that this was an MSHA investigation all along, with the federal agency calling all

---

[85]     *United States v. Blue Diamond Coal Co.*, 667 F.2d 510, 519 n.10 (6th Cir. 1981) (parallel citations omitted), *cert. denied*, 456 U.S. 1007 (1982).

[86]     *Consolidation Coal*, 560 F.2d at 219 n.10 (emphasis added);  *see also Soc'y of Prof'l Journalists v. Sec'y of Labor*, 832 F.2d 1180, 1181 n.1 (10th Cir. 1987) ("In the instant case, MSHA takes the position that it was not acting pursuant to 30 U.S.C. § 813(b), which statute provides for 'public hearings' with the power of subpoena.").

[87]     *Compare* MSHA's *Accident/Illness Investigation Procedures*, Handbook PH00-I-5, at Ch. 3, § VI.H.2 at 25 (stating that at interviews lawfully conducted not at a public hearing, and thus not pursuant to a subpoena, "[w]itness interviews are completely voluntary, and a witness may refuse to answer any question or may terminate the interview at any time"), *with id.* § VI.J. at 31 (stating that at interviews lawfully conducted *at a public hearing*, "[w]itnesses may appear voluntarily but they may also be compelled by subpoena to appear to answer questions and/or to produce records or other documents in their possession").

of the shots on whom to subpoena where and when.  It is undisputed, for example, that the November 30, 2010, interrogation was held at MSHA's offices, and the interrogations were conducted by MSHA investigators.[88]

Joseph Main, MSHA's Director, held a press conference on August 12, 2010, to discuss the subpoenas.[89]  Main stated, "***We're now issuing subpoenas*** on a routine basis with regard to witnesses that are requested to come in.  We anticipate this to be a pretty steady process from here until the conclusion."[90]  Kevin Stricklin, MSHA's Coal Administrator, said, "*We* made the decision that ***we're going to subpoena everybody*** . . . ."[91]  "*We* want them all in here and *we* want to interview all of them."[92]

As Main, Stricklin, and others made clear, this was MSHA's show, with MSHA co-opting the state agency's subpoena power in a naked effort to evade its own clear statutory limitations—limitations that MSHA plainly does not like, as Main's testimony before a Congressional committee shows:

WOOLSEY       So can you talk a little bit more about subpoena power and why is that necessary?

MAIN                Well, let's just use a current case in West Virginia.  *We have a state agency that is — that has subpoena power that is using that power to subpoena witnesses where we have an accident investigation going on.  We have to go to a public hearing before we can ever have that kind of a — of a — of a power.*

                        ***Information that we're able to get through the use of that state subpoena is something we don't have.***  And I think it's — a reasonable person would look at it from the standpoint of

---

[88]        (*See* Tr. vol. 2 at 87-88 (T. Watkins).)

[89]        Jim Workman, *MSHA: No results yet in UBB mine blast probe: Official vows to keep looking for answers*, THE REGISTER-HERALD, Beckley, W. Va., Aug. 12, 2010.

[90]        *Id.* (emphasis added) (quotations omitted).

[91]        *Id.* (emphasis added) (quotations omitted).

[92]        *Id.* (emphasis added) (quotations omitted).

> why doesn't the agency have it.  ***And its lack thereof — is that
> really impeding the agency's ability to get the job done?  And
> I think the answer to the latter part of that question is, yes, if
> the state wasn't there in this particular case.***

*House Committee On Education And Labor, Subcommittee On Workforce Protections* (Mar. 3,

2011) (emphasis added).

Stricklin was very clear about who was "going to subpoena everybody" and what

his agency's ultimate goal was:

> Stricklin said interviews initially were delayed when some
> Massey workers failed to show for scheduled meetings.
> "Sometimes they were coming in, and sometimes they weren't,"
> Stricklin said.  "***We*** were wasting time, (so) ***we decided we're
> going to subpoena everybody****. . . .*  Now we're going to get into
> upper management."

*Massey officials to be subpoenaed in inquiry*, Chris Togneri and Brian Bowling, Pittsburgh

Tribune Review (Aug. 12, 2010) (emphasis added) (alteration in original).[93]

In order to evade its own clear statutory limitations, MSHA recruited the

WVOMHS&T to achieve what MSHA cannot.  That is not allowed.  *See, e.g.*, *United States v.*

*Aero Mayflower Transit Co., Inc.*, 831 F.2d 1142, 1146 (D.C. Cir. 1987) (approving of

interagency subpoena "lending" but only because the borrower "clearly did not operate to

circumvent statutory or other limitations on [its] investigative powers");  *Gaffney v. Hamilton*

*Secs. Group, Inc.*, No. 99-5046, 1999 WL 615098, at *1 (D.C. Cir. July 2, 1999) ("The use of

subpoena power to obtain information for another agency component which does not have such

power would clearly be improper.") (quotations and citation omitted);  *United States v. Educ.*

*Dev. Network Corp.*, 884 F.2d 737, 743 n.11 (3d Cir. 1989) (approving interagency use of

---

[93]      *Available at* http://www.msha.gov/Fatals/2010/UBB/FTL10c0331noappx.pdf.  *See also United*
*States Dept. of Labor MSHA Coal Mine Safety & Health Rep. of Investigation, Fatal Underground Mine*
*Explosion, Apr. 5, 2010*, at 40 (acknowledging that "[t]he Mine Act limits MSHA ability to issue
subpoenas, only providing for subpoenas should there be public hearings" so "[t]o help facilitate the
interviews, WVOMHST issued 116 subpoenas").

subpoena only because "[t]here is nothing in this record to show that the agency investigation itself was improper or used as a subterfuge by the USAO once it was unable to obtain the subpoenas from a grand jury"), *cert. denied*, 494 U.S. 1078 (1990).

In response to Mr. Stover's pre-trial motion, the government briefly stated that the November 30 interrogation was "led by one of [the WVOMHS&T's] representatives,"[94] suggesting that this was enough to stamp the entire proceeding with sufficient "state-ness" to evade the rule preventing MSHA from co-opting the WVOMHS&T's subpoena power.  On the record that existed at the time, this position was untenable.  But the government's own lawyers and witnesses made it even more clear at trial who was calling the shots on November 30, 2010.  During his opening statement, the prosecutor was quick to point out that "*[d]uring the **MSHA investigation***, defendant, Hughie Elbert Stover, sitting over there, who was the chief of security at the Upper Big Branch mine, he *gave an **interview*** on November 30th, 2010 . . . ."[95]

And to whatever extent it could possibly be said that there was a *bona fide* "parallel" state investigation going on at the same time, it can hardly be said that that investigation was sufficiently independent of the federal government's to disregard all of this.  As Kevin Stricklin testified at trial, the Governor's "Independent Commission" was chaired by none other than Davitt McAteer, the former Assistant Secretary of Labor in charge of MSHA,[96] whom Stricklin of course knew "very well."[97]  When asked on direct examination who was at Elbert's November 30 interrogation, Tim Watkins, the district manager of MSHA's district 12

---

[94]     (Resp. of the U.S. to Def.'s Mot. to Suppress, *etc.*, at 8 n.1, Dkt. #41.)

[95]     (Tr. vol. 2 at 10 (emphasis added);  *accord id.* at 45 (MSHA Administrator for Coal Mine Safety and Health (Tr. vol. 2 at 31) Kevin Stricklin calling them "our interviews").)

[96]     (Tr. vol. 2 at 53.)

[97]     (*Id.*)

and a prosecution witness, testified that "[o]f course MSHA" was there, as was "the state," but he characterized McAteer as an "also present."[98]

Watkins then honestly described who was responsible for the November 30 interrogation (which, like most of the hundreds of others, was conducted at *MSHA's office*):

> Initially, they [some of the witnesses] were, they were not subpoenaed.  Initially, people were — *MSHA interviews are voluntary*.  And initially *we started off*, people volunteered to come in.  But *we was* [*sic*] *having problems* with the scheduling.  So, *the state later on started subpoenaing everyone* — . . . .

(Tr. vol. 2 at 93.)[99]   How the United States can, with a straight face, maintain that their November 30 interrogation of Elbert Stover—on which Count One is based in its entirety—was not obviously the product of MSHA recruiting the WVOHMST's subpoena power to dodge its own inability to compel Elbert's attendance defies rational explanation.

Whatever might have been unclear before trial is perfectly clear now:  Even if WVOMHS&T's subpoena *had* been lawful as to that agency, the Court should reject MSHA's pretextual end run around its own statutory limitations.[100]   Here, MSHA perpetrated a subterfuge on Mr. Stover, acting to circumvent—indeed openly flaunt—undisputed statutory limitations on its own investigative powers to achieve what MSHA cannot.[101]   That is not allowed.

### 3.    The exclusionary rule should have applied.

The United States argued that Elbert's sole remedy was to have moved to quash the illegal subpoena in state court and that the exclusionary rule, which the government asserted

---

[98]    (Tr. vol. 2 at 88.)

[99]    (*See* Tr. vol. 2 at 87-88 (T. Watkins) (explaining MSHA's role as including, "We conducted interviews.").)

[100]    *See, e.g., United States v. Procter & Gamble*, 356 U.S. 677, 683 (1958) (declaring that, if the government had used the grand jury subpoena process to gather evidence for its civil antitrust investigation, "it would have been flouting the policy of the law" because the Sherman Act requires that depositions taken under government civil process in an antitrust case "shall be open to the public.").

[101]    *Aero Mayflower Transit Co.*

was limited solely to constitutional violations, was inapplicable.[102]   And since, the government continued, "there was no constitutional violation in this case,"[103] the exclusionary rule did not apply.  This argument is incorrect for two reasons.

First, the application of the exclusionary rule is not as narrowly cabined as the government suggests, as the Supreme Court of the United States has, "in a number of areas . . . recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, *federal statutes, or federal rules of procedure.*"[104]

Second, this argument rests entirely on the government's mistaken belief that it did not violate the United States Constitution for MSHA or the WVOMHS&T to compel Elbert Stover to physically present himself under pain of imprisonment absent an underlying lawful basis for such command.[105]   Here, Elbert was required to appear pursuant to a subpoena that the issuing agencies lacked any power to issue.  It *would have been* precisely that statutory power— had the agency been given it by the Legislature—that could have formed the basis for the

---

[102]   (Resp. of the U.S. to Def.'s Mot. to Suppress & Mot. In Limine to Def.'s Stmts. at 9, Dkt. #41.)

[103]   (*Id.*)

[104]   *United States v. Blue*, 384 U.S. 251, 255 (1966) (emphasis added).  *See, e.g.*, *Miller v. United States*, 357 U.S. 301, 313-14 (1958) (upholding suppression of evidence obtained in violation of 18 U.S.C. § 3109 ("knock and announce" statute));  *Mallory v. United States*, 354 U.S. 449, 455 (1957) (stating that suppression of statements obtained in violation of FED. R. CRIM. P. 5 would be proper if failure to arraign "without unnecessary delay" provided "an opportunity for the extraction of a confession");  *United States v. Lombera-Camorlinga*, 206 F.3d 882, 887 (9th Cir.) ("We do not limit the exclusionary rule to use as a remedy for constitutional violations alone.  The Supreme Court some time ago indicated that an exclusionary remedy may be available for violations of provisions of law other than the Constitution."), *cert. denied,* 531 U.S. 991 (2000);  *SEC v. ESM Govt' Secs., Inc.*, 645 F.2d 310 (5th Cir. Unit B 1981) (discussing applicability of exclusionary rule to unlawful administrative subpoena).

[105]   *See, e.g., United States v. Utecht*, 238 F.3d 882, 887 (7th Cir. 2001) ("[T]he government's use of civil subpoenas (or other kinds of administrative measures that do not require probable cause) principally to further a criminal investigation could undermine the Fourth Amendment's probable cause requirement.  These constitutional concerns were recognized in *Abel v. United States*, 362 U.S. 217 (1960) . . . .  *Abel* explicitly contemplates applying the exclusionary rule to evidence obtained through the bad faith use of administrative warrants . . . .") (parallel citations omitted);  *Michigan v. Tyler*, 436 U.S. 499, 508 (1978) (holding that, while administrative search warrants issued without probable cause can be used to investigate the cause of a fire, search warrants based on probable cause must be used where authorities are seeking evidence that will be used in a criminal investigation).

enforcement of such a subpoena in the face of a constitutional challenge.[106]  The government's argument that MSHA's unlawful use of an unlawful WVOMHS&T subpoena to compel Elbert to appear and answer MSHA's questions under threat of punishment did not violate the Fourth, Fifth, and Fourteenth Amendments thus lacks merit.

In its earlier Order, the Court cited *United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977), for the principle that "[t]he availability of the suppression remedy for . . . statutory, *as opposed to constitutional*, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights."  Order at 10 (Dkt. #97). (emphasis added) (alterations in original);  *see also id.* (quoting *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011), for the proposition that "there is no exclusionary rule *generally* applicable to statutory violations") (emphasis added));  *Donovan*, 429 U.S. at 432 ("We turn now to the question whether the District Court properly suppressed evidence derived from the wiretaps at issue ***solely*** because of the failure of the law enforcement authorities to comply fully with the provisions of [the statute].") (emphasis added).

Unlike Donovan's and Clenney's cases, however, Mr. Stover's case presented both the former *and* the latter violations—*i.e.*, a statutory violation that *caused* a constitutional violation.  A subpoena compelling Mr. Stover to appear and testify or face punishment could only have been constitutional *if* it had been lawfully issued, because it is the underlying lawfulness of a subpoena that, in part, could have made it constitutional.[107]  Since that was not the case here, however, *Donovan*'s "statutory, *as opposed to constitutional*, violations" distinction and *Clenney*'s "general" observation, while true, are nevertheless inapposite.

---

[106]      *See, e.g.*, *Donovan v. Dewey*, 452 U.S. 594, 598 (1981).

[107]      *See, e.g.*, *Donovan v. Dewey, supra*.

## II. COUNT 3

### A.      Factual Background.

The following evidence was introduced at trial:

### 1.      Before January 2011.

Performance Coal kept its guards' logs, reports, and other records at the guard shack for a short time.  The records were then moved to the security chief's office until the end of the year, at which time they would be moved in boxes across Route 3 to "the barracks."[108] The barracks is an old house, the upper floor of which mine employees used as a bunk house and the basement of which the security department used as a veritable garbage dump to store beat-up VCRs, broken computer monitors, discarded radio equipment, and old paperwork, including old gate logs and security incident reports.[109]

Sometime around 2002 or 2003, the barracks' sewer system backed up, creating a terrible mess and contaminating much of the contents of the basement with human waste.[110]  On occasion, although Performance did not have a formal or written retention policy,[111] Elbert would nevertheless "go over there and see how dirty or nasty or junked up it was."[112]  Then either periodically or as needed, he would have someone (guards or temporary work crews) throw some of the junk out.[113]

---

[108]      (*See, e.g.*, Tr. vol. 2 at 124 & 130-31 (T. Wingo testifying that inspector logs and visitor logs were maintained at the main gate for one month, and then transferred to the barracks);  Tr. vol. 2 at 215 (C. Lilly) ("Q: Were the logs eventually filed somewhere?  A: Yes, sir.  Q: Can you tell the jury where?  A: We kept them in our building, all but our daily activity reports.  We kept them in our building until the end of the month and then they were turned in to Chief Stover.");  Tr. vol. 3 at 149 (H. Stover).)

[109]      (*See, e.g.*, Tr. vol. 2 at 131.)

[110]      (*See, e.g.*, Tr. vol. 3 at 141-42 (H. Stover).)

[111]      (*See* Tr. vol. 3 at 142 (H. Stover).)

[112]      (*Id.*)

[113]      (*See* discussion, *infra*.)

### 2.    January 2011.

In January 2011, it came time to move the 2010 records from Elbert's office to the barracks, which had again become crowded with junk.[114]  Did Elbert Stover—the man whom the government charged with trying to destroy documents to impede the government's investigation of the UBB disaster—shred those documents in his office shredder?[115]  Did he drive them to the top of a mountain and burn them?[116]  Did he call the company's disposal contractor and have them taken away directly?

No.   Elbert asked Jonathan Williams (who is, with all due respect to Mr. Williams, a lumbering figure not easily overlooked) to haul some of the junk in the barracks to a dumpster.  He asked Jonathan to save certain forms related to property and inventory tracking[117] (one of the security department's shared responsibilities[118]) and toss the balance in the trash. Jonathan would have to work overtime to do this, generating extra records.[119]  Jonathan would have to make many trips in the company vehicle, making it all but certain that someone would observe him (as happened).[120]  Elbert knew Jonathan would be working in daylight.[121]  He knew the project would take Jonathan across Route 3 and back onto the mine property,[122] which was

---

[114]    (*See* Tr. vol. 3 at 58 (J. Williams) ("It was — I mean, it was pretty crowded.  There was stuff everywhere in there.").)

[115]    (*See* Tr. vol. 3 at 58.)

[116]    (*See* Tr. vol. 3 at 158-59.)

[117]    Contrary to the prosecutor's representation during closing (discussed later), Elbert did *not* identify any specific things to throw out, only this one category of things to *not* throw out.

[118]    (Tr. vol. 3 at 146-47.)

[119]    (*See* Tr. vol. 3 at 35 (J. Williams) ("Q: Well, was it during your regular hours or — A: No, it was after.  Q: Did you get paid overtime to do this?  A: Yes. I stayed over, so I got paid.").)

[120]    (Tr. vol. 3 at 35-36 ("Q: Did all the papers fit in the Durango for one trip?  A: No. I made, I made a couple trips. I'm not sure how many, but it took a couple trips.") & 61.)

[121]    (*See* Tr. vol. 3 at 35 ("Q: Again, what time of day did you empty, or put the documents into the dumpster?  A: It was during — what time of day?  During the daytime.").)

[122]    (*See* Tr. vol. 2 at 164-64 (T. Wingo);  Tr. vol. 3 at 39 (J. Williams).)

51

still teeming with the state and federal inspectors and investigators still on-site;[123] past the always-manned guard shack,[124] which would announce the cleanup trips on the radio;[125] past the twenty-four hour recorded video cameras;[126] and to the dumpster right next to the mine's main office,[127] where those investigators and inspectors were sure to be present.[128]

When Jonathan reported to Elbert that the dumpster had filled up with the other garbage before he had a chance to throw out the old papers, did Elbert Stover panic and invoke

---

[123]    (*See, e.g.*, Tr. vol. 3 at 157 (H. Stover) ("Q: Tell us how often inspectors were on the property in late 2010, early 2011. A: It seemed like they was there every day.");  *accord* Tr. vol. 3 at 62 (J. Williams) ("Q: Okay. When you were doing your, your clean-up work, do you know whether or not there were any MSHA inspectors or State Troopers or FBI agents or anyone like that on the property? A: I'm sure there was. There was a lot of them there during that time. I'm not for sure.") & 39 (route);  *cf.* n.17, *supra* at 3 (MSHA administrator testifying that MSHA inspectors were at mine practically every day).)

[124]    (*See* Tr. vol. 3 at 73 (J. Cook) ("Q: I want to turn your attention specifically to January 11th, 2011. Were you working that day? A: I was. Q: What shift did you typically work? A: Day shift, 7:00 to 7:00. Q: What did you observe when you got to work that day? A: Lieutenant — or Mr. Williams was disposing of papers from the barracks. Q: How do you know that's what he was doing? A: I could see the barracks. Q: How did you know it was papers he was disposing of? A: Just — you could see in the Durango pretty much. Q: You could see the papers in the Durango? A: They were bagged, but, yeah. Q: They were in trash bags? A: Yeah. Q: Where was he taking the documents from? A: The barracks. Q: Where was he going to? A: The dumpster. . . . Q: Would Mr. Williams pass you on his way to the dumpster? A: Yes. Q: How many trips did you see him make? A: Four or five.").)

[125]    (*See, e.g.*, Tr. vol. 2 at 174 (T. Wingo) ("Q: What radio transmission did you hear? A: I was at another location approximately two miles from the Upper Big Branch property. It was after the hours that Mr. Williams would have been working. And I heard radio transmissions that he was on his way to the dumpster. I don't recall the officer on duty at the time. That is in documents on the duty log of the date that what happened. But I did call the main gate from my location, and that's when it was made aware that, that the barracks were being cleaned out.").)

[126]    (*See* Tr. vol. 3 at 62 (J. Williams) ("Q: . . . Do you know whether or not there are video cameras trained on the area of the dumpster and the main office and the guard shack? A: Yes. There's — we have a camera that I know of at the security building that we could control. It faces the — you can put it on the bridge or wherever you want it at.");  Tr. vol. 2 at 166 (T. Wingo) (same);  Tr. vol. 3 at 157 (H. Stover) (camera at main gate is on and monitored "24/7" and video from camera preserved for 30 days).)

[127]    (*See* Tr. vol. 3 at 158 (H. Stover) (believed dumpster to be 15-20 yards from mine office).)

[128]    (*See* Tr. vol. 3 at 158 (H. Stover) (testifying that believed the mine office was manned during daylight hours five or six days a week).)

"Plan B"?  No.  He casually told Jonathan to take his time and throw out the old papers whenever the contractors got around to emptying the dumpster.[129]

Before January 26, 2011, *no one had ever asked Elbert Stover for any of the paperwork that Jonathan was throwing out.*[130]  So it never crossed Elbert's mind that any part of that might be material to the government's investigation of the UBB explosion.[131]  To the contrary, in fact, someone *had* explicitly suggested to Elbert that records other than from around the time of the UBB disaster were *not* important to the investigation:  **the investigators**, who, during their November 30, 2010, interrogation of Elbert, had specifically asked him only for the records from around the time of the UBB disaster:

> Q       If I understand you, you say they check everyone that goes by the
>          security building?
>
> A       All non-Massey members, yes, sir.
>
> Q       All non-Massey members?
>
> A       Yes, sir.
>
> Q       And how do they distinguish between Massey members and non-
>          Massey members?

---

[129]     (*See* Tr. vol. 3 at 33-34 (J. Williams) ("Q: Why didn't you throw away the documents on that first trip?  A: I had mentioned to Elbert that the dumpster was full.  And he said, 'Wait until they empty it and then just take the documents and we'll clean out the rest of it when the trash compactor is empty.'. . . Q: What, if anything, did Mr. Stover tell you to do with the documents when the dumpster — because the dumpster was full?  A: What was that again?  Q: Well, you told him the dumpster was full.  A: Yes.  Q: Did he tell you anything to do with the documents after that?  A: No. He just said to wait until the, they come and emptied the dumpster.  And then once the dumpster is empty, we'll go clean out the, finish taking all the old paperwork and put it in the trash compactor.");  Tr. vol. 3 at 60 (J. Williams) ("Q: Okay. And as I understand it, the, the dumpster was full.  The contractor hadn't come to, to empty it.  And you didn't have room to put the paperwork in during the first trip.  Correct?  A: Yes.  Q: And you told Mr. Stover that; right?  A: Yes.  Q: Did he express any urgency to you about, 'We've got to get this done quick'?  A: No.   Q: Just, 'Whenever it gets emptied and there's room, then go ahead and clean it out; correct?  A: Yes.").)

[130]     (*See, e.g.*, Tr. vol. 3 at 153 ("Q: All  right. Let's go, let's go before you learned that there was a problem.  Did anyone ever request anything from that basement?  A: No, sir.  Q: Anyone from the FBI or MSHA or the State Police or the State Department of Mines or anyone?  A: No, sir.").)

[131]     (*See* Tr. vol. 3 at 140-41, 153, 160, 198.)

A      All Massey members have an ID. After you work the gate a while, they learn people.

Q      Okay. Non-Massey members, so they log those in.  Is it a manual log? A computer log?

A      It's a — it's manual but we put it into a computer also.

Q      Okay. And how long do you keep those records?

A      A year or two.

Q      Would it be possible to get a copy of those records *for, say, the month of April of this year?*

A      Yes, sir.

(Tr. vol. 2 at 70 (emphasis added).)  Later, this line of questioning took place:

Q      Okay. Do you know if there were any logs kept of anybody entering, leaving the — other than the two I said before, anybody entering or leaving the property at the Upper Big Branch mine in either portal, whichever, *on the 1st through the 5th* [of April 2010], particularly on the 2nd, 3rd and 4th?  That's Friday, Saturday, and Sunday.

A      I don't recall.

Q      You do not recall or you do not know of any?

A      I do not know of any.

Q      Okay.

A      We would have to go back and look at the logs.

Q      Okay. How would those be kept?

A      I have them in boxes in the office.

Q      Okay.  We would make a request to look at those boxes, if we don't already have them, of any other notations of any Massey employees, supervisor, hourly, whatever, that entered or left the property *April 1st through April 5th through that portal connected to Upper Big Branch mine where the accident occurred*.

A       For this year, they are in filing cabinets in my office.

(Tr. vol. 2 at 76 (emphasis added).)

After Jonathan had finally gotten the last of the trash into the dumpster, though, the investigators changed their minds.  A Massey attorney called Elbert and said "that the Government wanted some old records from eight or nine, nine, seven or eight company years back,"[132] years before the UBB disaster.  Elbert immediately realized that these were probably records that had been mixed in with the papers in the barracks and that Jonathan might have "already got rid of them" along with the other trash.[133]

Did Elbert leave it at that, comfortable in the knowledge that he had successfully "impeded" the government's investigation?  No.  Elbert telephoned Jonathan to see if the papers might still be in the dumpster.  Jonathan verified that the papers had indeed been taken to the dumpster but were still sitting there.  So Elbert told Jonathan to "make sure nobody picks that dumpster up and dumps it,"[134] and he had Jonathan drive back over, collect the papers, and return them to Elbert, who gave them to the attorney, who in turn ultimately turned them over to the federal investigators.

None of the paperwork was ever lost or damaged, and what few documents the government identified at trial that it wanted were safely turned over no worse for their wear.  And what did the government get for their trouble?  These documents—the documents that form the basis of Elbert Stover's conviction for a twenty-year felony—were *so* important to the government that even though Elbert turned them over on *January 26*, 2011 and FBI Agent

---

[132]     (Tr. vol. 3 at 154.)

[133]     (Tr. vol. 3 at 154.)

[134]     (Tr. vol. 3 at 155.)

Lafferty learned of the documents that day,[135] Lafferty could not even be bothered to drive down the street and pick them up from Massey's lawyers until *a week and a half before Elbert's October 2011 trial*,[136] at which time he "skimmed" them[137] and then put them in "a storage building we're using at the U.S. Attorney's Office in Charleston . . . ."[138]

### B.    Procedural Background.

In Count Three, the government alleged that Mr. Stover "knowingly and willfully caused the Known Person [Jonathan Williams] to conceal, cover up, mutilate and destroy records and documents [the security records from the barracks] with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of [the FBI and MSHA] by having the records and documents disposed of and otherwise destroyed."[139]

Mr. Stover does not dispute that he asked Jonathan to clean out the barracks, or that the old records were mixed in with the rest of the junk that Elbert wanted Jonathan to throw out.  As will be demonstrated, however, the government failed at trial to prove that Elbert did so with the requisite *mens rea*.  Elbert is therefore entitled to acquittal on Count Three.

### C.    The elements of a § 1519 charge.

Relevant to this case, the United States Code proscribes obstructing justice:

Whoever knowingly alters, destroys, mutilates, conceals, [or] covers up. . . any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any

---

[135]    (*See* Tr. vol. 3 at 103 ("Q: When did you first become aware that documents had been placed in a dumpster or a dumpster-like bin.   A: Same day, January 26th, 2011. . . . Q: So, Jonathan Williams' testimony was the first time you had any idea that things had been thrown away in the dumpster?  A: For me, yes, January 26th.").)

[136]    (Tr. vol. 2 at 86-87.)

[137]    (Tr. vol. 2 at 92-93.)

[138]    (Tr. vol. 2 at 86-87.)

[139]    (Superseding Indictment Count Three ¶ 6.)

> department or agency of the United States . . . shall be fined under
> this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.[140]  Courts setting out the elements of a § 1519 violation typically just repeat

the statutory language, which on its face seems clear enough:

> While the Court has been unable to find a case that breaks down 18
> U.S.C. § 1519 into discrete elements that do not merely parrot the
> statutory language, based on a review of the statute and the cases
> interpreting it, the Court finds that the elements of a Section 1519
> violation include (1) an investigation or other matter within the
> jurisdiction of a department or agency of the United States must
> have been pending or contemplated by such department or agency
> of the United States; (2) the defendant must have been aware of the
> pending or contemplated matter or investigation; and (3) the
> defendant must have knowingly altered, concealed, mutilated, or
> destroyed something with the intent to impede, obstruct, or
> influence the pending or contemplated matter or investigation, or
> any matter in relation to the pending or contemplated matter or
> investigation.

*United States v. Perraud*, 672 F. Supp. 2d 1328, 1350 (S.D. Fla. 2009) (citations omitted).[141]

Here, the government failed to prove, at least, element (3), that Elbert knowingly

altered, concealed, mutilated, or destroyed something with the intent to impede, obstruct, or

influence the pending matter or investigation.

> **D.    The government failed to prove that Elbert acted knowingly or willfully or
> that he acted with any intent to impede the UBB investigation.**

On what evidence did the government rely to prove that Elbert intended to impede

its investigation of the UBB tragedy?  As will be shown, nothing.

---

[140]    The government indicted Mr. Stover for allegedly causing Jonathan Williams to do things that,
had Elbert done them, would have constituted a violation of § 1519.  *See* 18 U.S.C. § 2(b) ("Whoever
willfully causes an act to be done which if directly performed by him or another would be an offense
against the United States, is punishable as a principal.").  Thus, the government was required to prove
beyond a reasonable doubt that Elbert knowingly and willfully caused Jonathan to conceal, mutilate, or
destroy the documents, and that Stover had the intent to impede, obstruct, or influence the pending matter
or investigation.

[141]    *Accord United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 540 n.102 (D.N.J.
2009).

1.      **In January 2011, there was absolutely no reason for Elbert to believe that the government would want any of the documents that were part of the barracks cleanup.**

The government argued that the jury should infer Elbert's intention to impede its investigation from the fact that he knew the documents were relevant to that investigation. Thus, argued the government, since Elbert asked Jonathan to throw them out, surely he must have had an evil motive. Fatal to the government's theory, however, is that as detailed below (*see also* discussion *supra* at 53), there was no reason at all for Elbert to have thought that the old documents, the ones that were part of the mountain of garbage that he asked Jonathan to throw out, were of any interest whatsoever to the government. On the contrary, all of the evidence showed that Elbert had every affirmative reason in the world to believe the opposite.

The government identified three specific reasons why Elbert should have known that it was interested in the old security department paperwork. But none of those theories was supported by any evidence at trial; they were instead each contradicted by that evidence.

a.      **Massey's internal "litigation holds" did not tell Elbert anything about the documents in the barracks or their relevance to the UBB investigation.**

The government first claimed that the jury should have inferred Elbert's intent to obstruct justice from the fact that Massey's attorneys issued a "litigation hold" four days after the UBB disaster[142] (and a reminder again in January 2011[143]). In fact, the prosecutor came *perilously* close to telling the jury that Elbert had a duty under § 1519 to keep the documents within the scope of the litigation hold: "Mr. Wilmoth said [Elbert] had no duty to keep these documents. Do you remember him saying that? *Absolutely he had a duty to keep these documents.* He had a memo on his wall. He had e-mails saying this. Here's the book. 'Do not

---

[142]      (*See, e.g.*, Tr. vol. 4 at 39 (prosecution closing) & Gov. Ex. 47.)

[143]      (*See, e.g.*, Tr. vol. 4 at 39 42-43 (same) & Gov. Ex. 48.)

destroy any documents.' "[144]   That   statement was not just wholly irrelevant (because the documents that Elbert threw out were, as far as he reasonably believed, not within that scope) but quite obviously false as a matter of law.

First, the litigation hold memos were not notices from any government agency, nor were they even about any government investigation.  Instead, they were issued by Massey's own lawyers "to notify and advise" its employees "regarding *the company's need* to preserve information *related to the April 5, 2010 tragedy at the Upper Big Branch Mine*."[145]  Elbert had no reason whatsoever for thinking that security department visitor logs, incident reports, and other paperwork, especially from years before the disaster, had anything to do with the UBB tragedy.  Furthermore, *even if* Elbert had believed that the documents fell within the scope of Massey's litigation hold, the jury could not properly infer from Elbert's ignoring his *employer's* instructions that he was trying to impede the *government's* investigation.

The other guards shared Elbert's (accurate) interpretation of the hold memorandum's scope.  On direct examination by the prosecution, for example, Thomas Wingo stated that he also understood that because "when this originated, it was in the, in the presence of a major mine disaster,"[146] the memo was limited to documents related to the UBB tragedy.  Talking about compliance with the memo, Wingo added that "[t]he best advice [Elbert] gave us as a security department was to follow orders and never lie."[147]

Greg Clay, another prosecution witness, testified similarly:

Q       Now, I want to ask you — I want to switch topics a little bit and talk to you about some events that occurred after the Upper Big

---

[144]     (Tr. vol. 4 at 60 (emphasis added).)

[145]     (Tr. Gov. Ex. 47 (emphasis added).)

[146]     (Tr. vol. 2 at 147.)

[147]     (Tr. vol. 2 at 146.)

Branch explosion in April, 2010.  After the explosion, were you
talked to about retaining documents?

A     Yes.

Q     What were you told about that?

A     We was [*sic*] told not to throw away anything *that we thought
might have to do with, you know, an investigation.*

(Tr. vol. 2 at 205 (emphasis added).)

No evidence supported the government's theory that the litigation hold proved

Elbert's criminal intent.

> ### b.     The investigators did not just fail to tell Elbert they wanted the old documents in the barracks, but instead specifically lead Elbert to believe they were *not* interested in those documents.

The government argued that Elbert should have known not to destroy the old

paperwork because of the pending investigation (of which Elbert was undoubtedly aware,

especially since he had been subpoenaed to testify in November of the previous year).[148]  But as

discussed, before January 2011, *no one—and specifically no government investigator—had ever

asked Elbert—*or anyone else[149]*—for any of the paperwork that Jonathan was throwing out.*

Two investigators *had*, to the contrary, explicitly suggested to Elbert during their November 30,

2010, interrogation of him that they were *not* interested in those records.[150]

---

[148]     (Tr. vol. 4 at 56 ("You can determine what this defendant intended by looking at what he knew
and what he did.  What did he know?  He knew there was a federal investigation.  No question about
that.").)

[149]     (*See* discussion *supra* at 53;  *see also* Tr. vol. 2 at 166-67 (T. Wingo) ("Q: Okay. In that 282 days
[between the April 5, 2010 explosion and January 11, 2011 when Jonathan took out the trash], to your
knowledge, did MSHA or anyone else ever request any of the items that were stored in the basement of
the barracks?  A: They never requested nothing from me.  I've never been asked to get anything from the,
from the barracks.").)

[150]     (*See* Tr. vol. 2 at 70 ("Q: Would it be possible to get a copy of those records *for, say, the month
of April of this year?*") & 76 ("Q: Do you know if there were any logs kept of anybody entering, leaving
the — other than the two I said before, anybody entering or leaving the property at the Upper Big Branch
mine in either portal, whichever, *on the 1st through the 5th* [of April 2010], particularly on the 2nd, 3rd

No evidence supported the government's theory that the existence of the UBB disaster investigation showed Elbert's intent to impede that investigation by throwing out paperwork from years before the tragedy.

> **c.    The government's statement that Elbert knew the FBI was specifically interested in the documents in Elbert's office was both false and irrelevant.**

During its closing argument, the prosecution asked the jury to believe that Elbert should have known that the government was interested in some documents in Elbert's office based on their May 2010 search of his office, and that the jury could base their verdict on Count Three on this fact:  "Mr. Stover is aware of that search and aware that they are collecting documents."[151]   In rebuttal, the prosecution went so far as to say, "He admitted he knew the agents were looking for them.   That's it."[152]   These statements were not just misleadingly irrelevant;  they were also false.

They are misleadingly irrelevant, because the documents in Elbert's office were not the subject of Count Three.   As discussed earlier, the documents in Elbert's office were the ones that the government *had* asked for during Elbert's November 2010 interrogation, that the government does not allege were part of the ones that Jonathan Williams threw out.[153]

Worse, they are false because the sole evidence at trial was flatly to the contrary:

Q      You were present when the FBI removed documents from your office in May of 2010?

---

and 4th? . . .   We would make a request to look at ***those boxes***, if we don't already have them, of any other notations of any Massey employees, supervisor, hourly, whatever, that entered or left the property ***April 1st through April 5th through that portal connected to Upper Big Branch mine where the accident occurred***.").)

[151]      (Tr. vol. 4 at 41.)

[152]      (Tr. vol. 4 at 61.)

[153]      As noted, Elbert based his belief that the *older* documents were *not* relevant on the investigators' singular—and perfectly understandable—interest in the 2010 documents.

A I was in the area, yes, sir.

**Q** **But you were aware that they were picking up documents from your office?**

A **I knew they was in my office.  *I didn't know what all they was doing*.**

(Tr. vol. 3 at 185 (emphasis added).)[154]

### 2. The government's argument that Elbert told Jonathan to only throw out the records was undisputedly false.

Also during its closing argument, the prosecution asked the jury to infer that

Elbert had an evil motive from his telling Jonathan only to throw out what the government says

were the documents that it wanted:

> So, let's talk about what the defendant knew and the actions he took.  He knew he was not supposed to throw away anything.  What did he do?  *He ordered Mr. Williams to throw away all the documents in the barracks.*
>
> And you heard Jonathan.  What did he leave?  He left some broken monitors, some other boxes.  Why?  He wasn't specifically told to throw those out.  *The only things he threw away were those that he was specifically told to by the defendant.*

(Tr. vol. 4 at 43 (emphasis added).)

Generously, this statement was a terribly misleading half-truth, suggesting that

Elbert only ordered Jonathan to throw away the disputed documents.  But that is false:

Q Let's go to the first day then.  What did he tell you to do, or what did he tell you with respect to going to the barracks that first time?

---

[154] Nothing in the barracks was ever mentioned in May 2010.  (*See* Tr. vol. 3 at 86 (Agent Lafferty) ("Q: And that building [the barracks] was not within the description of the search warrant; is that right? A: It was not."); Tr. vol. 3 at 108-09 (Agent Lafferty) ("Q: Let me ask you the question I intended to ask you and thought that I had.   Did you ask anyone if there were any documents stored anywhere else?  I didn't mean to specify the barracks if I did.  Did you ask at the time of the search if there were any documents stored anywhere other than the building where you were?  A: I did not.").)

As Agent Laffery so eloquently put it:  "Q: Did you ask Mr. Stover or anyone else if there were any records stored anywhere other than the building where you were when you saw Mr. Stover?  A: Just to make clear, there was three areas that we were searching that day.  So, there was three areas." (*Id.*)

A     He wanted me to go and clean out the barracks and get **all the old junk** that's out of there and throw it in the dumpster **like old microwaves and VCRs, coffee pots that we had there that was no good, and all the old paperwork**.  And he said to throw the paperwork into the crusher, the dumpster, trash compactor; and the other stuff, put it in like a scrap metal bin, the metal stuff.

(Tr. vol. 3 at 29 (J. Williams on direct examination by the prosecution) (emphasis added).)

In fact, Elbert did *not* specifically instruct Jonathan to throw out *any* documents:

Q     Did Mr. Stover ever tell you specifically to throw out inspector logs?

A     No.

Q     And he didn't tell you to throw out visitor logs?

A     No.

Q     Didn't tell you to throw out incident reports?

A     No.

(Tr. vol. 3 at 60 (J. Williams).)[155]

The prosecutor's comment also falsely suggested to the jury that Jonathan had indeed thrown out only the records, also false:

Q     All right. The first time you visited the barracks, what did you do in January of this year I mean?

A     Of 2011?  I threw away the, the old, the microwaves, the coffee pots, VCRs, VCR tapes, all the old stuff.

(Tr. vol. 3 at 33 (J. Williams).)

No evidence supported the government's argument that Elbert had instructed Jonathan to do anything other than throw out "the old stuff."  Instead, all of the evidence was to the contrary.

---

[155]     (*Accord* Tr. vol. 3 at 147 (H. Stover) ("Q: Okay.  Did you tell him specifically, 'Be sure you throw away the visitors' logs and the inspectors' logs'?  A: No, sir.").)

3.    **The government's argument that the barracks cleanup was unprecedented was undisputedly false.**

The prosecution asked the jury to believe that the January 2011 barracks cleanup was nearly unprecedented, only happening once before, again suggesting that the second time must therefore surely have been for some criminal purpose:

> Now, we've heard testimony about how often these barracks were cleaned out; **once in 2002, 2003** because of a sewage leak that ruined some of the documents so they had to be thrown away, **and once in January of 2011** when the documents were subject to a legal hold order, when an explosion had occurred at the mine, when there were multiple investigations going on, when the defendant's guards were being interviewed and the defendant himself was being interviewed.

(Tr. vol. 3 at 42 (emphasis added).)

But this, too, inaccurately mischaracterized the sole evidence.  The prosecutor had evidently forgotten this testimony, from her own witness:

> Q    Okay.  Was it a regular practice — if not a written policy, was it a regular practice after that to clean the garage out periodically?
>
> A    *Periodically we did remove documents from that barracks.*

(Tr. vol. 2 at 162 (T. Wingo) (emphasis added).)  And Elbert also testified the same way:

> Q    Had you had officers or employees of Massey or employees of the contractors clean out that basement any other times?
>
> A    Yeah.  We have — I guess we still do — have young boys, grass cutters that come in.  And I'd have them go over to the garage and clean out the trash that accumulates, junk that would — like when they would change the oil or add oil to a car and stuff like that, you just accumulate junk over there.  I'd have them clean it out periodically.

(Tr. vol. 3 at 141.)

No evidence supported the government's argument that the barracks had only been cleaned out twice.  Instead, all of the evidence was to the contrary, *i.e.*, that it had been cleaned out many times during Elbert's tenure.

> **4.  The government improperly asked the jury to impermissibly speculate that Elbert asked Jonathan to used garbage bags to conceal his activities.**

The prosecution asked the jury to speculate as to why Elbert asked Jonathan to take the loose papers out of the cardboard boxes and put them into plastic trash bags when the cardboard boxes they were in were in such good condition:

> What were his instructions?  "Take those things out of the boxes and put them in garbage bags."  What could be the reason for that?  The boxes went into the dumpster also.  The boxes had lids on them.  ***The boxes were in good condition***.  They didn't reuse them.  *He had him dump them into a regular looking trash bag* **so it would look like the nighttime rover was taking trash to the dumpster**.

(Tr. vol. 4 at 43 (emphasis added).)  But this was once again worse than pure conjecture.

Elbert testified why he had asked Jonathan to use plastic bags instead of relying on the old cardboard boxes—to avoid making a mess.[156]  And the government's only witness on this refused to go along with the government's theory, truthfully testifying only that Elbert never explained to Jonathan why he wanted Jonathan to use new plastic bags instead of the old cardboard boxes.[157]  If that were the only evidence, then the prosecutor's statement would have been asking the jury to speculate, something that is quite improper.

---

[156]  (*See, e.g.*, Tr. vol. 3 at 144-45 ("Q: Well, first of all, tell me why you had him put the paperwork in garbage bags because they weren't stored in garbage bags, were they?  A: No, sir. They was in boxes. Q: Okay.  So, why did you ask him to go to the trouble of taking them out of the boxes and putting them in a garbage bag?  A: Well, what I was thinking was when you secured the plastic and when they're dumped at the dumpster or wherever they take them to, they wouldn't be scattered all over the trash dump.").)

[157]  (*See* Tr. vol. 2 at 29-30 ("Q: Did he give you instructions on, on what to do particularly with the paper?  A: He said to take it out of the boxes and put it in trash bags.  Q: Did he tell you why he wanted

But that was not the only evidence. The real evidence was, again, to the contrary:

Q    What condition were they in before you removed the papers from them?

A    Some of them were in pretty good condition, *and then some of them weren't in very good condition because they were stacked up on top of each other and the boxes were like crushed.*

(Tr. vol. 3 at 36-37 (J. Williams) (emphasis added).)

In fact, another one of the government's own witnesses, Jordan Cook, testified that, contrary to the government's assertion, it was clear, even using bags, that Mr. Williams was throwing out the old paperwork in the barracks on January 10, 2011:

A    Lieutenant — or Mr. Williams was disposing of papers from the barracks.

Q    How do you know that's what he was doing?

A    I could see the barracks.

Q    How did you know it was papers he was disposing of?

A    Just — you could see in the Durango pretty much.

Q    You could see the papers in the Durango?

A    They were bagged, but, yeah.

(Tr. vol 3 at 73 (J. Cook).)

The government may not "bridg[e] an evidentiary gap with rank speculation."[158] It certainly may not mislead the jury into believing that which is contrary to its own witnesses' testimony. No evidence supported the government's theory that Elbert's decision not to make a

---

you to do that?  A: Just clean out the barracks because it was a mess.  Q: No, I mean about taking them out of boxes.  A: Oh, about taking them out of boxes, no.").)

Jonathan even testified that some of the bags were orange, again hardly the bag of choice for stealthy document destruction.  (Tr. vol. 3 at 37.)

[158]    *Goldsmith v. Witkowski*, 981 F.2d 697, 703 (4th Cir. 1992), *cert. denied*, 509 U.S. 913 (1993).

mess somehow supported the argument that Elbert was a criminal.  Instead, all of the evidence was to the contrary, *i.e.*, that Elbert's stated reason was the real reason.

### E.    Summary.

After the prosecutors' closing arguments, it is little wonder how the jury could have forgotten the *real* evidence:  Four days after the UBB tragedy, Elbert Stover was advised by his own company's lawyers "about the retention of documents and electronically stored information *related to the Upper Big Branch tragedy*" for the company's own use.  Elbert therefore testified, without contradiction, that he believed that the hold applied only to documents that were "related to," *i.e.*, from around the same time as, the UBB tragedy.  The sole evidence from the other guards was that they believed the same thing.  The only possible inference to be drawn from this was that Elbert's belief was both genuine and reasonable.

But there was another reason why Elbert believed that the old documents that were part of the barracks cleanup were not related to the investigation UBB tragedy:  *Because the investigators themselves had told Elbert they weren't.*  Eight months after the explosion, not one but two government investigators specifically asked Elbert to preserve documents that might be related to, *i.e.*, **that were from around the same time as**, the UBB explosion.  Elbert promised he would, a promise the government has never alleged that Elbert did not keep.

A month later, Elbert went to move all of the 2010 documents to the barracks for storage, but the barracks was once again full of junk, including the older logs and reports *not* identified as relevant by the investigators on November 30.  So Elbert asked Jonathan Williams to clean the barracks out.  Given all of the circumstances surrounding the steps that Jonathan would have to take—steps Elbert was well aware of—it was completely irrational and unreasonable to have inferred that Elbert bore some "criminal intent" when he asked Jonathan to

put the junk into plastic bags and throw it out.  Rather, the sole evidence was that Elbert took no steps whatsoever to ask Jonathan to conceal or to expedite any facet of what he was doing.

Over the course of the next week or so, Jonathan was finally able to get the barracks cleaned out.  But then, without warning, the investigators changed their minds:  Now, the government told Massey's lawyers, it wanted *everything*.  So they called Elbert, who told them that he thought he'd already thrown the old stuff out, but that he would check and get back with them.  Elbert hung up and called Jonathan, who told Elbert that sure enough, he had already thrown the old records out, but that they were still in the dumpster.  Elbert immediately told Jonathan to "make sure nobody picks that dumpster up and dumps it" and to return the records to Elbert, who turned them over to the lawyers, who produced them to the government.  The government does not allege that it received less than everything it ever asked for.

From this, the United States indicted, and somehow convicted, Elbert for a twenty-year felony.  And for what?  For a handful of documents that were so important that even though the FBI knew about them (thanks to Elbert himself) on January 26, they could not be bothered to drive down the street and get them until a week and a half before trial, "skim" through them looking for just enough to prop up their "materiality" argument in Elbert's trial, and then file them back in a storage building.

### III. ELBERT STOVER WAS DENIED DUE PROCESS.

The extensive factual mischaracterizations that the prosecution fed the jury during closing arguments,[159] especially regarding Count Three, were bad enough.  But during the government's closing remarks, the prosecutor also gave the jury following wink-nudge:

> [T]here's too much at stake here.   This is an important investigation.  Send a message that this investigation ought to be allowed to go forward, that it can't be obstructed.

---

[159]      (*See* discussion *supra*.)

(Tr. vol. 4 at 61-62.)  The clear message?  Convict Elbert Stover, innocence notwithstanding,

because we need his conviction in order to "go forward" with the UBB investigation.

> Due process fortunately forbids this kind of conduct:

> A prosecutor may not urge jurors to convict a criminal
> defendant in order to protect community values, preserve civil
> order, or deter future lawbreaking. The evil lurking in such
> prosecutorial appeals is that the defendant will be convicted for
> reasons wholly irrelevant to his own guilt or innocence.  Jurors
> may be persuaded by such appeals to believe that, by convicting a
> defendant, they will assist in the solution of some pressing social
> problem.  The amelioration of society's woes is far too heavy a
> burden for the individual criminal defendant to bear.

*United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984) (footnotes omitted), *cert.*

*denied*, 470 U.S. 1085 (1985).  Prosecutors may not "point to a particular crisis in our society

and ask the jury to make a statement" with their verdict.[160]

The pervasive mischaracterizations of fact, exacerbated by the prosecutor's

closing suggestion that the jury should "send a message" or else the UBB tragedy will never be

solved, denied Elbert Stover due process and are independently adequate to warrant a new

trial.[161]  *See, e.g.*, *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th Cir. 2011) ("The point of

the 'send a memo' statement was that if the jury acquitted Sanchez . . . , the verdict would in

effect send a message to other drug couriers to use that defense themselves.").

---

[160]     *United States v. Leon–Reyes*, 177 F.3d 816, 823 (9th Cir. 1999);  *see, e.g.*, *United States v. Pupo*, 841 F.2d 1235, 1240 (4th Cir.), *cert. denied*, 488 U.S. 842 (1988);  *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992);  *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991).

[161]     *See United States v. Baptiste*, 596 F.3d 214, 226-27 (4th Cir. 2010) (setting out two-element, six-factor test for analyzing whether prosecutor's remarks constituted a denial of due process ((A) impropriety of the comment and (B) consequent prejudice, which in turn depends in part on "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;  (2) whether the remarks were isolated or extensive;  (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused;  (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters [; ] . . . (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel [;]  . . . and (6) whether curative instructions were given to the jury,", all of which are easily met here) (alterations in original).

69

## IV. CONCLUSION

Rule 29 requires that if the government fails to adduce "substantial evidence"[162] to sustain a conviction, then the defendant is entitled to acquittal.[163]   Because granting Defendant's motion does not require the Court to reassess the credibility of any witnesses[164] (there were, in fact, few if any truly factual disputes) or draw any inferences other than those reasonably drawn from the evidence,[165] and because the standard governing § 1001(a)(2) violations specifically gives rise to questions that were and remain legal questions for the court, the Court may (and here must) set aside the jury's verdict and acquit Mr. Stover on both counts.

Mr. Stover is aware of the fact that he bears a heavy burden in this regard,[166] but as demonstrated herein, he should not have been convicted of either count.   The United States failed to prove each element of the charges in the superseding indictment to any degree whatsoever, much less beyond a reasonable doubt.[167]   Under the governing standard of review, Elbert Stover is therefore entitled to be acquitted on both Count One and Count Three.   In the alternative, Mr. Stover is at the very least entitled to a new trial on both counts.[168]

---

[162]    *Glasser v. United States*, 315 U.S. 60, 80 (1942).  *See also United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005), *cert. denied*, 547 U.S. 1113 (2006).  "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

[163]    FED. R. CR. P. 29.

[164]    *See United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989);  *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983), *cert. denied*, 465 U.S. 1028 (1984).

[165]    *See United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982);  *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc), *cert. denied*, 519 U.S. 1151 (1997);  *Arrington*, 719 F.2d at 704.

[166]    *See United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

[167]    *See Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993);  *In re Winship*, 397 U.S. 358 (1970).

[168]    A court may grant a motion for a new trial under FED. R. CR. P. 33 "if the interest of justice so requires."  Although "a court should exercise its discretion to grant a new trial sparingly," it should "when the evidence weighs heavily against the verdict."  *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)) (internal quotations omitted), *cert. denied*, 540 U.S. 1185 (2004).  Unlike a motion for a judgment of acquittal, the Court is not constrained to view the evidence in the light most favorable to the Government and may evaluate the

### A.     Count One.

The standards governing Count One are clear:  Due process and the rule of lenity generally, and specifically the well-deserved fear of turning 18 U.S.C. § 1001 into a weapon of unbridled government discretion, so persuasively articulated by Justice Ginsburg in *Brogan*, all add up to require two things:  First, that during questioning, the government, not the defendant, bears the burdens of asking unambiguous questions and of getting unambiguous answers;  and second, that at trial, the government bears the burden of proving beyond a reasonable doubt that no reasonable interpretation of the defendant's statements can be reconciled with any reasonable interpretation of the facts.

But that is absolutely *not* what happened here, where the *only* possible reasonable interpretation—but at the very least a perfectly reasonable interpretation—of Elbert Stover's November 30, 2010, statement in the context of the questioning, as clearly reflected in the government's very own indictment, was clear:  He intended only to assert that in his opinion and as far as he knew, nothing at Performance, including the guards' all-visitor radio transmissions, violated the proscription against "advance notice" in 30 U.S.C. § 820(e).  The government failed to prove—indeed it made no effort to prove—that this was not a reasonable interpretation of the facts, *i.e.*, that there necessarily *was* such a violation occurring, such that Elbert's "statement" (if such an obvious opinion can ever even be called that) was necessarily false.  Finally, even if the government could somehow be said to have proved that there was "advance notice" in the way *Elbert* meant, it never proved that Elbert knew this.  Indeed, it is clear that all of the evidence— even the government's own evidence—flatly *disproved* that he knew anything about this.

---

credibility of the witnesses.  *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  Thus, a new trial is appropriate "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment. . . ."  *Id.*

If, on the other hand, the government responds that it proved that the radio policy did provide a far broader kind of "notification," then Count One still necessarily fails because the government did not prove that Elbert ever said anything to contradict that view.

Sadly, this case is exactly the one Justice Ginsburg feared:  For obvious reasons, the government either cannot or will not prosecute the real violators—the people who, unlike Elbert Stover, might have actually contributed to the death of twenty-nine miners, the people to whom the government appears to have granted immunity in exchange for their testimony.

Instead, it went for the weakest member of the herd, picking an uninvolved, high-school educated, small-town police officer—a man whom the government's own witnesses practically revered on the stand for his honesty, integrity, and law-abidingness[169]—and then sics on him a pack of college-educated federal investigators, who illegally compel him to attend an inquisition and ask him a string of ambiguous questions.  When he gives them an ambiguous answer that they alone understand has an interpretation that is consistent with what they know to be the truth, but that also has an interpretation that is inconsistent with what they know to be the truth, they refuse to ask him to clear up the ambiguity and instead cut off every attempt he makes to do so, and then indict him for lying and send him to prison.

The Supreme Court of the United States tells us that it has "traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in

---

[169]     (*See, e.g.*, Tr. vol. 2 at 173 (T. Wingo) ("Q: What is his reputation with the others and you, his community of workers, for being truthful and honest and having a reputation for veracity, for being truthful and honest?  A: Mr. Stover was a firm by-the-book boss.  He wanted everything by the book, which is honesty.  He didn't want, he didn't want us to do anything illegal.  He wanted us to be up front and honest with him.  That's the kind of communication I had with Mr. Stover. . . .");  Tr. vol. 3 at 68 (J. Williams) ("Q: Okay.  Are you familiar with, with Mr. Stover's reputation among the guards and the people who work at UBB for honesty and truth and veracity?  A: Yes.  Q: What is that reputation? A: He's, he's by the book. I know that. He don't like — he wants everything done like it's supposed to and he's real strict.  And he's, he's always been honest with me as far as I know.").)

language that the common world will understand, of what the law intends to do if a certain line is passed.' "[170]  This case demanded that restraint.  Elbert Stover answered questions at his peril.[171] He was convicted for being ineloquent and less well-educated than his interrogators.  That is, however, no crime, and the law does not permit this.

Accordingly, Defendant requests the Court to **GRANT** his motion and to **ORDER** that a **JUDGEMENT OF ACQUITTAL** be entered as to Hughie Elbert Stover on Count One of the superseding indictment, or in the alternative **ORDER** that Mr. Stover receive a new trial on Count One of the superseding indictment.

**B.**     **Count Three.**

It is perhaps understandable how the jury might come to believe that Elbert intended to impede the government's investigation of the UBB tragedy when he asked Jonathan Williams to take out the trash:  They believed what the prosecutors told them in opening and closing arguments.

But the prosecution made promises in their opening that it never delivered on, and in its closing, it "summarized" the evidence in a way that was not just unsupported by, but flatly contradicted by, even their own evidence.  They asked the jury to believe that Elbert must surely have had a criminal purpose in mind, because he knew the litigation hold covered the documents that were part of what he asked Jonathan to throw away, he knew the investigators were interested in those documents, and he knew the FBI had been looking for some documents.  They told the jury that it should infer Elbert's intent to obstruct justice from the fact that he told Jonathan specifically to throw out only certain documents, that this was only the second time the barracks had ever been cleared out in over a decade, and that he asked Jonathan to use plastic

---

[170]      *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (citations omitted).

[171]      *See United States v. Diogo*, 320 F.2d 898, 905 (2d Cir. 1963).

bags instead of the perfectly usable cardboard boxes the records were already in so nobody would suspect he was throwing out documents.

As the Court is aware, however, the problem with all of these theories is worse than that they simply required the jury to impermissibly speculate about Elbert's motive in the face of a *lack* of evidence.  That alone would be reason enough to order his acquittal.  But the prosecution did not stop at insufficient evidence.  The problem with all of these theories is that the sole evidence at trial flatly contradicted every one of them.  In a word, they are all **false**.

Like Count One, this is not a "weight of the evidence" or "witness credibility" question of the kind that normally should be left to the jury.  As demonstrated, the government failed to introduce *any* evidence, much less substantial evidence, to support convicting Elbert Stover of violating 18 U.S.C. § 1519.  Because of the government's burden of proof at trial, that alone is independently adequate to require acquittal.  Defendant further pointed out the evidence favorable to his positions here merely to show that the jury's verdict was not just unsupported by substantial evidence, but was instead *contrary* to that evidence.

Accordingly, Defendant requests the Court to **GRANT** his motion and to **ORDER** that a **JUDGEMENT OF ACQUITTAL** be entered as to Hughie Elbert Stover on Count Three of the superseding indictment, or in the alternative **ORDER** that Mr. Stover receive a new trial on Count Three of the superseding indictment.

HUGHIE ELBERT STOVER,
By Counsel

/s/ William D. Wilmoth

William D. Wilmoth, Esq. (W. Va. Bar. No. 4075)
William J. O'Brien, Esq. (W. Va. Bar No. 10549)
Robert L. Bailey, Esq. (W. Va. Bar No. 8902)
1233 Main Street Suite 3000
P. O. Box 751
Wheeling, WV 26003-0751
Telephone:    (304) 233-0000
Facsimile:    (304) 233-0014

*Counsel for Defendant*

**STEPTOE & JOHNSON PLLC**
*Of Counsel*

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**At Beckley**

**UNITED STATES OF AMERICA**

**CRIMINAL NO. 5:11-CR-00038**

*v.*
**Judge Berger**

**HUGHIE ELBERT STOVER**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of January 2012, I have electronically filed

*"Memorandum in Support of Defendant's Motion for Judgment of Acquittal"* with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to the following

CM/ECF participants:

> R. Booth Goodwin, II
> Blaire L. Malkin
> Steven R. Ruby
> United States Attorney
> Southern District of West Virginia
> 300 Virginia Street, East, Room 4000
> Charleston, West Virginia  25301

/s/ William D. Wilmoth

5926174                                                                873440.00001