IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 5:11-00038

HUGHIE ELBERT STOVER

RESPONSE OF THE UNITED STATES TO DEFENDANT'S
RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL,
MOTION FOR NEW TRIAL, AND MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

In November 2011, after being convicted at trial on two counts of the Superseding Indictment, defendant Hughie Elbert Stover filed a renewed motion for judgment of acquittal and a motion for new trial. His renewed motion for judgment of acquittal raised a claim of insufficient evidence.  His motion for new trial raised three grounds: "(1) failure to grant pre-trial motions, (2) improper jury instructions and (3) insufficient evidence."

In January 2012, Stover filed a lengthy memorandum in support of his post-trial motions. In that memorandum, Stover argues against the sufficiency of the evidence and challenges the Court's pre-trial ruling that denied his motions to suppress his statements made during an interview on November 30, 2010.  He also raises an additional ground for overturning the jury's verdicts that he did not raise in his post-trial motions filed in November 2011.   Stover now claims a due process violation based on "pervasive

mischaracterizations of fact, exacerbated by the prosecutor's closing suggestion that the jury should 'send a message' or else the UBB tragedy will never be solved." Def. Memo. at 69. Stover fails to offer any support in his Memorandum for one of the grounds listed in his new trial motion, the allegedly improper jury instructions.

For the reasons explained more fully below, Stover's post-trial motions should be denied. Under the applicable legal standards for considering motions for judgment of acquittal and for new trial, there was more than sufficient evidence from which a reasonable jury could find Stover guilty as to all elements of the two counts of conviction. In addition, the Court properly denied Stover's pre-trial motions challenging the use at trial of Stover's November 30 statements.

As for Stover's due process argument, Stover did not timely raise this ground pursuant to Fed. R. Crim. P. 33(b)(2), and the Court should therefore not consider the argument. The due process argument, however, also fails on its own lack of merit, as explained below.

Finally, Stover should be deemed to have abandoned the issue of improper jury instructions as a basis to overturn the jury's verdicts.

## II.   STANDARD OF REVIEW FOR RULE 29 AND RULE 33 MOTIONS

For purposes of a Rule 29 motion, the evidence must be viewed in the light most favorable to the United States, to determine if "*any* rational trier of facts could have found Stover guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (emphasis added). Circumstantial evidence must be considered as well as

2

direct evidence, and the United States must be afforded the benefit of all reasonable inferences from the evidence. *Id.* at 1021.  As to how much evidence is enough to withstand a Rule 29 motion for judgment of acquittal, the Fourth Circuit has noted that even the uncorroborated testimony of a single witness may be sufficient. *See, e.g., United States v. Arrington*, 719 F.2d 701, 704-05 (4th Cir. 1983).  The credibility of the witnesses, moreover, is not to be considered.  To the contrary, credibility – or lack of credibility – of witnesses is strictly a matter for the jury, *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989), and it must be assumed the jury resolved all contradictions in favor of the prosecution. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).  Consequently, the Fourth Circuit has made clear that a defendant raising such a challenge bears "a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

In deciding a Rule 33 motion for new trial, the trial court has broader discretion to review the evidence and weigh the credibility of witnesses. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  Under Rule 33(a) a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." *See United States v. Lentz,* 383 F.3d 191, 219 (4th Cir. 2004).  While a district court has discretion to grant a new trial, it should, however, "exercise its discretion . . . 'sparingly' and  . . . should grant a new trial . . . 'only when the evidence weighs heavily against the verdict.'" *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997).  Additionally, although a district court has the power to evaluate witness credibility under Rule 33, the rule does not authorize the district

court to grant a new trial merely because it disbelieves part or all of the testimony of a government witness.  Witness credibility remains essentially a jury function.  Accordingly, a district court may not override a jury's credibility determination except in extraordinary circumstances, as where the witness's testimony is patently incredible or it violates physical laws. *See, e.g., United States v. Sanchez*, 969 F.2d 1409, 1414 (2d. Cir. 1992) (reversing grant of new trial based on district court's conclusion that government witnesses were not credible); *United States v. Kuzniar*, 881 F.2d 466, 470-71 (7th Cir. 1989) (same).  Moreover, a district court should not grant a new trial under Rule 33 simply because it disagrees with the jury's verdict.  *See Arrington*, 757 F.2d at 1486.

## III.   SUFFICIENCY OF THE EVIDENCE ON COUNT ONE

Stover essentially argues that the United States did not meet its burden of proof as to two elements of Count One.  He argues that the United States failed to prove that his statements were false, and that it further failed to prove that Stover knew they were false. Stover restates his Rule 29 arguments and the arguments he advanced in his pre-trial motion to dismiss, all of which the Court rejected before trial.  The Court addressed the legal issues for a second time after Stover raised his Rule 29 argument at the close of trial. The Court found that given Stover's plain statement, there was no legal issue with the way the questions were asked of Stover on November 30, 2010.  The Court should reaffirm its earlier findings, as Stover's arguments are without merit.  The trial record illustrates that there was overwhelming evidence to support the jury's verdict on Count One.

### A.   The Elements of 18 U.S.C. § 1001

In its instructions to the jury, the Court set out the elements of 18 U.S.C. § 1001 that the United States had to establish beyond a reasonable doubt.  These were that (1) on or about November 30, 2010, at or near Beaver, Raleigh County, West Virginia; (2) Stover made a false, fictitious or fraudulent statement or representation; (3) that in making the false, fictitious or fraudulent statement or representation, Stover acted knowingly and willfully; and (4) that the false, fictitious or fraudulent statement or representation made by Stover was material to a matter within the jurisdiction of the executive branch of the United States, that is the United States Department of Labor and the Mine Safety and Health Administration. Court's Charge to the Jury at 13-14.  The Court further explained that "[a] statement is false or fictitious if untrue when made and known to be untrue by the person making it. A statement is fraudulent if known to be untrue when made and made with intent to deceive."  *Id.* at 14.  The government had the burden "to negative any reasonable interpretation that would make Stover's statement factually correct," and the government had to prove beyond a reasonable doubt that the statement was made with knowledge of its falsity.  *Id.* at 14-15.

### B.   There Was Sufficient Evidence That Stover's Statement Was False

Stover argues that his statements at his November 30, 2010 interview were literally and factually correct. Stover argues strenuously that his case involved imprecise questioning by the government that resulted in an ambiguous and literally true answer by Stover. These assertions are belied by the evidence at trial and should be rejected by the Court.

In his interview on November 30, 2010, Stover was asked questions about the training of security guards and any specific instructions that guards are given. Govt. Ex. 3 at 38. He was next asked about specific instructions for visitors. *Id.* at 39. At this point, Stover himself raised the practice regarding inspectors. He stated, "One thing that is hammered in our head, you do not ask inspectors where they're going and you do not call the mines. You do not notify no one when inspectors come on that property. In fact, that is in our SOP, that you do not notify no one." *Id.* This topic was brought up by the interviewers on several other occasions, giving Stover many opportunities to clarify or elaborate on his original answer. For example, he was asked, "Could you elaborate. Just – I can go through the question specifically. You received information from Massey Coal Services with regard to notification issues and with regard to other instructions vis-à-vis inspectors on the property. Can you tell me what those have been." Stover responded, "It says when inspectors come on the property you do not call the mines. You do not notify no one." *Id.* at 70. He was then asked one more time, "Are there any other related instructions with regard to inspectors? Any other instructions with regard to inspectors?" He plainly responded, "That's it. When inspectors come on the job, we do not call the mines, do not notify." *Id.* at 71.

The evidence at trial was that these statements by Stover were false, that in fact, notification was routinely given by the security guards when inspectors came on the property, and that Stover himself had trained and instructed the security guards to provide

this notification over two radio channels.  The guards' testimony was unchallenged at trial. Each guard that testified explained how the system worked in the same way.

Quincy Burgess, a guard who worked for Stover at the Upper Big Branch and Ed Wight mines, testified that when an inspector came on the property his presence was announced over the Montcoal and security radio channels.  Trial Tr. Vol. II at 109.  He further explained that he sometimes got a response to these announcements.  After announcing an inspector, he would from time to time receive a phone call from the mine dispatcher who had heard the announcement over the radio.  *Id.* at 108.  Burgess explained he had been trained to make these notifications. *Id.* at 109.  Burgess also identified a memorandum (Govt. Ex. 5), written by Stover, that reminded guards to call out everyone not just the inspectors.  This practice was confirmed by the testimony of Tommy Wingo, Charles Lilly, and Jonathan Williams.

Charles Lilly explained in his testimony that when inspectors came on to the mine site, he announced their arrival on the security and Montcoal radio channels. Trial Tr. Vol. II at 216-17.  He further testified that he was told to do this by Stover.  *Id.* at 217.  He explained that only the security guards had access to the security channel but that the Montcoal channel went different places including to the mine and to most of the vehicles that the bosses used.  *Id.* at 217.  Mr. Lilly then recounted an incident where he had been "read the riot act" by an inspector for calling out his presence on the radio.  The inspector told Mr. Lilly that this practice was "absolutely illegal, that we couldn't do it, and not to do

it anymore." *Id.* at 218.  After this occurred, Mr. Lilly informed Stover about it and wrote a report on it.  *Id.*

These notifications sent out by the guards were transmitted to the dispatchers who then sent the information underground.  Bobbie Pauley, a mine dispatcher, testified about how the notification system worked at the Upper Big Branch Mine.  Ms. Pauley was stationed at the mine office, where there was a radio about seven feet from her. Trial Tr. Vol. II at 182.  She could hear the transmissions that came across the radio, which was set to the Montcoal channel.  *Id.* at 187.  She explained that she could hear the guard shack announcing that an inspector was on the property.  *Id.* at 183.  When she heard this announcement she advised the superintendent or someone else in a position of authority. *Id.* at 184.  She was then instructed to call or page underground to the let the miners underground know that an inspector was on the way.  *Id.*  This same information was confirmed by Greg Clay in his testimony.  He testified that the radio in the mine office was set to the Montcoal channel and that was never changed.  *Id.* at 200.  He would hear the security guards making announcements over that radio.  They would announce who was on the property and to which mine they were en route.  *Id.* at 201.  After he heard the announcement that an inspector was on the property, the superintendent or mine foreman would tell him to notify the miners underground.  *Id.* at 202.

Stover himself agreed with much of the testimony given by the guards.  Stover was asked on direct examination who could have heard announcements that were made over

the Montcoal radio channel.  He responded the belt crew, that there was a radio at the mine office, and that the president of the company and the safety director had access to that channel in their vehicles. Trial Tr. Vol. III at 161-62.  Stover confirmed that inspectors were announced over both the Montcoal and security radio channels.  *Id.* at 162.  He explained, "When they would notify me on the radio on both channels, you know, there was the opportunity for people to hear what was being said. But the only person that was notified was me on both channels."  *Id.* at 168.

In sum, the evidence on the record at trial was overwhelming that Stover's statement to the MSHA team that no one was notified when inspectors came on the property was false.  At a minimum, Stover admitted at trial that *he* was notified over both radio channels that an inspector was on the property, and that the Montcoal radio channel was broadcast to the mine site, as well as potentially to the company president and safety director.  Moreover, the security guards uniformly explained a practice and policy of notifying the mine of the presence of inspectors by making these announcements over the Montcoal and security channels.

Stover's statement that no one was notified when inspectors came on the property was clearly false, as demonstrated more than sufficiently by the evidence in the record.

### C.  There Was Sufficient Evidence That Stover Knew His Statement Was Untrue When He Made It

Stover also argues that even if his statements were false, he did not know they were false based on his interpretation of the questions.  Stover asserts that the policy of

announcing inspectors over the radio did not violate 30 U.S.C. § 820(e), and that therefore he could not know that his statements to the MSHA interviewers -- that no one was notified when inspectors came on the property -- were false.  This argument is without merit.

Contrary to the argument put forward by Stover about the imprecision and ambiguity of the questions posed to him, the questions asked at the November 30, 2010 were very plain, as were Stover's responses. He was not asked technical questions about statutory violations.  Instead he was asked about the procedures and the instructions that were followed when inspectors arrived on the mine property.  He described the policy in his own words. That policy was that *no one* was notified when inspectors came on the property.  That statement, as discussed above, was proved to be false at trial.

The evidence at trial proved that, as alleged in the Superseding Indictment, Stover was aware of the practice and policy of providing notice of an inspector's arrival on the property over two radio channels and that he in fact directed and enforced this practice. The evidence at trial further demonstrated that Stover was aware that these notifications went to the mine site and to others at the mine property.  Moreover, although unnecessary to proving the charges, there was also evidence at trial that Stover was aware that the practice of notification via the radio channels was indeed illegal.  As described above, this evidence came in through the testimony of Charles Lilly, Quincy Burgess, Bobbie Pauley, Greg Clay, and Stover.

The evidence at trial also showed that Stover was well aware that the investigators were interested in what guards did when MSHA inspectors came on the property, and that they were interested in all methods by which notification was given.  This context further demonstrates that Stover knew his answers were false when he gave them.

Tommy Wingo testified that after he was interviewed by the FBI in the fall of 2010, he discussed the interview with Stover.  He told Stover, "that the main concern of that interview was how we handled radio procedures with inspectors." Trial Tr. Vol. II at 149. Wingo testified that he told Stover he had explained to the FBI agents that they notified the presence of inspectors over both the Montcoal and security radio channels. *Id.*

Special Agent Robert Pruden testified about his interview of Stover on November 3, 2010, approximately four weeks before his interview with the MSHA team. Trial Tr. Vol. III at 7.  During this interview he discussed with Stover the different types of communication the guards had available to them.  *Id.* at 18.  These included the radio, phone, and CB radio.  *Id.*  After the discussion of the methods of communication, he asked Stover "if any notification of inspectors were made when they came on the property at the mine site." *Id.* at 10.  Stover told Pruden that only he, Stover, was notified and no one else.  *Id.*

The testimony from all the security guards, from Wingo, Clay, Pauley, and Special Agent Pruden, combined with Stover's own memorandum reminding his guards to call out everyone on the radio not just inspectors, Govt. Ex. 5, and his own statements about who listened to the radio transmissions, provided more than sufficient evidence for the jury to

11

have found that Stover knew his statements that no one was notified when inspectors came on the mine property to be false.

### D.  Stover's Interpretation of His Statements Is Not Reasonable or Credible

Stover asserts that only reasonable interpretation of his responses to the questions at the MSHA deposition was that as he understood the law nothing that was done at the Upper Big Branch mine constituted advance notice.  This assertion fails.  For this argument to succeed one would have to ignore the wording of the questions as posed to Stover, Stover's clear answers, and all the evidence of the practices and policies of the security guards that existed at the Upper Big Branch mine and which were directed by Stover.

As Stover emphasized in his memorandum, we have Stover's exact words available to us, and his exact words state over and over again that when inspectors came on the property, *no one* was notified.  Stover states in his brief that "the only possible reasonable interpretation . . . is that as far as he knew and as had been explained to him by the company's management and attorneys, 'notify' and 'call' were terms that Elbert understood meant calling someone in the mine to warn them that inspectors were coming in a way that violated 820(e)."  Def. Mem. at 21.  This explanation completely ignores the questions Stover was asked.  Stover was not asked, "Was illegal notice given when inspectors came on the property?"   Rather, Stover was asked, in several different ways, what were the instructions with regard to inspectors?  Stover responded to each question that the only instructions were that they did not call the mines, and did not notify anyone.  When given

12

the chance to elaborate and discuss other related instructions, Stover said there were no other instructions.  As Stover well knew there were other instructions in place.  As testified to by all the security guards the instructions were to notify the presence of inspectors over two radio channels.

Stover's proffered explanation of his answers is unreasonable, and the jury had the right to reject this theory based on the evidence it heard a trial.  The jury's conclusion that Stover knowingly and willfully made false statements should be upheld based on the evidence at trial.

## IV. THE COURT PROPERLY DENIED STOVER'S MOTION TO EXCLUDE HIS STATEMENTS OF NOVEMBER 30, 2010

Finally on Count One, Stover repeats and reasserts many of the arguments he made in his motion *in limine* to exclude statements [Docket 35]. Stover maintains that the statement given by Stover on November 30, 2010, should have been suppressed because the subpoena was issued outside the scope of WVOMHST's authority or in the alternative that MSHA improperly used WVOMHST's authority to take an action it could not have taken on its own.

The United States has previously responded to these arguments, and therefore hereby incorporates its prior response [Docket 41].  As the United States previously stated Stover's argument rests on a misinterpretation of the relevant West Virginia statute.  The statute clearly confers on WVOMHST the power to subpoena witnesses, "for the purpose of conducting hearings into . . . mine explosions."  Stover was subpoenaed under this

13

power, for the purpose of conducting a hearing into a mine explosion. Again, as the United States asserted in its prior response, the simple fact that MSHA also participated in the deposition in no way invalidates the subpoena. Moreover, Stover's proposed remedy of exclusion is not the appropriate remedy. As the United States has explained previously there was no constitutional violation.

The Court rejected Stover's arguments in an order issued on October 18, 2011 [Docket 97]. The Court properly rejected these arguments finding that even if the subpoena was invalid, the statements made and evidence derived from it were not legally excludable under the exclusionary rule, as any impropriety would have derived from a statutory violation. Docket 97, Mem. Op. & Order at 10. The Court should again reject Stover's arguments.

## V.    COUNT THREE

### A.    Elements of the Offense

Count Three of the Superseding Indictment charged Stover with violating 18 U.S.C. § 1519 on or about January 11, 2011. The offense was based on Stover's ordering Jonathan Williams to dispose of thousands of documents that were stored in a building known as the "Barracks." The documents were security-related papers that included visitor logs, incident reports, inspector logs, etc. Williams did as Stover ordered, placing the documents and other items in a trash compactor on UBB property. The documents were recovered before they were compacted and destroyed.

14

As the Court instructed the jury, the elements of this offense are:

First: That on or about January 11, 2011, at or near Montcoal, Raleigh County, West Virginia;

Second: Hughie Elbert Stover knowingly caused the Known Person to conceal, cover up, mutilate or destroy records or documents;

Third:  That Hughie Elbert Stover did so with the intent to impede, obstruct, or influence the investigation or proper administration; and

Fourth:  That the matter was within the jurisdiction of a department or agency of the United States, that is, the Federal Bureau of Investigation and the Mine Safety and Health Administration.[1]

### B.      Analysis of the Sufficiency of the Evidence

A summary of Stover's argument on Count Three may be found on page 56 of his Memorandum:  "Mr. Stover does not dispute that he asked Jonathan to clean out the barracks, or that the old records were mixed in with the rest of the junk that Elbert wanted Jonathan to throw out. . . .  [T]he government failed at trial to prove that Elbert did so with the requisite *mens rea*."  He then cites to parts of the trial that support his theory of innocence, drawing evidentiary inferences in his favor and refusing reasonable inferences favorable to the government's case (inferences the jury presumably drew). As detailed

---

[1]  Court's Charge to the Jury at 17.  Stover offers a slightly different formulation of the elements in his Memorandum, at page 57.  Stover's version of the elements does not differ materially from the Court's jury instruction.

below, however, the evidence at trial overwhelmingly supports the jury's verdict as to Count Three.

As an initial matter, there is no doubt that the documents stored in the Barracks, and which were subsequently thrown in the trash compactor by Jonathan Williams in January 2011, were relevant to the FBI's criminal investigation. In his direct testimony, Special Agent Lafferty explained the scope of the documents, the types of documents, and their importance to the investigation. Trial Tr. Vol. III, at 93-94. And both Special Agent Lafferty and Special Agent Pruden testified about the FBI's responsibility to investigate federal crimes, including violations of the Mine Act under Title 30 of the United States Code. *Id.* at 81-82 (Lafferty); *id.* at 5 (Pruden). Special Agent Pruden also explained that the investigation included determining "if notification of mine inspectors were being made when they came onto the property." *Id.* at 5-6. Some of the documents recovered from the trash compactor related to this issue. *See id.* at 95-101 and exhibits referred to therein (Lafferty explaining how specific documents were recovered in the documents thrown in the trash compactor). *Id.* at 95-101. Stover does not dispute this element in his Memorandum.

There also can be no doubt that Stover told Williams to get rid of almost all of the documents that had been stored in the Barracks. Williams testified, "[H]e said to throw the paperwork in the crusher, the dumpster, trash compactor." Trial Tr. Vol. III at 29. Williams added, "He said to take [the paperwork] out of the boxes and put it in trash bags." *Id.*  Williams explained that Stover ordered him to retain certain documents. *Id.* at

30. *See also id.* at 42-43 and Govt. Exs. 28 and 29 (Williams testimony explaining, and photos showing one box of documents retained), *compared with* Stipulation (Docket 144) and Govt. Ex. 39 (photo of 20 banker boxes of documents recovered from trash compactor). And Stover admitted at trial that he told Williams to get rid of paperwork and to put it into trash bags. See, e.g., Trial Tr. Vol. III at 195. Again, it cannot be seriously disputed that Stover knowingly caused Williams to get rid of documents.

Stover does dispute the issue of his intent, i.e., whether he intended to impede, obstruct or influence the investigation. The record, however, is replete with evidence from which any rational trier of fact could have found that Stover acted with the requisite intent.

The evidence includes the following:

- Stover knew that the FBI was conducting an investigation. Trial Tr. Vol. III at 160 (Stover admitting that he knew the FBI was doing an investigation).

- Stover knew that the FBI was interested in determining whether any notification was being provided about the arrival of MSHA inspectors to the UBB Mine. Wingo told Stover that he had been interviewed by the FBI about the policy for handling inspectors including the policy of announcing inspectors, radio procedures including the use of the Montcoal and security channels, and the use of the inspectors' logs. Trial Tr. Vol. II at 149-50 (Wingo testimony). Wingo's interview occurred in the fall of 2010, *id.* at 149, and he talked with Stover about it within two or three days. *Id.* at 150. Special Agent Pruden interviewed Stover on November 3, 2010, and they discussed who was notified when an inspector arrived on the mine property and the use of the radio. Trial Tr. Vol. III at 10, 18.

- Stover knew that the FBI was interested in an incident in which an MSHA inspector had upbraided one of his guards for "making notification of that mine inspector's presence on the property." Trial Tr. Vol. III at 13 (Pruden

testimony). This was the incident that Charles Lilly, the guard who had been reprimanded, had described. *Id.*

- After the incident involving Charles Lilly, in which Lilly had been "read the riot act" by an MSHA inspector, Lilly had talked to Stover about it and prepared an incident report. Trial Tr. Vol. II at 218-22 (Lilly testimony), Trial Tr. Vol. III at 188 (Stover testimony). Stover knew Lilly had prepared a report about the incident and that this incident report had been submitted to the then-president of Performance, Craig Boggs. Stover himself had discussed the incident with Boggs. *Id.* at 188-89. Only some incident reports were submitted to Boggs, not all of them. *Id.* at 189.

- Stover knew that incident reports were stored in the Barracks. Trial Tr. Vol. III at 199.

- Stover knew that the FBI was interested in certain other types of security-related documents. Trial Tr. Vol. III at 10, 12 (Pruden testimony, discussing visitor logs, inspector logs and standard operating procedure with Stover).

- Stover knew that those types of documents were also located in the Barracks. Trial Tr. Vol. III at 195, 199 (Stover testimony). In addition, Wingo testified how security-related documents were maintained at the guard shack for a time, then kept by Stover personally, and finally stored in the Barracks, as part of the regular course of business. Trial Tr. Vol. II at 130-31.

- Stover knew that his security guards were being subpoenaed to the grand jury. Trial Tr. Vol. III at 191 (Stover); *id.* at 32 (Williams); Trial Tr. Vol. II at 151 (Wingo).

- Stover knew that Massey Energy Company had ordered that all documents related to the UBB Mine be retained, without exception for the type or location of the documents (the so-called "legal hold"). Trial Tr. Vol. III at 139.

- Stover knew that the "legal hold" applied to the security-related documents that he had stored in the Barracks. After the "legal hold" was issued, Stover told his guards "[d]o not allow nothing to come off of the property." Trial Tr. Vol. II at 146 (Wingo testimony). This meant "everything on the property." *Id.* at 147. *See also* Trial Tr. Vol. III at 139, 140 (Stover testimony, stating that legal hold memo "said don't throw nothing away," and when he read

18

the legal hold memo, he thought "I file everything by the month anyway. . . . And I thought that's easy because I do it anyway.").

- Prior to January 2011, the last time documents in the Barracks had been discarded was in approximately 2003.  Trial Tr. Vol. II at 144-45, 159, 174 (Wingo testimony); Trial Tr. Vol. III at 141, 142 (Stover testimony, "one time, which has been brought up, when we had a sewer leak in the basement;" sewer backup was in 2002 or 2003).

- Stover told Williams to take the papers out of the boxes and place them in garbage bags. Stover did not explain his reasons to Williams. Trial Tr. Vol. III at 56 (Williams testimony). And while Stover has asserted that his reason was to keep papers from scattering about, placing the papers in garbage bags also meant that anyone who glanced in the compactor would not see the documents.

- Stover lied during his interview of November 30, 2010, as discussed above, in discussing notification of the presence of MSHA inspectors on mine property.  Evidence that he had lied could be found in the security-related documents that were included in the thousands of documents Stover ordered Williams to throw away.

Thus, at a time when he had been ordered not to dispose of or otherwise destroy any documents related to the mine, and in the midst of an ongoing FBI criminal investigation -- an investigation that had focused on a) his guards, b) the practice of announcing the arrival of MSHA inspectors over the radio, and c) documents related to that practice, all facts of which he was aware -- and despite the fact that he had not ordered the destruction of documents in almost eight years, Stover ordered Williams to get rid of nearly all of the stored papers and hide them in garbage bags.  And he gave that order while knowing that the types of records the FBI was interested in would be destroyed.

The facts listed above represent circumstantial evidence that Stover intended to impede the federal criminal investigation. In cases such as this one where Stover's intent is at issue, "circumstantial evidence is often an important means of proving what the [Stover's] state of mind was at the time of the events in question. Sometimes it is the only means of proving state of mind." Court's Charge to the Jury, at 5.  Moreover, as the Court instructed the jury, it may be inferred that "a person intends that which is the natural and probable consequences of his knowing acts." *Id.* at 17.

Certainly Stover can go through the record to find fragments of evidence that he believes support his theory of innocence.[2]  But no matter how stridently he argues now, the fact remains that there was more than sufficient evidence supporting the government's case on Stover's intent.  The jury was free to decide to believe the government's case, and not Stover's theory.  *See United States v. Goggin*, 853 F.2d 843, 846 (11th Cir. 1988) ("Presented with two narratives, one tending to establish defendants' guilt and another tending to establish their innocence, the jury was entitled to choose the account offered by the government.").

---

[2] In one instance, however, Stover makes a claim that is *not* supported by the record. He states on page 55 of his Memorandum that "he had Jonathan drive back over, *collect the papers, and return them to Elbert, who gave them to the attorney*, who in turn ultimately turned them over to the federal investigators." (Emphasis supplied.) This assertion has no evidentiary support whatsoever.  *See* Trial Tr. Vol. III at 64 (Williams testifying that after he told Stover that the documents were still in the compactor, Stover did not tell Williams to do anything about that); *id.* at 155 (Stover testimony about conversation with Williams about documents). There simply is nothing in the record to support the notion that Stover had Williams retrieve the documents from the trash compactor and give them to Stover.

The circumstantial evidence cited above is not all that supports the jury's verdict. Stover testified at trial and thereby put his own credibility directly at issue. The jury was entitled not to believe him.  *See*, *e.g.*, *Goggin*, 853 F.2d at 846 (noting that where defendant testified, the jury was entitled to disbelieve him). When a defendant puts his credibility at issue at trial, his lack of credibility may also be considered as part of the sum of the evidence against him.

In assessing Stover's credibility, the jury was free to consider such things as his memory or lack of memory, his demeanor and manner of testifying, the reasonableness or unreasonableness of his testimony, contradictory statements of other witnesses, *see* Court's Charge to the Jury at 8, and "all other circumstances appearing from the evidence." *Id.* at 9.

Here, Stover denied more than once that he acted with any criminal intent.  His denials could easily have been viewed by any rational trier of act as simply not credible. First, as stated earlier, there was plenty of circumstantial evidence indicating that he had in fact acted with criminal intent.  The jury was entitled to weigh this evidence against Stover's denials and determine that he was not telling the truth.  A well-founded belief that Stover has lied on the witness stand about his intent leads inexorably to the conclusion that he did indeed act with criminal intent.

Second, the manner in which he denied criminal intent was also something the jury could weigh against him. Stover took pains to elicit testimony that he was a "by-the-book"

guy who was strict about enforcing rules and regulations.[3] Through this testimony, Stover sought to portray himself as a very careful, cautious individual and not one given to acting impulsively or stupidly.  Yet Stover himself admitted that he acted very stupidly. Trial Tr. Vol. III at 141, 160. And he further admitted that the legal hold memo said "don't throw nothing away," *Id.* at 139, which meant that he did not comply with the hold imposed by Massey Energy on the destruction of documents, an obvious failure to live "by-the-book." So when Stover denied acting with criminal intent, the jury was entitled to disbelieve his protestations of innocence.  And when he went so far as to claim "[t]here's nothing on earth that would make me commit a crime," *id.* at 141, and "I cannot see me breaking the law," *id.* at 155, the jury could have reasonably concluded that those statements were so broad and over-the-top as to be incredible.

There is more.  In denying any bad intent, Stover testified that had he wanted to commit a crime, he would have destroyed the documents himself, would not have involved another person such as Williams, would not "have done so out in the open in a place that's crawling with law enforcement," Trial Tr. Vol. III at 158, but rather "would have just took it up on the mountain somewhere and set it on fire." *Id.* at 159. Presumably this testimony was an attempt to show that had Stover truly acted with criminal intent he would have avoided calling attention to his actions.  But Stover was the chief of security, held the rank

---

[3] *See, e.g.,* Trial Tr. Vol. II at 173 (Wingo testifying that Stover was a "firm by-the-book boss"); Trial Tr. Vol. III at 68 (Williams testimony that Stover is "by the book . . .  he wants everything done like it's supposed to and he's real strict"); *id.* at 9 (Stover told Special Agent Pruden his job was to ensure that all Massey rules and regulations were followed by the security guards).

of "Colonel," served as the personal security escort for the head of Massey Energy, *id.* at 182-83, was accustomed to giving orders, and had previously ordered others to clean out the Barracks. *Id.* at 141.   Certainly the sight of Colonel Stover personally hauling thousands of pieces of papers out of a basement storage area and over a mountainside to start a big fire, would have attracted attention and raised more than a few questions.  The jury could have reasonably concluded that Stover's claims of how he would have committed the crime, if he had wanted to commit the crime, were quite simply unreasonable and, therefore, not credible.[4]

In addition, at certain times in his testimony Stover claimed an inability to remember. For example, Stover stated that he could not recall or remember five times in a short series of questions about what Thomas Wingo had said to him and what he had said in his interview on November 30, 2010. Trial Tr. Vol. III at 191-92.  The claims of lack of

---

[4] Furthermore, Stover's attempt to portray the area around the security guard shack, the gate, and the blue building where Stover worked, as "crawling with law enforcement," Trial Tr. Vol. III at 158, was a stretch. The MSHA investigators who worked at the UBB Mine in the wake of the explosion worked out of a trailer located near the UBB Mine Office, which was adjacent to the portals to the UBB Mine and some 1.6 miles from the security guard shack. *See, e.g.,* Trial Tr. Vol. II at 44-45 (testimony of Kevin Stricklin about where MSHA investigators worked after the explosion); Trial Tr. Vol. III at 184-85 (Stover testimony that MSHA investigators would drive to the trailer by the UBB portal); Trial Tr. Vol. II at 126 (testimony of Thomas Wingo that UBB Mine Office was approximately 1.6 miles from the security guard shack at the main gate); *see also* Trial Tr. Vol. III at 103 (testimony of Special Agent Lafferty that after the search in May 2010, there were only two other occasions that the FBI was on Performance and that was at night involving the collection of evidence).  Thus, the area around the main gate was simply not "crawling with law enforcement," and Stover's attempt to portray it as such could easily have been viewed by the jury as unreasonable and not credible.

memory could have been viewed by the jury as not credible, generally. Also, the specific claim of lack of memory about whether he mentioned radios in his interview of November 30, 2010, or discussed the use of the security or Montcoal radio channels in that interview, could have been viewed as false testimony in particular.  It hardly seems likely that a defendant charged with making a false statement in an interview would not have reviewed a transcript of that interview in preparation for his trial. It seems even less likely that Stover would not have reviewed the transcript in the days or shortly before taking the witness stand, or that he would have not remembered what he said in the November 2010 interview inasmuch as relevant portions of a transcript of that interview were read aloud at trial *the day before Stover testified.*

Moreover, Stover's attempt to give the impression that the disposal of records in January 2011 was part of a regular practice of cleaning the Barracks, was not credible.[5] Stover testified that "young boys, grass cutters," would clean the garage area of the Barracks of "trash that accumulates, junk that would – like when they would change the oil or add oil to a car and stuff like that. . . . I'd have them clean it out periodically."  Trial Tr. Vol. III at 141.  "Junk" thus meant something other than documents.  Both Stover and Wingo

---

[5] Stover apparently attempted to conflate two different things – throwing out "junk" and disposing of records – into one practice of cleaning up periodically.  He said, for example, "When, when I asked Jonathan Williams, or told Jonathan Williams to clean out the barracks, all the trash and all the junk that was over there, it never entered my mind what I was asking or telling him to do was something illegal."  Trial Tr. Vol. III at 140. Stover, of course, was not charged with obstruction because he ordered Williams to get rid of trash and junk.  *See also* Defendant's Closing Argument, Trial Tr. Vol. IV at 47 ("they had a practice . . . of cleaning out the basement to make room for last year's records").

testified about paperwork being thrown out on only one occasion prior to 2011, in approximately 2003. Trial Tr. Vol. II at 144, 159, 174 (Wingo testifying that he could recall only one instance, which occurred between 2001-2003, when large amount of documents were removed from the Barracks prior to Williams removing documents in 2011); Trial Tr. Vol. III at 141, 143 (Stover testifying that documents contaminated by sewage leak in 2002 or 2003 were removed). On that one occasion, Stover ordered only that boxes of documents that had been contaminated be thrown out. *Id.* at 141. There was no other large scale removal of documents. Trial Tr. Vol. II at 159 (Wingo reiterating on cross-examination that cleaning out of old documents occurred only once prior to 2011). This fact was corroborated by the sheer volume of documents that Williams took out of the Barracks in January 2011 on Stover's orders, including the fact that those documents included paperwork covering a ten-year period. Trial Tr. Vol. III at 93 (Lafferty testimony, documents covered 2000 through 2009). Thus, the practice of regularly cleaning out "junk" clearly did not include throwing out the documents that Stover stored in the Barracks.

In sum, all of these factors -- the circumstantial evidence and Stover's lack of credibility -- were considered by the jury in this case and would support a similar guilty verdict by any other rational jury. The motions for judgment of acquittal and for new trial as to Count Three should be denied.

# VI.   <u>DUE PROCESS ARGUMENT</u>

## A.  **Stover's Claim is Time-Barred**

Finally, in his memorandum Stover raises a due process argument for the first time. This claim is time-barred and therefore should not be considered by the Court.  Stover did not object at trial, and he did not raise the issue in his motion for new trial or his motion for judgment of acquittal.   And even though Stover requested an extension to file a supporting memorandum to his motion, he never raised the ground in his initial motion and did not ask for extra time to file the motion.

Rule 33(b) requires that a new trial motion alleging any ground other than newly discovered evidence "must be filed within 14 days after the verdict or finding of guilty." The Fourth Circuit has on multiple occasions affirmed the denial of new trial motions that were not based on new evidence and which were not timely filed.  *See United States v. O'Neal*, 180 F.3d 115, 118 (4th Cir. 1999); *United States v. Smith*, 62 F.3d 641, 648, 651 (4th Cir. 1995).  In *Smith*, the Fourth Circuit held that the motion was filed late and was not based on new evidence; therefore, the district court lacked the power to entertain the untimely motion. *Smith*, 62 F.3d at 648.  Other circuits have similarly held that the district court should not consider a motion for a new trial that has been untimely filed.  *See, e.g., United States v. Brown*, 742 F.2d 363, 368 (7th Cir. 1984) ("A district court may not entertain a motion for a new trial filed beyond the . . . limit in Rule 33, unless the motion is based on newly-discovered evidence or the judge has extended the filing date during the

7-day period).  The district court may only consider the untimely motion if the court finds that the failure to file it on time was the result of excusable neglect.  *United States v. Owen*, 559 F.3d 82, 84 (2d Cir. 2009).  There is no excusable neglect in this instance and the court should not consider Stover's untimely argument.

###    B.  Even If Not Time-Barred, Stover's Argument is Subject to Plain Error Review Because He Did Not Object to the Statements At Trial

If the Court does consider Stover's due process argument on the merits, then the standard of review is plain error.  As explained in Fed. R. Crim. P. 51(b), to preserve a claim of error, a party must make a timely objection and state "the grounds for that objection."  *See also* 3B Charles Alan Wright, Nancy J. King and Susan R. Klein, *Federal Practice and Procedure: Criminal* § 842, at p. 443 (3d ed. 2004).  ("Defendant cannot speculate with the jury by letting error go by unremarked and then seek a new trial on the basis of the error if the verdict is unfavorable to him. . . .  Failure [to object] will ordinarily bar review of defendant's claim either on a subsequent motion or on appeal, except for plain error.") (footnotes omitted).  Rule 52(b) allows for review of a plain error that affects substantial rights.  Thus, if this Court were to consider the merits of Stover's due process claim notwithstanding his failure to raise this ground within the time limits of Rule 33, plain error review is the appropriate standard, because he failed to object at trial.

Plain error review examines four factors.  There must be (1) an identified error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity or public reputation of the judicial proceedings. *United States v. Brewer*, 1

F.3d 1430, 1434-35 (4th Cir. 1993).  This standard of review, however, is to be applied sparingly.   The plain error consideration contemplated by Rule 52(b) saves only "particularly egregious errors," where "a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985).  Furthermore, a plain error must be viewed "against the entire record . . . . [O]nly if in the context of the proceedings taken as a whole, the error either led to the conviction of a defendant who is actually innocent or otherwise seriously affected the fairness, integrity or public reputation of judicial proceedings should we exercise our discretion pursuant to Rule 52(b) to notice it." *United States v. Cedelle*, 89 F.3d 181, 184-85 (4th Cir. 1996) (internal quotations and citations omitted).  Stover bears the burden of demonstrating his entitlement to a new trial based on plain error.  *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998) (noting that the defendant bears the burden of persuasion on plain error review).

Here, Stover seizes on one statement made by the United States in its rebuttal closing and argues that this statement in combination with what he calls "a pervasive mischaracterization of fact" by the United States is enough to entitle Stover to a new trial. He also argues that each of these alleged errors standing alone would warrant a new trial. Under a plain error standard, Stover cannot satisfy and has not satisfied his burden of establishing that there was error or that the error was plain.  Moreover, he cannot establish and has not established that any error that may have occurred seriously affected a substantial right or the fairness, integrity or public reputation of the judicial proceeding. Stover lays out a two element, six-factor test for determining whether a prosecutor's

remarks constitute a denial of due process.  He fails, however, to show that the United States remarks in this case meet that test.

The factual mischaracterizations alleged by Stover are of no moment and have been refuted in the discussion of the evidence contained in previous sections of this response. The United States' characterization of the facts in its closing arguments was accurate and supported by the evidence at trial.  Moreover, Stover never objected to any part of the closing arguments of the United States during trial.  The Court should disregard Stover's argument on this point.

### C. The United States Remark Was Not Error and Was Appropriate Under the Circumstances and Context of This Case

The statement in the United States closing argument was entirely appropriate given the nature of the charges in the case, and given the assertions Stover made to the jury in his opening statement and closing argument.  As explained above, it is Stover's burden to prove that the United States remark was plain error.  He must show that it was in fact improper and that the remark prejudicially affected his substantial rights so as to deprive him of a fair trial. *See United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990).  Stover must prove that this error led to his conviction despite his actual innocence, or that this error seriously affected the fairness, integrity or public reputation of judicial proceedings. Stover utterly fails to meet this test.

The factors the Fourth Circuit considers in deciding whether a prosecutor's remarks were sufficiently prejudicial to warrant reversal are (1) the degree to which the prosecutor's

remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. *United States v. Baptiste*, 596 F.3d 214, 226-27 (4th Cir. 2010).

As to the first factor, in this case, the prosecutor's remark did not mislead the jury. Stover was alleged to have obstructed an ongoing investigation.  The prosecutor reiterated this in his closing remarks, telling the jury that the investigation was important and that it cannot be obstructed.   The message being sent was to Stover, that obstruction of government investigations will not be tolerated and that such conduct will be punished. The prosecutor was urging the jury to convict Stover of the crime with which he had been charged – obstruction.

Second, and as essentially conceded by Stover as he points to only one remark, the remark he complains of was isolated.  Third, the weight of the evidence against Stover was strong.  The weight of the evidence against Stover has been discussed at length in this response and clearly weighed very heavily against Stover.  The jury had before it the testimony of all the witnesses, and Stover's own testimony in which he admitted much of the alleged conduct, as well as the exhibits which supported the case against Stover.

The fourth factor is whether the comments were deliberately placed before the jury to divert attention to extraneous matters.  The fifth factor is whether the remarks were invited by improper conduct of defense counsel.  Here, the prosecutor's remarks were made to refocus the jury's attention on the matter at hand and Stover who was on trial, despite Stover's efforts to turn the jury's attention elsewhere.  Throughout the trial, defense counsel attempted to characterize the government's case as having scapegoated Stover and disregarded the "real villains."  Def. Closing Argument, Trial Tr. Vol. IV at 46.  He tried in his opening statements and closing arguments to turn the jury's attention to events outside the courtroom and to persons who were not on trial.  He told the jury that after the explosion at the Upper Big Branch mine "it was easy to hope that we might get some honest-to-God justice.  And now 570 days after the explosion, we're still no closer to unlocking that closet in the back of the courtroom. . . ."  *Id.* at 45.  He continued, "We're no closer to finding the real villain or villains in this explosion. . . This is who they brought you first, Elbert Stover, a veteran, a police officer, the chief of security guards.  They couldn't get you somebody who might actually be responsible for this tragedy. . . ."  *Id.* at 46.  Stover thus attempted to draw the jurors' attention to who was not on trial and to appeal to their sympathy.  The prosecutor's remarks were invited by Stover's appeals to extraneous matters.  By telling the jury to send a message that "this investigation ought to be allowed to go forward, that it can't be obstructed," Gov't. Rebuttal Argument, Trial Tr. Vol. IV at 62, the prosecutor brought the jury's attention back to the fact that the case before them was a case about a defendant who had obstructed the investigation and that it

was Stover who they were being asked to convict.  It was a message to disregard Stover's plea for sympathy, to disregard the assertions of who should be on trial, and to focus on Stover and the charges before them at this trial.

The final factor is whether curative instructions were given to the jury. In this case, because Stover did not object at trial there was no chance for the Court to give curative instructions.  Nonetheless, the Court's general instructions to the jury explain what they could and could not consider.  The Court told the jury, "Nothing said or done by the attorneys who have tried this case is to be considered by you as evidence of any fact . . . . Accordingly, if any argument, statement or remark of counsel is not based upon the evidence or the law as stated in these instructions, then you should disregard that argument, statement, or remark."  Court's Charge to the Jury at 6.

Given the weight of the evidence against Stover, and the context of the prosecutor's remark, the error if indeed there was error was certainly not of the type contemplated under the plain error standard.  The evidence against Stover was overwhelming, and one remark by the prosecutor cannot be said to have been an error so grave that without that remark Stover would have been found not guilty, or that the essential fairness of the proceedings was affected by the remark.  Stover's arguments on this point fail and should be rejected by the Court.

### VII.   STOVER HAS ABANDONED ANY ARGUMENT ABOUT IMPROPER JURY INSTRUCTIONS

In his motion for new trial filed on November 9, 2011, Stover listed "improper jury instructions" as one of his claims of error.  He did not explain in his motion which jury instructions were improper or how any instruction was improper.

In his Memorandum in Support of his Motion for New Trial filed on January 13, 2012, Stover did not include any argument about improper jury instructions.  He thus has abandoned "improper jury instructions" as a basis for a new trial in this case.

### VIII.   CONCLUSION

In his motions Stover requested a judgment of acquittal or in the alternative a new trial.  His motion for a judgment of acquittal is based on a claim of insufficient evidence on both counts of conviction.  As discussed above there is more than sufficient evidence under the Rule 29 standard to uphold the jury's verdict on both counts.   The United States requests that the Court again deny Stover's motion under Rule 29 as it did at the close of evidence at trial.

Stover also moved for a new trial based on the Court's failure to grant pre-trial motions, improper jury instructions, and insufficient evidence.   In addition, he moves for a new trial on due process grounds –– an issue he raises for the first time in his memorandum.  The Court should deny his motion on all these grounds.  The Court has previously denied Stover's motion to exclude his statements to MSHA and the Court should deny the motion for new trial for the same reasons given before trial.  Stover raised

the issue of jury instructions in his motion, but failed to address any particular jury instruction in his memorandum. Therefore the Court should deny his motion on that ground.   As to the insufficiency of the evidence, again, as discussed at length above, the evidence at trial weighed heavily in the United States favor, and the jury verdict should not be overturned based on this factor.  Finally, Stover's due process argument is time-barred, and even if considered on the merits, the prosecutors committed no error in their closing arguments.  Stover's motion should also be denied on this ground.

Thus, for the foregoing reasons, the United States respectfully requests that Stover's motions be denied on all grounds.

Respectfully submitted,

R. BOOTH GOODWIN II
United States Attorney

s/Blaire L. Malkin
Blaire L. Malkin, WV Bar No. 10671
Assistant United States Attorney
United States Attorney's Office
300 Virginia Street, E. – Rm 4000
Charleston, West Virginia  25301
Telephone: (304) 345-2200
Email:  blaire.malkin@usdoj.gov


s/Philip H. Wright
Philip H. Wright, WV Bar No. 7106
Assistant United States Attorney
United States Attorney's Office
300 Virginia Street, E. – Rm 4000
Charleston, West Virginia  25301
Telephone: (304) 345-2200
Email:  philip.wright@usdoj.gov

34

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing "RESPONSE OF THE UNITED STATES TO DEFENDANT'S RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL, MOTION FOR NEW TRIAL, AND MEMORANDUM IN SUPPORT," has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing on this 27th day of January, 2012, to:

> William David Wilmoth, Esquire
> Steptoe & Johnson PLLC
> 1233 Main Street, Suite 3000
> Wheeling, WV  26003-0751

> s/Blaire L. Malkin
> Blaire L. Malkin
> WV Bar Number: 10671
> Assistant United States Attorney
> United States Attorney's Office
> 300 Virginia St., E., Suite 4000
> Charleston, West Virginia 25301
> Telephone: (304) 345-2200
> Fax: (304) 347-5104
> Email: blaire.malkin@usdoj.gov

> s/Philip H. Wright
> Philip H. Wright, WV Bar No. 7106
> Assistant United States Attorney
> United States Attorney's Office
> 300 Virginia Street, E. – Rm 4000
> Charleston, West Virginia  25301
> Telephone: (304) 345-2200
> Email:  philip.wright@usdoj.gov