THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
At Beckley

UNITED STATES OF AMERICA

v.

HUGHIE ELBERT STOVER

CRIMINAL NO. 5:11-CR-00038
Judge Berger

DEFENDANT'S OBJECTIONS TO
THE GOVERNMENT'S SENTENCING MEMORANDUM

I. ANALYSIS

A.     **The government's allegation that Elbert Stover had anything to do with the UBB disaster is false.**

The government's sentencing memorandum focuses very little on the conduct alleged in the indictment or discussed at trial. In fact, accepting the government's sentencing recommendation would require *ignoring* the evidence at trial. Instead, the government attempts to persuade the Court to punish Elbert Stover eight or nine *times* more harshly than the Sentencing Guidelines range based on the fiction that Elbert had something to do with the UBB disaster and the tragic deaths of twenty-nine miners.

The evidence at trial showed incontrovertibly that on November 30, 2010, Elbert Stover stated that as far as he knew, advance notice of inspections at Performance Coal had stopped when he stopped it a decade earlier, and that the mine's policy remained as it was in 1999: "[W]hen inspectors come on the property, you do not call the mines. You do not notify no one."[1] The government failed to prove that, correctly understood, this statement was false, much less that Elbert knew it was. Instead, says the government, it proved that a different policy, Performance's radio policy, made Elbert's statements false because some of the mine

---

[1]      (Tr. vol. 2 at 80.)

dispatchers were, we only now know, intercepting those radio transmissions and abusing them to surreptitiously give the mines advance notice.

Let us momentarily entirely set aside this fact and assume, unreasonably, that Elbert intended his statement to address the radio policy. Let us also further set aside the equally undeniable fact that even such a misinterpretation of what Elbert said is still true because the radio policy was never intended to "notify" or "call" anyone at the mines, as Elbert had (painfully obviously) consistently used those words. Even after setting aside all of these fatal shortcomings in the government's case and believing the impossible, we are still left with the uncontroverted fact—proven not just by Elbert's testimony, not just by the testimony of his fellow guards, but by the testimony of the government's star witnesses—that *Elbert Stover had absolutely no idea whatsoever that any of the dispatchers' misconduct was going on*.

Notwithstanding the government's overreaching rhetoric to the contrary, Elbert Stover played no "role" at all in the deaths of those miners. In fact, it is impossible to know how many miners Elbert's only "role" in advance notice at Performance Coal *saved* when he stopped, as far as he ever knew, the practice over a decade earlier. It is an insult not just to Elbert, but also to the "grieving families," "45,000 underground coal miners," a "nation appalled and ashamed" that the government shamelessly invokes in its brief to maintain otherwise.

> B.  **The government's proposed sentence does *not* reflect the seriousness of the offense.**

The government offers a few flippant examples of comparative underlying crimes that it says put the Guidelines range in "some perspective." (Govt's Br. at 3.)[2]

---

[2] The government picked 18 U.S.C. § 46 as an example of what it presumably believes to be a trivial crime with only a six month maximum sentence. This was not an especially good example. That provision punishes the interstate transportation of *trapa natans*, a noxious and invasive water plant whose eradication efforts have already costs the country millions of dollars. *See, e.g.*, *http://www.waterchestnut.org/Assets/PDF/wcfactsheet.pdf*. Worse, *T. natans* also harbors the larval flukes responsible for fasciolopsiasis, a disease of major global public health importance, sickening

A similar comparison with the government's sentencing demand might be equally illustrative. The government wants sixty-year-old Mr. Stover to spend twenty-five years in prison, a *de facto* life sentence. *Compare with* 18 U.S.C. § 36(b)(2) (major drug offenders who commit murder); 18 U.S.C. § 175c(c) (biological weapon terrorists); 18 U.S.C. § 2242 (rapists); 18 U.S.C. § 2251(e) (third-offense child molesters); 18 U.S.C. § 2332g (a person who shoots an airplane down with a missile); 18 U.S.C. § 2332h(c)(1) (a person who explodes a radiological dispersal device (a "dirty bomb")).

Even limiting the comparison to twenty-five years still shows the proposed sentence to be outrageous. The government wants to punish Elbert for saying (truthfully, as far as he knew) "when inspectors come on the property, you do not call the mines, [y]ou do not notify no one"[3] and for telling Jonathan Williams to "clean out the barracks and get all the old junk that's out of there and throw it in the dumpster like old microwaves and VCRs, coffee pots . . . that was no good, and all the old paperwork"[4] in the same way that it punishes: armed and violent bank robbers (18 U.S.C. § 2113(d)), car-jackers who cause serious bodily injury (18 U.S.C. § 2119(2)), major drug offenders who commit a drive-by shooting (18 U.S.C. § 36(a)(1)), second-offense international gun smugglers (18 U.S.C. § 924(c)(1)(C)(i)), violent drug thieves (18 U.S.C. § 2118(c)(1)), and international terrorists (18 U.S.C. § 2332b(c)(1)(E)).[5]

---

millions of adults and children around the world and causing great human suffering. *See* www.who.int/neglected_diseases/diseases/fascioliasis; www.who.int/bulletin/archives/77(4)340.pdf; www.who.int/neglected_diseases/integrated_media/integrated_media_fascioliasis/en/index.html; whqlibdoc.who.int/bulletin/1995/Vol73-No3/bulletin_1995_73(3)_397-401.pdf. While apparently humorous to the prosecutors, 18 U.S.C. § 46, with its six-month statutory maximum, punishes a serious and dangerous act that has the potential to harm millions of people and cost millions of dollars.

[3] (Tr. vol. 2 at 80.)

[4] (Tr. vol. 3 at 30.)

[5] The cases that the government cites also do not support its position that unintended consequences are relevant in sentencing. In *United States v. Alvarado Perez*, 609 F.3d 609, 615 (4th Cir. 2010), the decision to base the sentence in part on the psychological injury suffered by the victim was expressly justified by reference to U.S.S.G. § 5K2.3, which provides that " '[t]he extent of the increase ordinarily

The government's unbelievable proposed sentence very badly overstates the seriousness of even what the government says Elbert did.

### C. It is inappropriate (and in any event too late) to "send a message" with Elbert Stover's sentence.

Having been successful with its "send a message" maneuver at trial, the government dusts it off to use again here, arguing that the Court should base Elbert's sentence on what the government itself admits is the "[l]ongstanding conventional wisdom . . . that the federal government cares little about mine safety crimes." To suggest that altering public perception, well-founded or not, should form some basis for sending an innocent man to prison for the rest of his life is bad enough. To admit that that perception is the result of—and that Elbert's sentence is offered to somehow make amends for—the government's own embarrassing history of lackadaisical mine safety enforcement requires unimaginable gall. It certainly does not, however, allow, much less require, making Elbert Stover a scapegoat.

Fortunately, there is also no need for the Court to wade into the message-sending business, because the government has already sent its own message, loud and clear, about what happens to people like Bobby Pauley who get caught "gambling with coal miners' lives." Do they "risk the most severe punishment available under the law"? Not hardly. Instead, the government gives the fox the keys to the hen house, rewarding an admitted provider of advance notice of MSHA inspections with a job as an MSHA inspector. And just in case that message were not already clear enough, it symbolically does so the day of Elbert Stover's trial. One does not need to look very far to find the *real* source of the longstanding conventional wisdom.

---

should depend on the severity of the psychological injury *and the extent to which the injury was intended or knowingly risked*.' " *Id.* at 615 (emphasis added). And how a case involving a "sentence for a defendant *who tried to kill a witness*" (Gov't Br. at 4 (emphasis added)) somehow supports the proposition that "the consequences of a defendant's underlying conduct . . . matter, even if they are unintended" (*id.* at 3) is mystifying.

4

## II. CONCLUSION

The following facts were undisputed at trial:

Before Elbert Stover arrived at Performance Coal over a decade ago, the company had a practice whereby the guards would telephone the mines and give them advance notice of inspections.[6] In 1999, Performance hired Elbert as the head guard. Elbert felt that this practice was wrong, so as soon as he became the head guard, he ended it.[7]

Performance later instituted a policy that required the guard who was working the main gate to transmit the identity of every visitor on the company's property to the other guards around the site via the two radio channels that the security department used.[8] Out of an abundance of caution, Elbert sought the advice of the president of his company to ensure that this new radio practice complied with the law.[9] He was assured that it did.[10]

One night years later, a group of MSHA inspectors came to Performance for an inspection. When they arrived, one of the inspectors told the guard on duty, Thomas Wingo, " '[t]hat if [the guards] notified anyone on the property by phone or radio that he . . . would issue a citation.' "[11] So Wingo obliged and did not "notify anyone on the property."[12] When told about this later, Wingo said, Elbert "agreed that we done the proper thing."[13] Another six years passed, and in 2007, a different MSHA inspector (Lyall) chastised a different Performance guard

---

[6]   (Tr. vol. 3 at 163-64.)

[7]   (*Id.* at 164.)

[8]   (*Id.* at 164-65.)

[9]   (*Id.*)

[10]  (*Id.* at 165 ("I said, 'Is this legal?' He said, 'Our lawyers told me this was legal.' I said, 'Well, I just want to make sure because security does not do anything illegal.' "))

[11]  (Tr. vol. 2 at 141.)

[12]  (*Id.*)

[13]  (*Id.*)

5

(Charles Lilly) for transmitting Lyall's presence over the radio.[14] Lilly reported this to Elbert,[15] who contacted his company's president, who, in turn, again reassured Elbert that Mr. Lyall had overreacted and that Performance's lawyer had verified that the radio policy did not constitute "advance notice."[16,17]

Every witness who testified to the issue stated that Elbert genuinely accepted this advice. It is certainly easy to believe why: Notwithstanding the almost daily presence of state and federal mine inspectors on Performance's site during this same period, in the twelve years that Performance's guards followed the company's radio transmission policy, MSHA *never* once issued Performance or Elbert or any guard or any dispatcher or any foreman or any company or person whatsoever a citation for providing advance notice at the site.[18]

As it now turns out, two of the mine's dispatchers (*i.e.*, two people who did not work for the security department)—Bobby Pauley and Greg Clay—had been intercepting the guards' transmission, and when they overheard that an inspector was on site, they would covertly signal that fact to the miners underground.[19] The dispatchers, however, testified that they had been told to do this *not* by Elbert Stover, but by "upper management," *i.e.*, "[t]he superintendent,

---

[14] (*Id.* at 218.)

[15] (*Id.*)

[16] (Tr. vol. 2 at 222; vol. 3 at 166 ("And what I was told then was, you know, 'Our lawyer said this was legal.' I said, 'Okay.' ").)

[17] Defendant trusts that the Court has seen through the subtle efforts at deception in the government's brief. Calling the occurrence of exactly two incidents "at least twice" (Government's Br. at 2), for example, thereby insinuating that there were other times that the government could not be troubled to prove, is an unprofessional stunt with no purpose but to mislead and no place in a brief of the import of the sovereign's sentencing memorandum.

[18] In a naked attempt at *post hoc* revisionism, twenty days after Elbert filed his motion for judgment of acquittal pointing all of this out, MSHA issued Performance citation 8431853 and proposed to fine the company nearly eleven million dollars. The allegation? "That the mine had a regular practice of notifying persons underground that an inspector was present on the surface." (Citation 8431853, attached as Ex. A; Proposed Assessment 000274429, attached as Ex. B.) No mention of the radio policy, no mention of the guards, and no mention of Elbert Stover.

[19] (Tr. vol. 2 at 183-88 (B. Pauley) & 198-204 (G. Clay); Tr. vol. 3 at 203-04 (foreman Coalson).)

the mine foreman." Pauley testified that Elbert played no role in the behavior that she admitted to, and that as far as she knew, Elbert did not know about it.[20] Clay likewise testified that Elbert played no part in the dispatchers' practice,[21] adding that but for what the dispatchers were doing at "upper management's" behest, the mines would never have even known in advance about the inspectors' presence.[22]

It is now February 2012, almost two years after the UBB disaster. None of the dispatchers who admitted to violating § 820(e) has been prosecuted—nor, thanks to their immunity agreements with the government, will they ever be. Bobby Pauley has even been rewarded with a job as an MSHA inspector. And the United States government inexplicably maintains that Elbert Stover caused a national disaster, murdered twenty-nine coal miners, and deserves to die in prison. Something is terribly, horribly wrong with this picture.

What is wrong is that the prosecution's arguments for sentencing Elbert are, like its case against Elbert at trial, based on innuendo and circumstantial evidence, piled upon innuendo and circumstantial evidence, then stretched beyond the breaking point. What is wrong is that those arguments, too, contain mischaracterizations of evidence calculated to mislead, followed by an election-year plea to punish Elbert because it will be good for the nation.

A thorough review of the transcript and a careful comparison of the elements of the charged offenses with the proof presented, however, in whatever light the prosecution is entitled to, easily show that the government failed to check every box, and in some cases that the government even "shaded in" boxes with false summaries of the evidence and improper appeals to the jurors' passions. Defendant is therefore entitled to be *acquitted on both counts*.

---

[20] (Tr. vol. 2 at 192.)

[21] (Tr. vol. 2 at 209.)

[22] (Tr. vol. 2 at 206.)

Now, rather than acknowledge this, the government has re-doubled down, in fact, has gone all in, arguing that the Guidelines range of three or four years—which is three or four years too long—is actually twenty-plus years too *short* and that Elbert Stover should instead spend *twenty-five years*—*i.e.*, the rest of his life—in prison. Obviously, the government hopes this this ruse will make Elbert's erroneous conviction and the Guidelines range both seem somehow more reasonable by comparison, or perhaps might even persuade Elbert to quietly accept the Guidelines range and not push his luck.

Defendant implores the Court not to be fooled. Even putting aside the prosecutorial misconduct at trial, the evidence in this case does not support Elbert's convictions on either count. But even if it had, the weakness of that evidence mitigates heavily against any sentence of incarceration—a fact that remains true notwithstanding the government's baseless exaggeration to make Elbert's conviction and the Guidelines range seem more palatable.

At the beginning of its brief, the United States promised that it was going to tell the Court about "his [Elbert Stover's] conduct's reach or consequences." But it has done nothing of the sort. It told the Court about Bobby Pauley's conduct and Greg Clay's conduct and the consequences of MSHA's historical enforcement failures. But nothing Elbert Stover did had anything to do with the Upper Big Branch tragedy. To suggest otherwise by alleging that Elbert "played a singular and indispensable role in these warnings" and was the "leader of criminal activity" and that "[t]wenty-nine coal miners . . . died in part because of a system of inspection warnings that depended heavily on defendant's leadership" is offensive, it is scandalous, it is libelous, but most importantly, it is false.

**HUGHIE ELBERT STOVER,**
By Counsel

|  |  |
|---|---|
| **STEPTOE & JOHNSON PLLC**<br>*Of Counsel* | /s/ William D. Wilmoth<br>William D. Wilmoth, Esq. (W. Va. Bar. No. 4075)<br>William J. O'Brien, Esq. (W. Va. Bar No. 10549)<br>Robert L. Bailey, Esq. (W. Va. Bar No. 8902)<br>1233 Main Street Suite 3000<br>P. O. Box 751<br>Wheeling, WV 26003-0751<br>Telephone: (304) 233-0000<br>Facsimile: (304) 233-0014<br>*Counsel for Defendant* |

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
At Beckley

UNITED STATES OF AMERICA

v.

CRIMINAL NO. 5:11-CR-00038
**Judge Berger**

HUGHIE ELBERT STOVER

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February 2012, I have electronically filed "*Defendant's Objections to the Government's Sentencing Memorandum*" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> R. Booth Goodwin, II
> Blaire L. Malkin
> Steven R. Ruby
> United States Attorney
> Southern District of West Virginia
> 300 Virginia Street, East, Room 4000
> Charleston, West Virginia 25301

/s/ William D. Wilmoth