**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                               CRIMINAL ACTION NO. 5:11-cr-00038

HUGHIE ELBERT STOVER,

                Defendant.


**MEMORANDUM OPINION AND ORDER**

The Court has reviewed Defendant's *Motion for a New Trial* (Document 157) and Defendant's *Renewed Motion for Judgment of Acquittal* (Document 158). After careful consideration of the motions, supporting memoranda and all written submissions relative thereto, the Court denies both motions for the reasons set forth below.

**I.     *FACTUAL BACKGROUND & PROCEDURAL HISTORY***

On October 26, 2011, Defendant Hughie Elbert Stover was convicted of knowingly and willfully making a materially false, fictitious or fraudulent statement, in violation of 18 U.S.C. § 1001, as charged in Count One of the Superseding Indictment.[1] (See Document 149.) The Defendant was also convicted of knowingly and willfully causing the concealment, cover up, mutilation or destruction of documents with the intent to impede, obstruct or influence an

---

[1] Specifically, Count One charged that "on or about November 30, 2010, at or near Beaver, Raleigh County, West Virginia, and within the Southern District of West Virginia, [D]efendant HUGHIE ELBERT STOVER knowingly and willfully made materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States." (Superseding Indictment Count One ¶ 13).

investigation, in violation of 18 U.S.C. §§ 2(b) and 1519, as charged in Count Three of the Superseding Indictment. [2]  On November 9, 2011, Defendant filed his motion for a new trial and renewed motion for judgment of acquittal. Defendant's renewed motion for judgment of acquittal raised a claim of insufficient evidence.  Defendant's motion for a new trial raised three grounds: "(1) failure to grant pre-trial motions, (2) improper jury instructions and (3) insufficient evidence."  The Court will address each motion in turn.

## II.   RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

### A.  Standard of Review

The standard for deciding a  motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is "whether there is substantial [direct and/or circumstantial] evidence which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). In considering the sufficiency of the trial evidence, the Court must view both "the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir.1996) (en banc). Furthermore, the Court should not consider the credibility of the witnesses at trial. *See United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989). "A defendant challenging the sufficiency of the evidence to support his conviction bears 'a heavy burden.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997). The question for the Court is whether "any rational trier of fact could have found the essential elements of the crime beyond a

---

[2]Specifically, Count Three charged that "on or about January 11, 2011, at or near Montcoal, Raleigh County, West Virginia, and within the Southern District of West Virginia, [D]efendant HUGHIE ELBERT STOVER knowingly and willfully caused a Known Person to conceal, cover up, mutilate and destroy records and documents. Defendant HUGHIE ELBERT STOVER did so with the intent to impede, obstruct and influence the investigation of a matter within the jurisdiction of agencies of the United States . . . by having the records and documents disposed of and otherwise destroyed." (Superseding Indictment Count Three ¶ 14).

reasonable doubt." *United States v. Myers*, 280 F.3d 407, 415 (4th Cir. 2002) (quoting *United States v. Lowe*, 65 F.3d 1137 (4th Cir.1995)). "The court does not function as a re-trier of the facts, and it cannot supplant the jury's judgment with alternative factual findings." *U.S. v. Talley*, 2010 WL 4813880, *1 (S.D. W.Va. 2010).

### B. *Count One*

As stated in the Court's Charge to the Jury, the Government was required to prove beyond a reasonable doubt that  (1) on or about November 30, 2010, at or near Beaver, Raleigh County, West Virginia; (2) the Defendant made a false, fictitious or fraudulent statement or representation; (3) in making the false, fictitious or fraudulent statement or representation, the Defendant acted knowingly and willfully; and (4) the false, fictitious or fraudulent statement or representation made by the Defendant was material to a matter within the jurisdiction of the executive branch of the United States, that is the United States Department of Labor and the Mine Safety and Health Administration ("MSHA"). (Document 153 at 13-14).  Specifically, the indictment states that the Defendant "stated and represented . . . Performance had a practice and policy that forbade personnel at the [UBB] Mine from giving advance notice of an inspection by prohibiting the security guards from notifying anyone at the mine site of the presence of MSHA inspectors at the [UBB] Mine." (Superseding Indictment Count One ¶ 13).  Also, Count One alleged that the "statements and representations were false, fictitious and fraudulent because Defendant Hughie Elbert Stover had himself directed and trained security guards at Performance's [UBB] Mine to give advance notice by announcing the presence of an MSHA inspector on the mine property over the radio." (*Id*. ¶ 14).

The Defendant argues that the Government had two theories to prove the assertions in Paragraphs 13 and 14 of Count One of the Superseding Indictment.  Under the first theory, "the

government intended the phrase 'advance notice' in [Paragraphs 13 and 14] in the indictment to have the same meaning it does in [30 U.S.C.] § 820(e)." [3] (Document 166 at 10).  Under this "narrow" theory of "advance notice," Defendant argues the Government would need to prove that he "testified that nothing at Performance violated § 820(e)'s proscription against advance notice, but that the all-visitor radio transmission policy actually did violate § 820(e)." (*Id.*) Alternatively, the Defendant suggests that a broader reading of "advance notice" under the second theory meant that "the government theory was that Elbert's statement on November 30 was intended to assert that nothing at Performance gave any kind of 'notification' whatsoever— no matter how broad, no matter how indirectly, no matter how unintentionally from the guards' perspective—but that the all-visitor radio transmission actually did result in such 'notification'." (*Id.*)

The Defendant argues that under either theory, the Government failed to prove that his statement was both actually false and that he knew anything he said was false and that the Government attempted to prove falsity "by trying to prove that accepting the defendant's statement as true is necessarily mutually inconsistent with accepting the government's version of reality as true." (*Id.* 166 at 15).  The Defendant submits that "the prosecution must first prove what the *defendant* meant to assert—*not* how the *government* interpreted what the defendant said." (*Id.*) (emphasis supplied.)  Furthermore, when the statement is solicited by the Government's questioning, "the question and the circumstances surrounding its asking, too, must be examined, as must the other circumstances and context, both before and after the statement." (*Id.* at 17).  Defendant argues the Government failed to prove that what he actually meant and the actual state of reality were necessarily inconsistent such that his statement was actually false.

---

[3] "Unless otherwise authorized by this chapter, any person who gives advance notice of any inspection to be conducted under this chapter shall, upon conviction, be punished by a fine of not more than $1,000 or by imprisonment for not more than six months, or both." 30 U.S.C. § 820(e) (2006).

(*Id.*) Finally, as the jury was instructed, the Government must negate any reasonable interpretation that would make the defendant's statement factually correct. (*Id.*)   Defendant alleges that not only is his interpretation of his statement and the facts reasonable, but it is the only reasonable interpretation that could be made from the evidence. (*Id.*)   Essentially, the Defendant argues two separate defenses, the "literal truth" defense and the "ambiguity" defense.

Defendant posits that any ambiguity in the Government's questions or Defendant's answers must be resolved in favor of his meaning because the burden of precise questioning and clearing up any ambiguities in the questioning is always on the Government. (*Id*. at 18). Defendant goes to great lengths to indicate that the following questions and answers are ambiguous:

Q     And how about any specific instructions for visitors?
A     One thing that is hammered in our head, you do not ask inspectors where they're going and you do not call the mines. You do not ***notify*** no one when inspectors come on that property. In fact, that is in our SOP, that you do not ***notify*** no one.
                                        * * * *
Q     As far as notification when inspectors arrived on the property, I think it was your response that ***it's Massey's policy that you don't notify, you don't call ahead of time when inspectors are there***.
A     Yes, sir.
                                        * * * *
Q     Could you elaborate? Just — I can go through the question specifically. You received information from Massey Coal Services with regard to notification issues and with regard to other instructions vis-a-vis inspectors on the property. Can you tell me what those have been?
A     ***It says when inspectors come on the property, you do not call the mines. You do not notify no one***.
                                        * * * *
Q     Are there any other related instructions with regard to inspectors? Any other instructions with regard to inspectors?
A     That's it. ***When inspectors come on the job, we do not call the mines, do not notify.***

(Document 166 at 20-21) (citing (Tr. vol. 2 at 66-84 (emphasis added))).

This Court previously found that given the questions, the Defendant's statement and the totality of the evidence, there was no legal issue with the questioning which should result in the Court granting a judgment of acquittal. (Trial Tr. vol. 3, 228). "The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement." *United States v. Sarwari*, **---** F.3d **----**, 2012 WL 401593 at *4 (4th Cir. 2012). However, "[f]undamental ambiguity is the exception, not the rule." *Id*. (quoting *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998)). "A question is fundamentally ambiguous only when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id*. (internal citations and quotations omitted.) Additionally, "[a] defendant may not succeed on a claim of fundamental ambiguity by isolating a question from its context." *Id.* at *5 (internal citations and quotations omitted.)

Agent Pruden testified that security procedures and duties UBB had with the arrival of mine inspectors was discussed during the November 3, 2010 interview. He testified that the interview included a discussion about whether any notifications of inspectors were given when the inspectors came on the property at the mine site.[4] (Trial Tr. vol. 3, 9-10). There was also testimony of Mr. Wingo that he told the Defendant "that the main concern of [his FBI] interview was how we handled radio procedures with inspectors." (Trial Tr. vol. 2, 149). Mr. Wingo further testified that he told the Defendant that during his interview he informed the FBI "about the inspectors' log and that we notified them by Montcoal and security frequency on the radio, and at no time was we to announce it by telephone to the mine operation." (*Id*. at 149-50). The

---

[4] "Q. Okay. Did you ask him about any kind of notification?
A. We also asked if notification of that inspector was  announced on the mine property.
Q. Okay. And what did Mr. Stover say?
A. He said that he was notified, and only him, and no one else." (Trial Tr. vol. 3, 11.)

Defendant was asked a question about visitors and he responded with the statement that "One thing that is hammered in our head, you do not ask inspectors where they're going and you do not call the mines. You do not notify no one when inspectors come on that property.  In fact, that is in our SOP, that you do not notify no one."  Most importantly, there was evidence that the Defendant understood the context of this question in light of the previous interview with Agent Pruden as well his discussions with Mr. Wingo about the substance of Wingo's interview with the FBI.  Viewing the totality of the evidence in the light most favorable to the Government, the Court, again, finds that the questions and answers were not ambiguous.  Accordingly, Defendant's ambiguity argument fails.

Defendant's literal truth defense rests on the idea that all of the evidence proves that nothing he said was inconsistent with the interpretation that all of the Government's witnesses stated about the radio policy. "The only reasonable interpretation of what Elbert meant by 'notify' and 'call' was that they contained an element of intent or directedness. . . [.]" (Document 166 at 22).  Specifically, Defendant argues that the Government did not meet its burden to negate any reasonable interpretation that makes his statement factually correct.  The Defendant argues that none of the evidence put forth by the Government, as to what the true facts were, proved anything inconsistent with what the Defendant said.

Furthermore, Defendant argues that the Government did not try to prove that anything at UBB violated the "advance notice" statute. The Defendant relies on the fact that Mr. Strickland testified that MSHA officials were duty bound to cite any and all violations during an inspection and that no such citation had ever been given to UBB.  However, this is a logical fallacy. For instance, a police officer is "duty bound" to pull over a driver who is speeding. Sometimes a police officer opts not to stop a speeder.  Other times he writes a citation, and on some occasions

a police officer will give a speeding driver a warning.  Just because the driver is not issued a citation does not necessarily mean that he did not violate the traffic law.  Similarly, here there was testimony about the incident where Charles Lilly was "read the riot act" for announcing an MSHA inspector's arrival on the property.  On that occasion, Mr. Lilly was essentially given a "warning" rather than a "ticket," and just because he was given a "warning" does not mean that he did not violate the policy or the law. This incident was reported to the Defendant both verbally and in the form of an incident report.  Additionally, there was testimony by miners and dispatchers who indicated that when an inspector came onto the property, the dispatcher would be notified on the Montcoal channel, and then the dispatcher would call underground to give advance notice of the inspector.  Quincy Burgess, Charles Lilly, Tommy Wingo and Jonathan William all testified that the Defendant trained them to announce an inspector's presence on the mine property, over both the Montcoal and security channels.  Bobby Pauley and Greg Clay testified that when an inspector came onto the property, they would be notified on the Montcoal channel dispatcher, and then they would notify the superintendent or mine foreman who would have them call underground to give notice of the inspector.  The Defendant's witnesses, Larry Brown, Gary Neil, and David McFalls, all testified that they never received advance notice of mine inspectors while working underground at UBB.   In rebuttal, miner Andrew Coalson testified that he could not recall any time that inspectors arrived without advance notification.  Furthermore, Mr. Coalson testified that he heard the announcements of inspectors on the property over the Montcoal channel when he was in the mine office, and every time he heard this announcement he would call underground.

Looking at the totality of all the evidence in the light most favorable to the Government, and recognizing that it is the jury's duty to assess credibility of witnesses, the Court finds there

was sufficient evidence for a jury to conclude that the Defendant's statements, relative to notification of an inspector's presence on the mine property, were, in fact, false. Furthermore, viewing the totality of the evidence in the light most favorable to the Government, the Court finds there was sufficient evidence for a reasonable jury to find that the Government met its burden to negate any reasonable interpretation that the Defendant statements were factually correct. Accordingly, the Court finds that the Government submitted sufficient evidence for a reasonable jury to find both that the Defendant's statement was, in fact, false and there was no reasonable interpretation that would make his statement factually correct.

Next, the Court addresses whether there was sufficient evidence that the Defendant knew his statement was false. When a question, as here, "is not 'fundamentally ambiguous' but merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false." *Sarwari*, **---** F.3d **----**, 2012 WL 401593 at *4. Mr. Wingo testified that he told the Defendant "that the main concern of that interview was how we handled radio procedures with inspectors." (Trial Tr. vol. 2, 149). Mr. Wingo further testified that he told the Defendant during his (Wingo's) interview with the FBI, he told Agent Pruden "about the inspectors' log and the policy we notified them by Montcoal and security frequency on the radio" (*Id*.) Mr. Wingo also testified that he told the Defendant that he told the FBI that he was not supposed to pick up the phone to call the mine. (*Id*. at 149-50). Additionally, the Government introduced evidence of the Defendant's own memorandum reminding his guards to call out everyone on the radio, not just inspectors. (Gov. Ex. 5). Moreover, the Government introduced evidence of Mr. Lilly being "read the riot act" for announcing the presence of an MSHA inspector, and the Defendant's knowledge of that incident. Given the totality of the

evidence and the context surrounding the investigation, the Court finds that the Government introduced sufficient evidence for a reasonable jury to find the Defendant knew his statement was false.

In summary, viewing the evidence in a light most favorable to the Government, the Court finds that the Government introduced sufficient evidence such that any rational jury could have found the Defendant guilty beyond a reasonable doubt on Count One.  Accordingly, Defendant's Renewed Motion for Judgment of Acquittal as to Count One is denied.


### C.  Count Three

As stated in the Court's Charge to the Jury, the Government was required to prove beyond a reasonable doubt that (1) on or about January 11, 2011, at or near Montcoal, Raleigh County, West Virginia; (2) Defendant knowingly caused the known person to conceal, cover up, mutilate, or destroy records or documents; (3) Defendant did so with the intent to impede, obstruct, or influence the investigation or proper administration; and (4) the matter was within the jurisdiction of a department or agency of the United States, that is, the FBI and MSHA. (Document 153 at 17).

The Defendant argues that the Government failed to prove that he acted knowingly or willfully or that he acted with the intent to impede the investigation.  The Defendant contends that the Government identified three specific reasons why he should have known that investigators were interested in the documents, all three of which, he argues, were contradicted by the evidence. (Document 166 at 58-62).  First, Defendant argues that Massey's litigation "holds" did not tell the Defendant anything about the documents in the "barracks."[5] (*Id*. at 58).

---

[5]  As described by Defendant, "[t]he barracks is an old house, the upper floor of which mine employees used as a bunk house and the basement of which the security department used as a veritable garbage dump to store beat-up

Second, Defendant argues the investigators specifically led him to believe that they were not interested in the documents in the barracks (*Id*. at 60) and third, Defendant argues the Government's statement, that he knew the FBI was interested in the documents in his office, was both false and misleading. (*Id*. at 61).

Defendant contends he was expressly led to believe that the only documents the FBI and MSHA needed were from the months immediately surrounding the April 5, 2010 explosion. (*Id*. at 60.)  Further, Defendant testified that he had never been asked for any document located in the barracks. (*Id*.)  The Defendant argues that "[n]o evidence supported the government's theory that the existence of the UBB disaster investigation showed Elbert's intent to impede that investigation by throwing out paperwork from years before the tragedy."

In the jury charge, the Court instructed that the jury "may infer that a person intends that which is the natural and probable consequence of his knowing acts." (Document 153 at 17).  The Court also instructed the jury that "circumstantial evidence is often an important means of proving what the Defendant's state of mind was at the time of the events in question.  Sometimes it is the only means of proving state of mind." (*Id*. at 5).

At trial, there was evidence that the Defendant knew, from the interview with Agent Pruden and discussions with security guards Williams and Wingo about the FBI investigation into procedures and practices when an inspector arrived on the UBB property.  Additionally, the Government introduced evidence that the FBI was interested in determining whether any notifications were made upon the arrival of MSHA inspectors to the UBB Mine.  Pruden testified that, in his interview of the Defendant on November 3, 2010, they discussed who was notified when an inspector arrived on the mine property and the use of the radio. (Trial Tr. vol. 3, 10, 18).

---

VCRs, broken computer monitors, discarded radio equipment, and old paperwork, including old gate logs and security incident reports." (Document 166 at 50).

Furthermore, he testified that during this interview, they discussed inspector logs and other procedures used when visitors and inspectors arrived at UBB. (*Id*. at 10.)  There was evidence the Defendant knew Williams and Wingo had been subpoenaed to the grand jury. (Trial Tr. vol. 3, 32; Trial Tr. vol. 2, 151).   The Defendant acknowledges he knew that inspector logs and visitor logs from past years were located in the barracks. There was evidence that the Defendant instructed Mr. Williams to take the papers out of the boxes and place them in garbage bags. (Trial Tr. vol. 3, 56).  The Defendant offered an explanation that he did this to keep the papers from scattering. The Defendant contends in his reply that the sole evidence as to whether he knew Mr. Lilly's  incident report was in the material to be thrown out was that he did not know. (Document 170 at 21). However, the jury was able to make a credibility assessment of Defendant's testimony.[6]  Thus, the jury was free to believe or disbelieve all of the Defendant's statements with regard to his criminal intent.[7]   Additionally, the Government introduced evidence that the barracks was not regularly cleaned out.  Mr. Wingo could only recall cleaning out a large amount of documents from the barracks on one prior occasion, after there was sewage back up. (Trial Tr. vol. 2, 159).  The Defendant testified and argues that the barracks was cleaned out "periodically." Coincidently, Defendant ordered all documents and junk, except for the property records, to be put in garbage bags and thrown in the dumpster in January of 2011. This was just over a month after his sworn testimony, which, in part, covered a discussion about some of the very documents in the barracks. Moreover, there was evidence that Massey had put a

---

[6] "Q. The kind of daily duty logs that somebody like Charles Lilly would fill out when an inspector reads him the riot act?
A. Those are incident reports. That could be anything and everything, yes, sir.
Q. But you knew incident reports were in there?
A. Yes, sir." (Trial Tr. vol. 3, 200).
[7] "There's nothing on earth that would make me commit a crime. And there's nothing on earth that would make me put my wife and my daughter and my brothers and sisters through all the heartache and misery that we've been going through. That's probably -- or it is the biggest, stupidest mistake I ever made when I made that decision. But it never crossed my mind that I was doing something illegal. I wouldn't, I wouldn't wish on anybody the heartache and misery we've been going through over this." (Trial Tr. vol. 3, 141).

"litigation hold" on all of the documents related to the UBB explosion.  This document, ordering that no documents be destroyed, was posted in several locations on mine property, and the Defendant did not deny having knowledge of the same.   The jury was free to assess the credibility of the Defendant's statements about how he would have disposed of the documents, had he intended to impede the investigation.[8]  The jury could reasonably infer from the totality of the direct and circumstantial evidence that the Defendant intentionally obstructed the investigation.  Therefore, viewing the evidence in a light most favorable to the Government, the Court finds there was sufficient evidence that any rational jury could have found the Defendant knowingly caused Mr. Williams to conceal, cover up, or destroy records or documents and find that he acted with the requisite intent to impede the investigation.   Accordingly, Defendant's Renewed Motion for Judgment of Acquittal as to Count Three is denied.


### III.     MOTION FOR NEW TRIAL


#### A.     Standard of Review

Rule 33 of the Federal Rules of Criminal Procedure states that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "[A] trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 216-17 (4th Cir.2006) (citations omitted). The Court "is not constrained by the requirement that it view the evidence in the light most favorable to the government." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). However, such motion should only be granted when "the evidence weighs so heavily against the verdict that it

---

[8] "If I was going to destroy something I wasn't supposed to, I would have just took it up on the mountain somewhere and set it on fire." (Trial Tr. vol. 3, 159).

would be unjust to enter judgment." (*Id.*)  Furthermore, "[a] judge's disagreement with the jury's verdict does not mandate a new trial." (*Id.*)

## B.    Discussion

Defendant's motion for new trial raised three grounds: "(1) failure to grant pre-trial motions, (2) improper jury instructions and (3) insufficient evidence."  In his motion, Defendant also asked for "an extension of time to file a supporting brief." (*Id.*)  Insofar as the Defendant sought an extension of time to prepare a supporting brief, the Court granted his motion and allowed him to file a brief in support within thirty (30) days following receipt of the trial transcript. (Document 161).

However, in his supportive brief, the Defendant raises for the first time that he was denied due process. (Document 166 at 68-69).  Specifically, Defendant contends that "[t]he pervasive mischaracterizations of fact, exacerbated by the prosecutor's closing suggestion that the jury should 'send a message' or else the UBB tragedy will never be solved, denied Elbert Stover due process and are independently adequate to warrant a new trial." (*Id.* at 69).  In response, the Government asserts that the due process ground is time barred because the Defendant "did not object at trial, and he did not raise the issue in his motion for new trial or his motion for judgment of acquittal." (Document 169 at 26).  Rule 33(b) requires that a motion for new trial alleging any ground other than newly discovered evidence "must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b).  The Defendant argues that barring the argument based on timeliness is inconsistent with the modern "notice motion" practice of filing short motions and deferring all discussions on merits for a later filed supportive brief. (Document 170 at 27-28).  Defendant cites *United States v. Villalpando*, 259 F.3d 934, (8th Cir. 2001) for the proposition that additional grounds raised in amendments or supplements of a

timely motion for a new trial are procedurally barred if not timely filed, unless the court granted an extension prior to the original expiration period. (*Id*. at n 57).

The Defendant does not fully appreciate the extension he received. The Court granted him an extension to file a brief in support of his motion for a new trial, in which he had already raised the three grounds he wished to pursue.  This extension did not, however, reserve the right for Defendant to assert additional grounds for a new trial.  Furthermore, *Villalpando* stated "[g]enerally, we strictly apply the time limits of Rule 33 when considering supplements to motions for new trial, especially when the newly articulated claim alleges a very different violation of the defendant's rights than that contained in the original timely motion." *Villalpando*, 259 F.3d at 937-38. Moreover, the instant case is factually distinct from *Villalpando*.   In *Villalpando*, the defendant's original new trial motion cited ineffective assistance of counsel as a ground and the "supplemental motion permitted by the district court merely specified another instance in support of the ineffective assistance claim-a claim previously timely raised." (*Id*. at 938).  Here, the Defendant's due process ground does not "specify another instance in support" of any of the three grounds listed in his original motion.   Rather, he presents a new and independent ground.   In addition, the Defendant's due process claims arose from what he considers "inaccurate summaries" of the evidence and suggestion that the jury should "send a message," both of which took place in the Government's closing argument.   The Defendant surely should have appreciated this due process ground at the time he filed his motion for a new trial without the aid of the transcript. (Document 166 at 68-69).   The Court finds that the due process ground argued in Defendant's memorandum in support of his motion for a new trial was not timely raised within the fourteen (14) day period required under Rule 33(b), is not based on newly discovered evidence, and the Defendant's extension to file a supportive brief did not

permit him to raise additional grounds not contained in the original motion.  Accordingly, the Court finds that the argument for a new trial, based on due process grounds, is time barred by Rule 33(b). Nevertheless, out of an abundance of caution, the Court will briefly address this due process argument under the plain error standard.

In light of the Defendant's failure to object to what he considers "pervasive mischaracterizations" of fact and the prosecutor's closing suggestion that the jury should "send a message," the Court reviews the prosecutor's statement for plain error. Fed. R. Crim. P. 52(b). "To reverse for plain error the reviewing court must (1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Brewer*, 1 F.3d 1430, 1434-35 (4th Cir. 1993). (Internal citation and quotations omitted.)  When the first three requirements are met, the Court considers "whether the circumstances present an appropriate occasion for the exercise of our discretion to notice the error." *United States v. Cedelle*, 89 F.3d 181, 185 (4th Cir. 1996). "Only if in the context of the proceedings taken as a whole, the error either led to the conviction of a defendant who is actually innocent or otherwise seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" should the Court notice a plain error as a grounds for granting the motion. *Id.* (Internal citation and quotations omitted.)

When alleging prosecutorial misconduct, a defendant must show the remarks were, in fact, improper and that the remark prejudicially affected his substantial rights so as to deprive the defendant of a fair trial. *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir.1993).  To decide if a prosecutor's remarks are improper so as to require reversal, the Court is to consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately

placed before the jury to divert attention to extraneous matters [; ] ... (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel [;] ... and (6) whether curative instructions were given to the jury.

*United States v. Baptiste*, 596 F.3d 214, 226-27 (4th Cir. 2010). (Quoting *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir.1998)). The crux of Defendant's argument focuses on the prosecutor's "send a message" comment.  To the extent that such remark might have a tendency to mislead the jury or prejudice the accused, it was a very isolated comment in an otherwise relatively strong case.  Furthermore, viewing the record, as a whole, it does not appear the comment was deliberately placed before the jury to divert attention to extraneous matters, nor does it appear that the Government's statement was invited by improper conduct of defense counsel.  Finally, the Court gave a general instruction to the jury regarding the statements of counsel.  However, since the Defendant failed to object to the comment, of which he now complains, there was no opportunity for a curative instruction even had the Court found the same to be appropriate.[9]  Therefore, after careful consideration of all of the *Baptiste* factors relative to the Defendant's due process argument, the Court finds no evidence to support a new trial based on the prosecutor's comments.  Specifically, the Court finds no plain error which affected the Defendant's substantial rights or which seriously affected the fairness, integrity or public reputation of the trial.

## 1.  Failure to Grant Pre-trial Motions

This Court previously held that Defendant's statements made on November 30, 2010, should not be excluded under the exclusionary rule. (Document 97 at 10).  Defendant now argues

---

[9] "Nothing said or done by the attorneys who have tried this case is to be considered by you as evidence of any fact. The questions of counsel, the opening statements, and the final arguments of counsel are intended to help you in understanding the evidence and applying the law to the evidence, but they are not themselves evidence.
Accordingly, if any argument, statement, or remark of counsel is not based upon the evidence or the law as stated in these instructions, then you should disregard that argument, statement, or remark." (Document 153 at 6-7).

that this case presented "a statutory violation that *caused* a constitutional violation." (Document 166 at 49) (emphasis supplied). The Court declines Defendant's invitation to reconsider this ruling.  Furthermore, if the Defendant believed the subpoena was invalid, his remedy would be to move to quash the subpoena rather than attempting to suppress testimony given, under oath, in response to the subpoena.  Accordingly, Defendant's Motion for a New Trial on the ground of failure to grant pre-trial motions is denied.

2.  *Improper Jury Instructions*

Although cited as a ground in his motion for a new trial, Defendant does not argue in his supportive memorandum that improper jury instructions constitute grounds for a new trial. Therefore, the Court finds that the Defendant has abandoned this as a ground for a new trial. Nevertheless, in reviewing the Court's Charge to the Jury, the Court finds the jury instructions were proper and no grounds exist which would support the granting of a new trial.  Accordingly, Defendant's Motion for a New Trial on the ground of improper jury instructions is denied.

3.  *Insufficient Evidence*

The Court hereby incorporates the discussion of the evidence relative to the Defendant's motion for judgment of acquittal. *See supra* pp. 3-14.  Again, considering this evidence, the Court finds that the evidence does not weigh heavily against the verdict to necessitate a new trial in the interest of justice.  Accordingly, Defendant's Motion for a New Trial on the ground of insufficient evidence is denied.

*CONCLUSION*

In light of the findings and discussion *supra*, the Court hereby **ORDERS** that Defendant's *Motion for a New Trial* (Document 157) and Defendant's *Renewed Motion for Judgment of Acquittal* (Document 158) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office and to the United States Marshal.

ENTER:        February 27, 2012

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA