1      IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                  AT BECKLEY

3          TRANSCRIPT OF PROCEEDINGS

4   ----------------------------x
                                :
5   UNITED STATES OF AMERICA,   :      CRIMINAL ACTION
                                :      NO. 5:11-CR-00038
6   vs.                         :
                                :
7   HUGHIE ELBERT STOVER,       :      February 29, 2012
                                :
8          Defendant.           :
                                :
9   ----------------------------x

10            SENTENCING HEARING

11      BEFORE THE HONORABLE IRENE C. BERGER
          UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14  For the United States:       MR. R. BOOTH GOODWIN, II
                                 United States Attorney
15                               MR. STEVEN R. RUBY
                                 Assistant U.S. Attorney
16                               300 Virginia Street, East
                                 Charleston, WV  25301
17
    For the Defendant:           MR. WILLIAM D. WILMOTH
18                               Steptoe & Johnson
                                 P.O. Box 751
19                               Wheeling, WV  26003-0751

20

21

22

23  Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR
    Proceedings recorded by mechanical stenography; transcript
24  produced by computer.

25

2

I N D E X

GOVERNMENT'S WITNESSES:                                    PAGE

**KEVIN STRICKLIN**
        Direct Examination (By Mr. Ruby) . . . . . .  36
        Cross Examination (By Mr. Wilmoth) . . . . .  61
        Redirect Examination (By Mr. Ruby) . . . . .  66

**GARY MAY**
        Direct Examination (By Mr. Ruby) . . . . . .  69
        Cross Examination (By Mr. Wilmoth) . . . . .  79

**GINA JONES**
        Direct Examination (By Mr. Ruby) . . . . . .  81
        Cross Examination (By Mr. Wilmoth) . . . . .  84

P R O C E E D I N G S

THE CLERK:  The matter before the Court is the *United States* vs. *Hughie Elbert Stover*, Case Number 5:11-CR-38, scheduled for sentencing.

THE COURT:  Good morning, everyone.

Counsel, would you note your appearances for the record, please.

MR. GOODWIN:  Yes, Your Honor.  Booth Goodwin on behalf of the United States along with Steve Ruby and Jim Lafferty who is a Special Agent with the FBI seated at counsel table.

MR. WILMOTH:  Bill Wilmoth on behalf of the defendant, Your Honor.  Mr. Stover is here in the courtroom with me.

THE COURT:  All right.  Are we prepared to go forward?

MR. GOODWIN:  The United States is, Your Honor.

THE COURT:  All right.

MR. WILMOTH:  Yes, Your Honor.

THE COURT:  All right.

Madam Clerk, if you would please administer the oath to the defendant.

(Defendant sworn)

THE COURT:  Mr. Stover, on October 26th of last year you were convicted by a jury verdict of knowingly and

1    willfully making a materially false, fictitious, or

2    fraudulent statement in violation of 18, U.S.C., Section

3    1001 as charged in Count One of the superseding indictment,

4    and of knowingly and willfully causing the concealment,

5    cover-up, mutilation, or destruction of documents with

6    intent to impede, obstruct, or influence an investigation in

7    violation of 18, U.S.C., Section 2(b) and 1519 as charged in

8    Count Three of the superseding indictment.

9         Since the time of your plea, the probation office has

10   prepared a Pre-Sentence Investigation Report.

11        Mr. Wilmoth, have you had the opportunity to review

12   that report prepared on February the 1st of this year?

13        MR. WILMOTH:  Yes, Your Honor.  And I've reviewed

14   it in detail with Mr. Stover.

15        THE COURT:  All right.  You have also, I take it,

16   had the opportunity to review the attached addendum.

17        MR. WILMOTH:  Yes, ma'am.

18        THE COURT:  Mr. Stover, your lawyer has

19   anticipated my next questions, and they were whether you had

20   the opportunity to review those documents and discuss them

21   with your counsel.

22        THE DEFENDANT:  Yes, ma'am.

23        THE COURT:  Do you understand the contents of the

24   Pre-Sentence Investigation Report?

25        THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Any questions about it?

2          THE DEFENDANT:  No, ma'am.

3          THE COURT:  All right.  After my review of them,

4     it appears that the Government had one remaining objection

5     and the defendant had four.

6          As I understand it, Mr. Goodwin, the objection that was

7     posed by the Government was simply to Paragraphs 100 and 101

8     in which you've indicated that it was your position that

9     there was reasoning for an upward departure or variance.  Is

10    that correct?

11         MR. GOODWIN:  That is correct, Your Honor.

12         THE COURT:  I'll give you an opportunity to

13    address those issues later in today's proceeding.

14         Mr. Wilmoth, I'll take your four objections in turn.

15         What I am going to refer to as the first objection is

16    the defendant's objection to a two-level increase for

17    obstruction of justice as reflected in Paragraph 45 of the

18    Pre-Sentence Report.

19         Based on my review, the argument is that the

20    information contained in Paragraph 29 of the Pre-Sentence

21    Investigation Report is incorrect.

22         That particular paragraph involves the defendant's

23    testimony regarding the periodic removal of documents from

24    the barracks and his memory relative to the Charles Lilly

25    incident, or as commonly referred to in the Pre-Sentence

1    Report, Mr. Lilly having been read the riot act as a result

2    of giving prior notification.

3        Any statements that you want to make relative to that

4    objection?

5            MR. WILMOTH:  No, Your Honor.  I think as, as with

6    all of our objections, our position is sufficient in written

7    form unless you have questions.

8            THE COURT:  All right.

9        Any statements relative to that objection from the

10   Government counsel?

11           MR. GOODWIN:  Likewise, I believe we've, we've

12   made our argument in written form as well.

13           THE COURT:  All right.  Let me say after my review

14   of the Pre-Sentence Report and the testimony, as well as

15   those, what I'm going to refer to as arguments in the

16   Pre-Sentence Report and the sentencing memorandum, I find it

17   unnecessary to give consideration to the information

18   contained in Paragraph 29 in order to make a determination

19   and issue a ruling with respect to this particular objection

20   on whether or not an enhancement for obstruction of justice

21   should be given.

22       I find, therefore, that a ruling on that portion of the

23   objection is not necessary.

24       However, I will, Mr. Wilmoth, give consideration to the

25   merits of the defendant's objection to that enhancement.

1   And I will note for the record in order for the Court to

2   impose a two-level enhancement for obstruction of justice

3   under Section 3C1.1, the Court is required to find that the

4   defendant gave false testimony concerning a material matter

5   with willful intent to deceive.

6       During the trial of this case, this defendant was asked

7   by his counsel, Mr. Wilmoth, quote, "Did you destroy or have

8   these documents destroyed for the purpose, with the intent

9   of obstructing the investigation into the cause of the

10  explosion at the Upper Big Branch mine?"

11      Defendant responded, quote, "No, sir, I did not."

12      That's located in the transcript, Volume III at Page

13  159.

14      Mr. Stover indicated that this was a stupid mistake and

15  that, quote, it just never crossed his mind that he was

16  doing something that he shouldn't have done when he told Mr.

17  Williams to clean out that basement, end of quote.

18      I find that the defendant's testimony that he did not

19  have intent to obstruct the investigation was, in fact,

20  false.  And I base that based on the jury's verdict.  The

21  jury would necessarily have had to find that the statement

22  was false in order to convict the defendant with respect to

23  Count Three.

24      Further, I find that the false statement concerned a

25  material matter because intent was a necessary element of

1  the offense and it goes to the heart of the charge.

2      In support, I would cite you lawyers to the Fourth

3  Circuit opinions of *United States* vs. *Godwin* at 272 F.3d

4  659, and *United States* vs. *Lusk*, a 2010 Westlaw opinion.  I

5  apologize.  I don't have a cite other than the number at

6  Westlaw is 3760216.

7      Additionally, I find that the statement was made with

8  the willful intent to deceive, giving appropriate

9  consideration to the jury's verdict as to Count Three and

10  the jury's necessary finding with respect to the credibility

11  or the lack thereof given the statements made by the

12  defendant.

13      The defendant knew the testimony was false, wanted the

14  jury to believe that testimony in order to be acquitted.

15  And, of course, I find that the defendant's statement was

16  not a result of confusion, mistake, or faulty memory.

17      In other words, counsel, I find that this obstruction

18  of justice enhancement necessarily follows the jury's

19  verdict with respect to Count Three.  And given my review of

20  the transcript, I find that all of the elements necessary to

21  support the enhancement under Section 3C1.1 are present.

22      For those reasons, I find that the two-level

23  enhancement is applicable and appropriate, and I overrule

24  the defendant's objection as it relates to Paragraph 45,

25  again finding it unnecessary to issue a ruling with respect

1  to the matters contained in Paragraph 29 of the Pre-Sentence

2  Report.

3      Next the defendant objects to the two-level specific

4  offense characteristic enhancement applied in 2J1.2(b)(3) if

5  the offense involved the destruction of a substantial number

6  of records or documents or involved the selection of any

7  essential or especially probative record or document.

8      Again, Mr. Wilmoth, I know you've indicated that with

9  respect to all of your objections you feel that they are

10  covered.  I want to give you the opportunity to address them

11  if you desire to do so.

12          MR. WILMOTH:  Thank you, Your Honor.  I think it's

13  covered.  But may I sit down so I can take notes?

14          THE COURT:  Yes, you can sit down.

15      And, Mr. Stover, you can sit down as well given that my

16  review of these objections will be lengthy.

17          MR. WILMOTH:  Thank you.

18          THE COURT:  Yes, sir.

19      Mr. Goodwin, anything on behalf of the Government --

20          MR. GOODWIN:  Nothing further with --

21          THE COURT:  -- with respect to the objection?

22          MR. GOODWIN:  I'm sorry, Your Honor.  Nothing

23  further on behalf of the Government other than what we have

24  stated in our responses to defendant's objections.

25          THE COURT:  All right.

1      Counsel, again, after careful review of the

2  Pre-Sentence Report and the testimony, as well as the

3  positions that you both took with respect to the

4  applicability of this particular enhancement, I again find

5  that the enhancement is appropriate in that the facts of

6  this case clearly involve the selection of essential and

7  especially probative records and documents to destroy.

8      If you read the guideline provision, there are what I'm

9  going to refer to as three instances where this enhancement

10  can be applied.

11      After receiving the litigation hold document in this

12  case, the evidence indicates that this defendant selected

13  documents to be destroyed, told Mr. Williams to remove them

14  and to destroy them.  He knew that those documents, by his

15  admission, contained incident reports, security records, and

16  other documents probative in the on-going UBB mine

17  investigation.

18      Again, I find that the enhancement is clearly

19  applicable given the factors or elements the jury would have

20  had to find to return a verdict against the defendant as to

21  Count Three of the superseding indictment.

22      The Court finds there is no evidence to support actual

23  destruction.  When you read the guideline and what I'm going

24  to refer to as prong two -- prong one is applicable to

25  actual destruction.  Prong two is applicable when certain

1    documents have been selected to destroy.  And, of course,

2    the third was if the offense was extensive in scope,

3    planning, or preparation as required by 2J1.2(b)(3)(C),

4    which in my review of the Pre-Sentence Report and the

5    evidence at trial, I cannot and do not find evidence to

6    support the extensive nature of it given how that has been

7    interpreted by the applicable case law.

8         I do find the provision to be applicable based on the

9    selection of essential and especially probative records and

10   documents to destroy.

11        So, for that reason, counsel, I again overrule the

12   defendant's objection, preserving an objection and

13   exception.

14        Moving on to the next objection, it is with respect to

15   role in the offense, and specifically whether or not this

16   defendant has abused a position of trust or used a special

17   skill.

18        Again, counsel, I'll call on you and ask you if you

19   have any statements that you want to make relative to this

20   particular objection.

21             MR. WILMOTH:  No, Your Honor.

22             MR. GOODWIN:  Nothing further, Your Honor.

23             THE COURT:  All right.  To apply this particular

24   enhancement, the Court is required by law to find that the

25   defendant occupied and abused a position of public or

1   private trust. The Court must also find that the abuse of

2   trust significantly facilitated either the commission or the

3   concealment of the offense.

4      In assessing culpability, the Court is required, of

5   course, to look at the facts and circumstances of the

6   particular case.

7      In determining whether or not the defendant held a

8   position of trust, case law guides the Court and instructs

9   the Court to consider whether the defendant had special

10   duties or access to information which was not available to

11   other employees, to look to the extent of the defendant's

12   discretion, and also to look to whether the defendant's acts

13   indicate he's more culpable than similarly situated criminal

14   actors.

15      Before imposing a 3B1.3 enhancement, the Court is

16   required to look to find whether or not there is a

17   relationship akin to a fiduciary or trust relationship.

18      Here after, again, careful review of the Pre-Sentence

19   Investigation Report, testimony during the course of the

20   trial, and the positions taken by counsel, I find that this

21   defendant as chief of security was in a supervisory or

22   managerial role.

23      I further find that he did, in fact, have access to

24   information in the barracks that was not available to other

25   employees. In other words, other employees did not have

1    general access to these documents.

2         Further, he had broad discretion in overseeing the

3    security operations.  He was in a position to order the

4    destruction of the documents, and his acts were, of course,

5    more culpable than others similarly situated.

6         In this particular instance, that criteria does not

7    have much application.  You can give consideration to Mr.

8    Williams who was following orders.

9         He was in a position of trust, when one gives

10   consideration to the criteria, with the company and with

11   employees who, based on the evidence in this case, depended

12   on him to ensure the safety and security of the mine.

13        Clearly, it was his position as chief of security and

14   his abuse of that position of trust that significantly

15   facilitated the commission of the acts alleged in Count

16   Three of the indictment.

17        Only he could order the destruction of the documents in

18   the barracks, or he was in a position to order the

19   destruction of the documents in the barracks.  There was no

20   evidence to indicate that others were in that position.

21        I would assume that those who were his bosses or

22   superiors may have been in a position to do so.  But it is

23   his position that put him, gave him the ability to order the

24   destruction.

25        And, again, others at the mine depended on him in his

1    position of trust to ensure the safety and security of the

2    mine.

3        I find, of course, that that position significantly

4    facilitated its commission and, based on these

5    considerations and the particular facts of this case, that a

6    two-level enhancement for role in the offense is appropriate

7    and, therefore, overrule defendant's objection and preserve

8    an objection and exception for the defendant.

9        Lastly, with what I'm going to refer to as the

10    defendant's fourth objection, the defendant has indicated

11    that he is unaware of the origin of the $1,569 in

12    self-employment earnings reflected in Paragraph 78 of the

13    Pre-Sentence Report.

14        Counsel, if there are no statements about that, I'll

15    simply state to you that those earnings, according to the

16    Pre-Sentence Investigation Report, are reflected in the

17    Social Security Administration records, but the origin of

18    that money in self-employment earnings does not affect

19    sentencing in any way, and nor will the Court consider its

20    origin.

21        And, so, it is my position that a ruling on that

22    particular objection, if it is an objection, is not

23    necessary.  And --

24        Yes, sir.

25            MR. WILMOTH:  I'm not sure it's an objection

1  either, Your Honor. It's just that the defendant couldn't

2  recall what the, what the source of the self-employment

3  income was. And I didn't think you were going to find that

4  was an important item. So, it's not really an objection.

5      THE COURT: All right. That is a common position

6  for defendants with respect to information like this that

7  they don't recall. But I wanted to make sure that I at

8  least addressed it on the record and assured Mr. Stover that

9  its origin would not be something that the Court would

10  consider in determining the appropriate sentence.

11      Are there any other objections at this time to be

12  stated, counsel, on either side of counsel table?

13      MR. WILMOTH: Not from the defendant, Your Honor.

14      MR. GOODWIN: Not on behalf of the United States,

15  Your Honor.

16      THE COURT: All right. In that event, I find

17  sufficient indicia of reliability to support the probable

18  accuracy of the information contained in the Pre-Sentence

19  Investigation Report and the addendum and, therefore, adopt

20  the same and direct the probation office to file a copy of

21  the Pre-Sentence Report in the court file under seal.

22      All right. Moving forward, Mr. Stover, based on your

23  convictions for Count One and Count Three as I have outlined

24  on the record, as to Count One, federal law provides a

25  maximum penalty of a term of imprisonment of up to five

1  years; a period of supervised release up to three years; a

2  fine up to $250,000; restitution; and a special assessment

3  of $100.

4      As a result of your conviction for Count Three, federal

5  law provides a maximum penalty of a term of imprisonment up

6  to 20 years; a period of supervised release up to three

7  years; a fine up to $250,000; restitution; and a special

8  assessment of $100.

9      In light of the Supreme Court's decision in *Gall* vs.

10  *United States* and *United States* vs. *Booker*, the United

11  States Sentencing Guidelines are now advisory.  They're not

12  binding on the Court.

13      Further, case law instructs the Court that the Court

14  cannot presume that the guideline range is reasonable.  The

15  *Gall* decision, however, instructs the Court that I still

16  must calculate and consider the applicable guideline range.

17  And I'm also required to consider those sentencing factors

18  that are set forth in 18, U.S.C., Section 3553(a) in trying

19  to determine your appropriate sentence.

20      I'll begin by calculating the applicable advisory

21  guideline range.

22      In cases involving multiple counts of conviction, the

23  counts are grouped into distinct groups of closely related

24  counts by applying the rules in Section 3D1.2 of the

25  Sentencing Guidelines.

1    The offense level applicable to each group is

2 determined by applying the rules in Section 3D1.3, and the

3 combined offense level applicable to all groups taken

4 together is determined by applying the rules in Section

5 3D1.4 of the Sentencing Guidelines.

6    In this case, the counts of conviction involve two or

7 more acts or transactions connected by a common criminal

8 objective or constituting part of a common scheme or plan.

9 And, so, the counts are grouped pursuant to Section

10 3D1.2(b).

11    For the offense of knowingly and willfully making a

12 materially false, fictitious, or fraudulent statement in

13 violation of 18, U.S.C., Section 1001, the relevant United

14 States Sentencing Guideline is found in Section 2B1.1 and

15 provides for a Base Offense Level of six.

16    This Court in addressing the parties' objections has

17 previously found that a two-level enhancement for

18 obstruction of justice pursuant to 3C1.1 is applicable.  And

19 that would bring the offense level for that particular count

20 to eight.

21    The Base Offense Level for knowingly and willfully

22 causing the concealment, cover-up, mutilation, or

23 destruction of documents is found in Section 2J1.2.  That

24 provides for a Base Offense Level, Mr. Stover, of 14.

25    Again, in ruling on the defendant's objections, I've

1   found and placed on the record the reasoning that the

2   two-level enhancement under 2J1.2(b)(3)(B) is applicable

3   and, so -- for selection of probative records or documents

4   to destroy.  And that brings the offense level from 14 to 16

5   for that particular count.

6       I've also found in ruling on the objections that a

7   two-level increase is appropriate for abuse of a position of

8   trust and placed those reasons on the record.  That

9   two-level increase would bring the offense level to 18.

10      Lastly, I've found that the two-level increase for

11  obstruction of justice pursuant to Section 3C1.1 is

12  applicable to the facts of this case.  That brings the Total

13  Offense Level for Count Three up to 20.

14      Pursuant to Section 3D1.4(a), Mr. Stover, the group

15  with the highest offense level is counted as one unit.

16  Group one results in an adjusted offense level of eight.

17  And group two results in an adjusted offense level of 20.

18      Therefore, according to this provision, the second

19  group, for lack of a better way of putting it, is assigned

20  one unit, and group one is disregarded since it's more than

21  nine levels less serious than group two.

22      The combined adjusted offense level, applying that

23  particular provision, brings the combined level to 20.  And

24  that means your Total Offense Level is at 20.

25      You have no criminal history and, therefore, zero

1  criminal history points which establishes a Criminal History

2  Category of I.

3      Given a Total Offense Level of 20 and a Criminal

4  History Category of I, the advisory guideline range is a

5  term of imprisonment of 33 to 41 months; a period of

6  supervised release of one to three years; a fine of $7,500

7  to $75,000; restitution; and a special assessment of $200.

8      Counsel, other than the objections which I've

9  previously covered, are there any statements that you would

10  make relative to the calculations that I've placed on the

11  record?

12      Mr. Goodwin.

13      MR. GOODWIN:  Not on behalf of the United States,

14  Your Honor.

15      THE COURT:  Mr. Wilmoth.

16      MR. WILMOTH:  Nothing additional on behalf of the

17  defendant, Your Honor.

18      THE COURT:  All right.  There are some things that

19  these lawyers are well aware of that I want to go through on

20  the record for your purposes, Mr. Stover.

21      You've heard me make reference to Section 3553(a) of

22  Title 18.  That provision provides several factors that the

23  District Court must consider in determining your appropriate

24  sentence.

25      Specifically, that section tells the Court to consider

1    the nature and circumstances of the offense; the history and

2    characteristics of a particular defendant; and the need for

3    the sentence imposed to reflect the seriousness of the

4    offense, to promote respect for the law, to provide just

5    punishment for the offense, to afford adequate deterrence to

6    criminal conduct, to protect the public from further crimes

7    of a defendant, and to consider the need for that sentence

8    to provide a defendant with needed educational or vocational

9    training, medical care, or other corrective treatment in the

10    most effective manner.

11       The Court is also instructed by Section 3553(a) to

12    consider any pertinent policy statement that's in effect on

13    the date of a defendant's sentence; the need for that

14    sentence to avoid unwarranted sentence disparities among

15    defendants with similar history and characteristics who have

16    been convicted of the same or similar offense; and the need

17    to provide restitution to victims, if any, of that offense.

18       Section 3553(a) also instructs the Court to consider

19    the kinds of sentences that are available, as well as that

20    applicable advisory guideline range. I've already

21    calculated the range and I'll consider it together with the

22    other Section 3553(a) factors in determining your

23    appropriate sentence.

24       Counsel, I have reviewed your sentencing memoranda and

25    I will permit you-all to address the Section 3553(a) factors

1  via evidence and/or argument at this time if you choose to

2  do so.

3          MR. WILMOTH:  Your Honor, may we approach first,

4  please?

5          THE COURT:  Yes, sir.

6      (Bench conference on the record)

7          THE COURT:  Mr. Wilmoth.

8          MR. WILMOTH:  Your Honor, the defendant will not

9  be putting any witnesses on.  The Government does intend, I

10  believe, to put witnesses on and to offer exhibits.

11      Mr. Ruby and I have been discussing a proposed

12  stipulation of, of those facts to keep us from having to

13  have witnesses.  I've reviewed the proposed stipulation with

14  Mr. Stover and I have it here if Your Honor would like to

15  see it and if the Government has no objection.

16          MR. GOODWIN:  No objection.

17          THE COURT:  You-all have stipulated to the

18  statements in this document is what you're saying to me?

19          MR. WILMOTH:  What I guess I'm saying is that

20  proposed stipulation, I believe, shows what it is the

21  Government intends to put evidence on to show.

22          THE COURT:  Okay.

23          MR. WILMOTH:  And it seems to me that Your Honor

24  should consider not allowing that evidence.  And the reason

25  is because, for the most part, it's the rankest of hearsay.

1  It's far outside of the factors that the Court needs to, to

2  consider.  It's duplicative of the thorough pre-sentence

3  investigation that the probation office did.  And at bottom,

4  it's really unduly prejudicial and not something I

5  particularly want his wife, family, and friends to have to

6  hear.

7      So, I object to the Government's putting on evidence

8  which is described in the proposed stipulation.

9          THE COURT:  All right.  Let me read it and then

10  I'll hear your response.  I will say off the top of the

11  bat -- off the top of -- at the top that if it is evidence

12  that is otherwise relevant, although it might be difficult

13  for his family and friends to hear, I don't consider that a

14  ground for excluding it.  But let me read it and then I'll

15  call on you to respond.

16          MR. GOODWIN:  All right.

17      (Pause)

18          THE COURT:  Counsel, does this residential care

19  facility's definition have anything to do with what you all

20  intended to submit to me?

21          MR. WILMOTH:  Oh, no.

22          THE COURT:  In other words, the print is small and

23  I don't want to go to the trouble of reading it unless it

24  was intended to be submitted to me.

25          MR. WILMOTH:  I don't know how that got in there.

1    Here's a copy, Your Honor, that doesn't have that on it.

2              THE COURT:  I have one.  Thank you.

3              MR. WILMOTH:  I'm sorry.

4              THE COURT:  All right.  Response?

5              MR. GOODWIN:  Your Honor, Mr. Ruby plans to handle

6    all of the witnesses that are involved, so I will let him

7    take the lead on this.

8              THE COURT:  All right.

9         Mr. Ruby, step closer, please.

10             MR. RUBY:  Yes, Your Honor.

11        Your Honor, I'll say, first of all, that the United

12   States is reluctant to get into the kind of testimony that's

13   reflected in the stipulation, which is the reason that we

14   propose to stipulate to it rather than to get into it in

15   open court.

16        However, the defendant has indicated that he's not

17   interested in a stipulation here.  And, so, given that the

18   defendant has placed his character squarely at issue for

19   sentencing in the sentencing memoranda today that he's filed

20   which depends heavily on his service as a member of the

21   military service, his service as a police officer and deputy

22   sheriff's department, and his overall good character and

23   sound citizenship, the United States is in the position of

24   either offering this evidence in some form or preventing the

25   Court from having a full picture of the issues that the

1    defendant has raised.

2         Now, as to the question of hearsay, the evidence that's

3    discussed in the stipulation is admissible because it's

4    admissions from the defendant himself to the witnesses who

5    are going to provide the testimony or it's in the form of

6    authenticated records.

7         And, of course, as the Court's well aware, Rule 1101

8    provides that the rules of evidence do not apply at

9    sentencing in any event and the evidence is admissible.

10        We would still be willing to enter into the stipulation

11   at this time if defendant prefers to do that rather than

12   have the witnesses testify in open court.

13             THE COURT:  Any further argument, Mr. Wilmoth?

14             MR. WILMOTH:  Well, Your Honor, the, the -- for an

15   example, the military record and the sheriff's department

16   record were covered in the evidence at trial, and they were

17   certainly covered in the Pre-Sentence Report.  And we don't

18   think anything more is really necessary for that sort of

19   evidence.

20        Secondly, the kind of allegations about shooting a cat

21   with a .22, one, didn't happen but, two, how do I defend

22   that?  And it really has -- I know the rules of evidence

23   don't apply and I agree with Mr. Ruby on that.  But surely

24   the Court does not want to hear things that are so far out

25   of the realm of relevance as to be a waste of your time and

1    unduly prejudicial to the defendant.

2            THE COURT:  All right.  Is that it, counsel?

3        All right.  With respect to the matters contained in

4    Paragraph 1, I find that to be admissible for purposes of

5    the Court's sentencing.  And I find it admissible because

6    the fact that this man has served in the military is

7    contained in the Pre-Sentence Report and, of course, is

8    referenced in the sentencing memorandum.  Without a better

9    way to characterize it, it's touted as a positive.

10       And, so, in order to ensure that there is balance, if

11   there are things about that military record as a positive

12   that would detract from that, the Court seeing it solely as

13   his sacrifice and his time given to his country for military

14   service, if there's something that detracts from that, I

15   think that that's relevant in order for the Court to get a

16   balanced view of the service.

17       So, I find that the matter with respect to the military

18   contained in Paragraph 1 is, in fact, relevant.

19       With respect to Paragraph 2, it indicates that he

20   failed to work for extended time periods, did not show up to

21   the point that he was deemed to have voluntarily quit his,

22   terminated his employment.

23       That information is of no assistance to this Court in

24   trying to determine what the appropriate sentence is,

25   Mr. Ruby.

1    There are in the Pre-Sentence Report statements about

2  his periods of employment and with what agencies.  But the

3  fact that he voluntarily quit, did not show up for a

4  particular job is of no moment to me in trying to determine

5  the applicable and appropriate sentence.

6    And, so, I would exclude what is contained in Paragraph

7  2 of the stipulation.

8    Three is -- Paragraph 3 refers to his indiscriminately

9  firing at an abandoned house and -- oh, I'm sorry.  That's

10  it.  Told a subordinate to indiscriminately direct gunfire

11  in an abandoned house owned by Massey in which defendant

12  believed squatters to be staying.

13    I'm not sure that I understand, and I want to make sure

14  that I understand.  It's referred to as an abandoned house,

15  but also indicates that the defendant believed people were

16  living in it.

17    Mr. Ruby.

18    MR. RUBY:  Your Honor, the evidence from the

19  witness, if it's admitted by the Court, would be that the

20  house had been abandoned by its permanent occupants and that

21  someone had sneaked into the house, for lack of a better

22  word, and was squatting there or staying there

23  surreptitiously.

24    THE COURT:  So, it's your position that there was,

25  in fact, someone staying in the house.

1          MR. RUBY:  Correct, Your Honor.

2          THE COURT:  That would be the testimony.

3          MR. RUBY:  Yes, Your Honor.

4          THE COURT:  Anything further on this issue?

5          MR. WILMOTH:  No, Your Honor, except I don't see

6   how that's helpful to you in determining sentence.

7          MR. RUBY:  Could I respond, Your Honor?

8          THE COURT:  Yes, sir.

9          MR. RUBY:  Your Honor, beyond the specifics of the

10  defendant's claims about his honorable military service and

11  his honorable service as a police officer, he relies heavily

12  in his memoranda on claims about his status as a, a solid

13  and good citizen, a law-abiding citizen of his community.

14  And this certainly goes to the claim for the defendant's

15  law-abiding nature.

16         THE COURT:  All right.  And is there, in fact,

17  evidence that there were people living in the house?

18         MR. RUBY:  The witness would testify to that, yes,

19  Your Honor.  And I can proffer that the testimony would be

20  that when the witness entered the house, he saw that there

21  was a cot with bedding that appeared to be recently used and

22  other implements that indicated that someone was, in

23  essence, camping out in the house.  And when the witness

24  returned again, the witness set the items outside of the

25  house.  And when he returned, they had been moved back into

1   the house and concealed, indicating -- and this happened

2   more than once, indicating that someone was, in fact,

3   staying in the house without authorization.

4           THE COURT:  Okay.  With respect to Paragraph 3, as

5   best I understand both attorneys on this issue, there is no

6   evidence that there was anyone in the house at the time this

7   shooting took place, if we assume that the shooting took

8   place.  He shot at what was supposedly an abandoned house.

9   But the proffer is that he believed people to be staying

10  there.

11      The witness would testify that he went in.  There

12  appeared to have been someone sleeping there recently.  He

13  put things outside, and later returned and they were inside.

14      I will exclude what's contained in Paragraph 3, finding

15  that it is not going to be helpful to the Court in trying to

16  determine the appropriate sentence, given the facts and

17  circumstances -- or given the offenses for which this man

18  has been convicted.

19      I will say that knowing that it is important for this

20  Court to take into consideration the defendant's history and

21  characteristics, Mr. Ruby, this, however, is something that,

22  without this Court knowing whether or not he knew people

23  were there or living there, is going to put me in a position

24  of speculating.  And that's what -- those facts are what

25  would make this very germane for the Court to consider in

1  determining his sentence.  Without that, I'm going to

2  exclude what has been proffered here in Paragraph 3.

3      With respect to 4, I am going to exclude that.  That is

4  of no help to this Court.  If we were looking at it in terms

5  of the jury, I'd say that it's likely to be inflammatory.

6  But his receiving sexually explicit images on his computer,

7  his berating a subordinate for refusing to look at it is of

8  no assistance to me in trying to determine what the

9  appropriate sentence in this case is.  And, so, I exclude

10  what is contained in Paragraph 4.

11      Paragraph 5 indicates facts which would be an offense

12  if true.  And it indicates that this defendant basically

13  forwarded child pornography.  We all know that pre-sentence

14  reports include charges.

15      I don't know that this man was ever charged with this

16  or what the evidence is going to be.  The nature of it, if

17  it's in the form of a charge, would be commonplace in the

18  Pre-Sentence Report for a Court to give consideration to in

19  determining an appropriate sentence.

20      That being the case, I am going to order that the

21  information contained in Paragraph 5, albeit admissible, I'm

22  going to tell you lawyers right now it will play very little

23  part in what I do with this case and guide you in that way.

24  And I say it's admissible because it's information that we

25  generally find in pre-sentence reports.

1    It has been my habit over the course of the 17 years

2    I've been on the bench to give consideration to convictions

3    because I feel that anybody can be charged.  But at the same

4    time, I know that this type of information is contained in

5    pre-sentence reports.  But I'm telling you-all to guide you

6    in whether you want to put this evidence on, it's going to

7    be -- I don't feel it's appropriate for me to exclude it for

8    that reason, but it's going to be of, of practically no help

9    to me in determining the appropriate sentence.  I don't

10   exclude it for the reasons I've just stated on the record.

11   The Paragraph 6 I will say likewise.  I believe that it

12   is admissible because his tenure as a Raleigh County sheriff

13   is being touted as what I'm going to refer to as a positive.

14   And, so, the Court should have the full view of that

15   service.  I'm not going to exclude it for that reason.  It's

16   like his military service.  It's being touted as a positive.

17   His sacrifice, his being a law enforcement officer is being

18   touted as a positive for him in terms of sentencing.

19   And, so, in order for the Court to view that

20   employment, or that service in a balanced way, if there are

21   things that he did with respect to his duties as a sheriff's

22   deputy that are negative, the Court should hear that as well

23   in order to have a balanced view.  So, I do not exclude

24   what's contained in 6.

25   Paragraph 7, Mr. Ruby, I exclude.  That's simply of no

1   assistance to me in trying to determine what the appropriate

2   sentence is.

3        The rules of evidence, as you lawyers have agreed, do

4   not apply.  However, I do think that rules of fairness

5   apply.  And, so, I've made an effort to indicate to you-all

6   what evidence will be admissible to give a balanced view to

7   the Court of the issues that are, in fact, relevant -- and I

8   hate to use that word -- helpful to this Court in trying to

9   make an appropriate determination about sentencing.

10       I preserve an objection and exception for either party

11  aggrieved by any portion of the ruling that I've made with

12  respect to these issues.

13            MR. WILMOTH:  Your Honor, in light of your

14  rulings, then, may Mr. Ruby and Mr. Goodwin and I get off in

15  a corner for a second and see if we can agree on language

16  for a stipulation?

17            THE COURT:  Yes, sir.

18            MR. RUBY:  Your Honor, may I ask what Paragraph 7

19  is?  We didn't bring it up because I didn't realize there

20  was still a possibility of agreeing to it.

21            THE COURT:  Paragraph 7 is shooting cats.

22            MR. RUBY:  Okay.

23            THE COURT:  Not Assistant U.S. Attorneys, but

24  cats.

25            MR. RUBY:  Understood, Your Honor.

1      THE COURT:  All right.  Do you want to -- do you

2  need until noon or not?

3      MR. RUBY:  Yes, Your Honor.

4      THE COURT:  We'll stand in recess until noon.

5      (Bench conference concluded)

6      (Pause in proceedings from 11:50 a.m. until

7  12:00 p.m.)

8      MR. RUBY:  Your Honor, may we approach?

9      THE COURT:  Yes, sir.

10    (Bench conference on the record)

11     MR. WILMOTH:  Your Honor, the three of us have

12  agreed that we can say on the record to you what we have

13  stipulated with respect to Paragraphs 1 and 6.

14     MR. RUBY:  With some slight modifications.

15     MR. WILMOTH:  Yes, with some slight modifications.

16     THE COURT:  I'm sorry?  1 and --

17     MR. RUBY:  6.

18     MR. WILMOTH:  We have agreed to language that

19  basically says this is what the witnesses would have said if

20  they had been called.

21     THE COURT:  All right.

22     MR. WILMOTH:  And that way, it cuts it down.  It

23  means no witnesses.

24     MR. RUBY:  Your Honor, there are a couple of

25  witnesses on points not related to the stipulation.

1          MR. WILMOTH:  Okay.  Like Kevin Stricklin maybe?

2          MR. RUBY:  Yes.

3          MR. WILMOTH:  I have no problem with that.  I'm

4    just concerned about what was in the proposed stipulation.

5    And we've worked out a deal that will keep that from being,

6    from being heard in open court.

7       And, in fact, if -- since Your Honor is the only person

8    that is the fact finder here making a determination, I'm

9    absolutely fine and would request that Mr. Ruby just read

10   the stipulation that we've agreed to here now so it doesn't

11   have to be heard by everyone.

12         THE COURT:  That's fine.  Does the stipulation

13   take care of Paragraph 5 as well?  You-all mentioned 1 and

14   6.

15         MR. RUBY:  We've decided not to offer any evidence

16   of Paragraph 5.

17         THE COURT:  All right.  You're going to read to me

18   now, Mr. Ruby?

19         MR. RUBY:  If that's acceptable with the Court,

20   Your Honor.

21         THE COURT:  Yes, sir.

22         MR. RUBY:  "The United States and defendant,

23   Hughie Elbert Stover, do hereby stipulate and agree to the

24   following:

25      "While a member of the United States Navy, defendant

1    deserted his post several times in violation of the Uniform

2    Code of Military Justice, including once for approximately

3    six months.  He was court-martialed, sentenced to hard

4    labor, and ultimately honorably discharged because he was

5    found unsuitable for further military service."

6         The stipulation also provides that witnesses would

7    testify that Mr. Stover told them that while a Raleigh

8    County deputy sheriff, Mr. Stover from time to time

9    transported recently arrested prisoners to remote locations,

10   handcuffed them, forced them to their knees, and beat them

11   gratuitously.

12        A witness would testify that Mr. Stover told him that

13   Mr. Stover wore cowboy boots while he was on duty because

14   they were particularly useful for kicking prisoners in the

15   face.

16        A witness would also testify that Mr. Stover told him

17   that Mr. Stover particularly targeted African-Americans for

18   such brutality.

19             THE COURT:  That's the sum and substance of your

20   stipulation?  Is that correct, counsel?

21             MR. WILMOTH:  It is, Your Honor.  And I've

22   reviewed it with Mr. Stover and he agrees as well.

23             THE COURT:  Mr. Stover, --

24             MR. WILMOTH:  Do you want to acknowledge to the

25   Judge that you agree to the stipulation?

1          THE COURT:  Mr. Stover, you heard these lawyers

2   tell me that there has been an agreement between the parties

3   with respect to what's contained in Paragraphs 1 and 6 of

4   the proposed earlier stipulation.  Mr. Ruby has read that,

5   has placed it on the record.

6       You agree that that is, in fact, the stipulation as the

7   language he read; is that correct?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  All right.  Anything further here at

10  the bench?

11         MR. RUBY:  Not from the United States, Your Honor.

12         MR. WILMOTH:  No, Your Honor.

13         THE COURT:  Mr. Ruby, you read that he had been

14  dishonorably discharged?

15         MR. RUBY:  No, Your Honor.  If I misspoke, I

16  apologize.

17         THE COURT:  I thought that's what I heard which

18  was not what I had read, and I just wanted to make sure

19  about your stipulation.

20         MR. WILMOTH:  I believe he said "honorably," and

21  that's, that's correct.

22         THE COURT:  Okay.  Then I misunderstood it.

23  That's what I remember from the pre-sentence investigation.

24         MR. WILMOTH:  Do I understand there are just two

25  more witnesses then?

Kevin Stricklin - Direct

1  MR. RUBY:  We will have Mr. Stricklin, Mr. May,

2  and Ms. Jones, three witnesses.

3  MR. WILMOTH:  Okay.

4  MR. RUBY:  And I expect that only Stricklin will

5  take any significant amount of time.

6  THE COURT:  Okay.  Thank you-all.

7  (Bench conference concluded)

8  THE COURT:  Counsel, if you have further argument

9  and/or evidence relative to the 3553(a) factors, I will let

10  you present it at this time.

11  MR. RUBY:  Your Honor, the United States will have

12  three witnesses.  And the United States first calls Kevin

13  Stricklin.

14  THE COURT:  All right.

15  **KEVIN STRICKLIN**, GOVERNMENT'S WITNESS, SWORN

16  DIRECT EXAMINATION

17  BY MR. RUBY:

18  Q.   Good morning, sir.  I know you've testified in this

19  matter before, but would you mind please re-introducing

20  yourself to the Court and telling the Court what your

21  position is.

22  A.   My name is Kevin G. Stricklin, S-t-r-i-c-k-l-i-n.  I'm

23  the Administrator for Coal Mine Safety and Health of the

24  Mine Safety and Health Administration.

25  Q.   In that position, Mr. Stricklin, are you in charge of

Kevin Stricklin - Direct

1   the regulation of coal mines on the part of the Federal

2   Government?

3   A.   Yes.

4   Q.   Does your responsibility cover the entire country?

5   A.   Yes.

6   Q.   How long have you held the position that you're in now,

7   sir?

8   A.   Approximately five years.

9   Q.   Mr. Stricklin, are you familiar with an explosion that

10  occurred at the Upper Big Branch mine in 2010?

11  A.   Yes.

12  Q.   Did your agency investigate that explosion?

13  A.   Yes.

14  Q.   Did MSHA consider whether advance notice of mine

15  inspections played any role in that explosion?

16  A.   Yes.

17  Q.   What did MSHA conclude?

18  A.   We concluded that advance notice was a contributory

19  factor in the explosion.

20  Q.   Mr. Stricklin, we'll talk more about that conclusion

21  later.  But let me ask you first, have you helped with the

22  investigation of mine accidents before this one?

23  A.   Yes.

24  Q.   When was the first mine accident or mine disaster that

25  you helped investigate?

Kevin Stricklin - Direct

1   A.   It would have been in November of 1980.

2   Q.   Mr. Stricklin, I'm going to show you on the screen –

3   it's there to your side – a document that's been marked

4   Government's Exhibit 1.

5        MR. RUBY:  And, Your Honor, if it's acceptable to

6   the Court, I will -- I have about four exhibits for Mr.

7   Stricklin and I'll simply display them on the screen and

8   then tender them marked exhibits to the clerk at the

9   conclusion of his testimony.

10        THE COURT:  Yes, that's acceptable as long as they

11   aren't displayed until I can either rule on them or there is

12   an agreement that they're admissible.  And when I say

13   "displayed," I mean displayed beyond me and the Court

14   personnel.

15        MR. RUBY:  Understood, Your Honor.

16        THE COURT:  Thank you.

17   BY MR. RUBY:

18   Q.   Mr. Stricklin, do you recognize the document that is on

19   your screen right now?

20   A.   Yes.

21   Q.   How do you recognize it?

22   A.   I was -- I put together yesterday all the explosions or

23   major disasters that have occurred since 1980 to the

24   present.  And I outlined in red the ones that I was involved

25   in as far as the investigation of it.

Kevin Stricklin - Direct

1   Q.   Did you prepare this document as a summary of testimony

2   that you're going to provide today?

3   A.   Yes.

4           MR. RUBY:  Your Honor, the United States moves the

5   admission of Government's 1.

6           THE COURT:  Any objection?

7           MR. WILMOTH:  No, Your Honor.

8           THE COURT:  Government's Exhibit Number 1 will be

9   admitted into evidence without objection.

10  BY MR. RUBY:

11  Q.   Mr. Stricklin, which investigations, or which, which

12  mine disasters on this list are disasters that you

13  participated in the investigation of?

14  A.   They would be highlighted in the red.

15  Q.   Okay.  Approximately how many of those are there?

16  A.   Approximately 17 or 18.  I can't see the bottom of the

17  sheet.

18  Q.   When did your career at MSHA begin, Mr. Stricklin?

19  A.   May of 1980.

20  Q.   All right.  How old were you when you started working

21  there?

22  A.   Twenty-two.

23  Q.   Mr. Stricklin, why does MSHA investigate mine

24  disasters?

25  A.   Number one, we owe the families an explanation as to

Kevin Stricklin - Direct

1    what occurred.  And we also owe the mining industry an

2    explanation to try to keep it from ever happening again.

3    Q.   Do MSHA investigations of mine disasters normally lead

4    to changes that help prevent future accidents?

5    A.   Yes.

6    Q.   Can you give us some examples of that?

7    A.   An example, after the Sago explosion, regulations were

8    promulgated, or there were things put in place to have

9    refuge chambers in the active areas of the mine, more mine

10   rescue teams.

11        After UBB, an emergency temporary standard was put in

12   place that required 80 percent rock dust in all areas of the

13   mine.

14   Q.   If witnesses make false statements in a disaster

15   investigation, Mr. Stricklin, how does it affect MSHA's

16   ability to prevent mine disasters in the future?

17   A.   Well, it wouldn't give us the whole picture or the

18   information that we need to conclude the, the correct

19   information.

20   Q.   And if records are destroyed while a mine is under

21   investigation, how does that affect MSHA's ability to

22   prevent mine disasters in the future?

23   A.   Well, records are just an important part of our

24   investigation.  It allows us to evaluate what was in place

25   at the time of the explosion or things leading up to the

Kevin Stricklin – Direct

1    explosion.

2    Q.   Mr. Stricklin, I'm going to turn now to the explosion

3    at Upper Big Branch that the, we discussed briefly earlier.

4    First, I want to talk a little bit about the mine at UBB

5    itself.  Have you been underground at Upper Big Branch?

6    A.   Yes.

7    Q.   Are you also familiar with the Upper Big Branch mine

8    through MSHA's investigation?

9    A.   Yes.

10   Q.   Mr. Stricklin, I'm going to show you another exhibit.

11           MR. RUBY:  And if the Court will permit, I'm going

12   to share a copy of all of these with defense counsel.

13   BY MR. RUBY:

14   Q.   This document, Mr. Stricklin, has been marked

15   Government's Exhibit 2.  I will try to operate the projector

16   here so you can see the entire thing.  Do you recognize the

17   document that's on your screen now, sir?

18   A.   Yes.

19   Q.   And how do you recognize it?

20   A.   I've seen enough of this map over the past couple years

21   to understand it.  It's the Upper Big Branch mine.

22   Q.   Okay.

23           MR. RUBY:  Your Honor, the United States moves

24   admission of Government's 2.

25           THE COURT:  Any objection, counsel?

Kevin Stricklin – Direct

1    MR. WILMOTH:  No, Your Honor.

2    THE COURT:  Government's 2, Mr. Ruby, will be

3  admitted into evidence without objection.

4    MR. RUBY:  Thank you, Your Honor.

5    Your Honor, may I publish the exhibit?

6    THE COURT:  Yes, sir, at your discretion.

7    MR. RUBY:  Thank you, Your Honor.

8  BY MR. RUBY:

9  Q.  Mr. Stricklin, just to help us get our bearings here,

10  is this map an overhead view of the Upper Big Branch mine?

11  A.  Yes.

12  Q.  In other words, is this essentially what you'd see if

13  you cut off the top of the mountain and looked down in from

14  overhead?

15  A.  Yes, sir.

16  Q.  How long has the Upper Big Branch mine been around,

17  roughly speaking, sir?

18  A.  I believe it went into operation in 1994.

19  Q.  Does that mean that most of the area shown on this map

20  has already been mined?

21  A.  Yeah.  The darkened colors would have been mined -- or

22  are areas that have been mined in the past.

23  Q.  Can you show us the areas, then, of the mine where coal

24  was actively being mined at the time of the explosion at

25  UBB.  And you can draw on the screen there in front of you

Kevin Stricklin - Direct

1    by touching it with your finger.

2    A.    Okay.  There were four active sections of the mine that

3    were being mined, the first one being the longwall section;

4    right next to it, the tailgate 22 section; the headgate 22

5    section; and the barrier section.

6    Q.    Now, can you show us where the entrances to the mine

7    were, where miners came and went, Mr. Stricklin?

8    A.    Yeah.  There were two locations, the first one being

9    the Upper Big Branch portal, and the second one being the

10   Ellis portal.

11   Q.    All right.  And approximately how long did it take, Mr.

12   Stricklin, to get from the entrance to the mine at the most

13   distant area you've marked as a place where work was

14   happening?

15   A.    I would guess approximately 50 minutes.

16   Q.    Okay.  Sir, you mentioned the longwall.  Could you

17   please again indicate where the longwall was in this mine

18   and explain briefly how longwall mining works.

19   A.    Could you repeat that, please?

20   Q.    Yes, sir.  You, you mentioned the longwall in an answer

21   you gave a minute ago.  Could you again indicate to the

22   Court where the longwall area of the mine was?

23   A.    The longwall area of the mine was in the circle right

24   beyond the darkened area where the mining had already

25   proceeded to that point.

Kevin Stricklin - Direct

1  Q.  Could you explain, Mr. Stricklin, how longwall,

2  longwall mining works?

3  A.  Longwall mining is typically a big block of coal.  And

4  in Upper Big Branch's case, it was about 1,000 foot wide by

5  10,000 feet long.  And you have a machine known as a

6  longwall shearing machine that goes back across, back across

7  the thousand foot face that's kind of like what we would

8  call a meat slicer that slices the coal in about 30-inch

9  pieces.  And it is brought out the entire length until all

10 of that block of coal has been mined.

11 Q.  Mr. Stricklin, I'm going to show you another document

12 that I've marked as Government's Exhibit 3.  Do you

13 recognize what's depicted in this document, Mr. Stricklin?

14 A.  Yes.

15 Q.  How do you recognize it?

16 A.  From the accident investigation.  I'm aware that this

17 is the shearing machine at the Upper Big Branch mine.

18         MR. RUBY:  Your Honor, the United States moves to

19 admit Government's 3.

20         THE COURT:  Any objection?

21         MR. WILMOTH:  No, Your Honor.

22         THE COURT:  Government's Exhibit Number 3 will be

23 admitted into evidence without objection.

24         MR. RUBY:  Thank you, Your Honor.

25 BY MR. RUBY:

Kevin Stricklin - Direct

1   Q.   Mr. Stricklin, could you show us the part of this

2   machine that actually does the work of tearing the coal out

3   of the coal seam?

4   A.   Yeah.   This -- a shearing machine is made up of two

5   drums, the head drum and the tail drum.   And they each are

6   basically laid out the same.

7        This is a picture of what would be the tail drum.   And

8   you can see that there's bits extending out of the drum.

9   And that's, that would be the part that would actually be

10  biting into the coal and breaking it up to be carried away

11  from the mining area to the outside.

12        MR. RUBY:   And, Your Honor, if I could, I'd like

13  to go ahead and publish this.

14        THE COURT:   Yes, sir, at your discretion.   It's

15  been admitted.

16        MR. RUBY:   Thank you.

17  BY MR. RUBY:

18  Q.   Mr. Stricklin, is there any safety equipment that's

19  built into the part of the machine that's shown in this

20  photograph?

21  A.   There's a number of safety features built into it.

22        Number one, you can't stand close to the shearing

23  machine while you're operating it.   You have to stand back a

24  ways from it.   So, you have, I guess, a bracket in place

25  that holds the arm, but you can't get close to the, the

Kevin Stricklin - Direct

1    cutting machine as it's rotating.

2        You also have another safety feature behind the bits,

3    the water sprays that basically spray water as the coal is

4    being mined for a couple of different reasons.

5    Q.   Tell us what those reasons are.

6    A.   One is to combat the dust that's generated during the

7    mining process.

8        And the second one is assist in the ventilation process

9    to move the dust and the methane that may be liberated

10   during the mining process away from the active area.

11   Q.   Can you show us on this picture where the water sprays

12   that you talked about are located?

13   A.   The water sprays would be located behind the bits.

14   It's difficult to show.  But, basically, as the bits turn

15   and come around in a circle, the water sprays hit directly

16   where the bits are hitting the coal itself.

17   Q.   Do the water sprays run all the time when the machine

18   is running?

19   A.   They're supposed to, yes.

20   Q.   And is one of the purposes of the, the water sprays

21   that are built into this machine have to do with keeping the

22   area cool around, around this machinery?

23   A.   Yes.  That's a -- a third component is to make sure

24   that there's no hot smear material from cutting coal or from

25   cutting sandstone most prevalently, to make sure there's no

Kevin Stricklin - Direct

1    heat generated during the process.

2    Q.    Why is that important?

3    A.    Well, you can have a frictional ignition that can cause

4    an ignition to occur.

5    Q.    And when you say an ignition, what, what is it that

6    would ignite in a scenario where the sandstone around the

7    longwall becomes too hot?

8    A.    It would be methane liberated.  And the ignition source

9    would be that heat smear that's created during the, the

10   cutting without the water cooling the surface.

11   Q.    Thank you, sir.  Let's turn back to Upper Big Branch.

12   I want to discuss the investigation that took place there.

13   How did you first learn about the explosion at UBB?

14   A.    On April the 5th, I had caught a flight from

15   Washington, D.C., to Charleston, West Virginia.  And when I

16   landed in Charleston, I was to get in a car and drive to

17   Pikeville, Kentucky.

18       I had a message on my phone indicating that there was a

19   problem at the Upper Big Branch mine.  And I called back to

20   the office to get more information about that.

21   Q.    What did you do once you learned more about what was

22   going on?

23   A.    I decided that I needed to get to the Upper Big Branch

24   mine.

25   Q.    What was the situation when you arrived?

Kevin Stricklin – Direct

1   A.    There were a lot of emergency vehicles.  I first

2   arrived at the Ellis portal.  There was a lot of emergency

3   vehicles, a lot of police presence.  And they -- I got in

4   through the gate, or, or the area there to cross the bridge

5   and started up toward the Ellis portal when I ran into my

6   District Manager, Bob Hardman, who was walking away from the

7   Ellis portal coming down the hill.

8   Q.    What did you find out from Mr. Hardman?

9   A.    He had told me that there were a number of fatalities

10  that already had occurred, and that he was going over to the

11  Upper Big Branch portal to set up a command center.

12  Q.    And, ultimately, how many people lost their life at

13  Upper Big Branch, sir?

14  A.    Twenty-nine.

15  Q.    When is the last time, Mr. Stricklin, that that many

16  people died in a mine disaster?

17  A.    1972.

18  Q.    Where was that?

19  A.    Hyden, Kentucky.

20  Q.    How many people died in that accident?

21  A.    Forty.

22  Q.    When was MSHA created, Mr. Stricklin?

23  A.    1977.

24  Q.    In the entire history of MSHA, then, where does this

25  disaster rank with respect to fatalities?

Kevin Stricklin - Direct

1   A.   It's the worst.

2   Q.   Did MSHA conduct an investigation after the disaster at

3   UBB?

4   A.   Yes.

5   Q.   Now, in terms of importance in your experience at MSHA,

6   importance of the investigation, where does this disaster

7   investigation rank?

8   A.   It would be the most important one that we've done.

9   Q.   After the explosion, Mr. Stricklin, did there come a

10  time when you were called to the White House?

11  A.   Yes, sir.

12  Q.   Tell us about that.

13  A.   It was probably a week and a half after the explosion

14  had occurred and my boss came to me and said that he wanted

15  me to get some, a map prepared and to be prepared to go to

16  the White House to do a briefing.  And him, the Assistant

17  Secretary, Joe Main, the Secretary of Labor, Hilda Solis,

18  and myself went to the White House and actually briefed the

19  President on what occurred there.

20  Q.   What was the President's response?

21  A.   He was deeply moved.  As I laid the map on his desk and

22  basically went over -- naturally, it was preliminary at the

23  time.  But he was moved by what had occurred and the number

24  of fatalities.  And he was very interested, asked a lot of

25  questions at that time about mining and the Upper Big Branch

Kevin Stricklin - Direct

1  explosion.

2  Q.  What direction did he give you as you moved forward

3  with the investigation?

4  A.  He specifically told me to do everything I could to

5  find the cause of the explosion.  And he also asked us at

6  that time to work closely with the Department of Justice.

7  Q.  We talked earlier, Mr. Stricklin, about the role of

8  investigations in preventing future disasters.  How many

9  underground coal miners are there in America?

10  A.  Approximately 50,000 underground miners, and about

11  10,000 contractors that work in underground mines.

12  Q.  Is it your experience that the results of an

13  investigation of a mine disaster are important to, to

14  underground miners all across the country?

15  A.  Yes, it's very important.

16  Q.  Is it your experience, sir, that determining the cause

17  of a mine disaster is important to the families of the

18  deceased?

19  A.  That's, that's just as important as the cause of it,

20  yes.

21  Q.  In this particular case, was it your experience that it

22  was important to the families of the deceased?

23  A.  Yes, sir.

24  Q.  Did you hold meetings with the families of the, the men

25  who had lost their lives at UBB?

Kevin Stricklin - Direct

1    A.    Yes, I did.

2    Q.    Were those meetings well attended?

3    A.    Yes.

4    Q.    How many people, just estimating, came to those

5    meetings regularly?

6    A.    Approximately 100 I would say.

7    Q.    Let's turn, Mr. Stricklin, to the details of the

8    investigation.  What was the process that you followed in

9    getting this investigation up and running?

10   A.    The first thing I did was I had to put a team together.

11   And I had to look at the expertise that I thought I would

12   need to do the investigation.

13         And when you first start out, you just don't know

14   exactly -- number one, you don't know where the explosion

15   started and you don't know what kind of help you'll need.

16         But I made a point of making sure that I had

17   ventilation, roof control, electrical expertise, and people

18   who had familiarity with longwall mining and development

19   mining at the time that I put the team together.  I really

20   didn't know where the explosion started at.

21   Q.    Ultimately, how many people participated in MSHA's

22   investigation of the Upper Big Branch disaster?

23   A.    Signing the report, I think there were 15 people that

24   signed it.  But at times, there were over 100 people that

25   were involved in this investigation in one way or another to

Kevin Stricklin - Direct

1    try to determine the cause.

2    Q.    How many people did MSHA interview in the course of the

3    investigation?

4    A.    Approximately 270 or -80.

5    Q.    How many pages of documents did MSHA review?

6    A.    88,000.

7    Q.    Can you describe for us the extent of MSHA's physical

8    investigation of the underground site itself?

9    A.    The instructions I gave to everybody was do everything

10   you can to find the cause of this explosion.  And it, it was

11   about a year and a half of underground work that these

12   people went underground every day and just -- it was very

13   meticulous.

14        As part of the investigation, you look at singed rock

15   dust bags.  You look at where a concrete block may be

16   located and you try to determine where that block came from.

17   And you try to find any information that you can to help you

18   find what, what was the cause of this explosion.

19   Q.    All together, how many months did MSHA's underground

20   investigation at UBB take?

21   A.    Approximately 18 months.

22   Q.    Is there any risk involved with the underground portion

23   of the investigation?

24   A.    There's always risk involved of going underground

25   after an explosion.  You have a lot of coal dust still in

                        Kevin Stricklin - Direct

1   place.  The ventilation system is fragile as compared to

2   what it used to be.  So, yes.

3   Q.    Mr. Stricklin, when a witness makes a false statement

4   in an MSHA accident investigation, does that jeopardize

5   MSHA's ability to prevent mine disasters in the future?

6   A.    Yes.

7   Q.    When a witness destroys records during the course of an

8   MSHA disaster investigation, does that jeopardize MSHA's

9   ability to prevent disasters in the future?

10  A.    Yes.

11  Q.    Mr. Stricklin, in the course of its investigation, did

12  MSHA find out whether miners at Upper Big Branch were warned

13  when mine inspectors were coming their way?

14  A.    Yes.

15  Q.    Did that happen at UBB?

16  A.    Yes, it did.

17  Q.    How common was it?

18  A.    It -- through our interview process, it appeared very

19  common.

20  Q.    Did things just work out that way or was there a system

21  in place at UBB to give advance warning when mine inspectors

22  were coming?

23  A.    There appeared to be a system in place based on our

24  interviews.

25  Q.    Could you explain that to us?

Kevin Stricklin – Direct

1   A.   Our interview process indicated that as our inspectors

2   came off of the main road, I believe it was Route 3, they

3   passed through a guard shack.  And as they proceeded from

4   the guard shack up to the mine, the guard would call up and

5   announce our presence at the mine.

6   Q.   You indicated earlier the amount of time that it would

7   take to travel to a working section once the mine was

8   entered.  How long all together from the step that you just

9   mentioned, arriving at the security gate, would it take for

10   a mine inspector to get to the farthest working area of the

11   mine?

12   A.   I would guesstimate somewhere about an hour to an hour

13   and 15 minutes based on how much work they had to do

14   outside, how many books they needed to review before they

15   went into the mine.

16   Q.   Are the mine inspections that MSHA conducts supposed to

17   be unannounced?

18   A.   Yes, sir.

19   Q.   Did MSHA determine in its investigation whether it was

20   common for mine safety laws to be broken at Upper Big Branch

21   in ways that could be hidden when the warning came that an

22   inspector was on the way?

23   A.   Yes.

24   Q.   Was it?

25   A.   Yes.

Kevin Stricklin - Direct

1  Q.  How common was it?

2  A.  It appeared to be pretty common.

3  Q.  Could you tell us what some of the dangerous conduct

4  was that was hidden when mine inspectors were coming at UBB?

5  A.  Some of the things that could be done is tightening up

6  the ventilation curtain to make sure you have enough air,

7  moving the air from one section to another after finding out

8  which section the inspector was going to, installing more

9  roof bolts, cleaning up accumulations of coal, putting some

10  rock dust on the areas where an inspector may be located at,

11  those types of things.

12  Q.  Now, I'm going to ask you just briefly, Mr. Stricklin,

13  to explain for us what the importance is to safety of the

14  air that goes to the working coal face in a coal mine.

15  A.  Well, there's a number of reasons.  In Upper Big

16  Branch's case, they, they liberated methane.  And it's

17  important that you have enough air to the face to decrease

18  the amount of methane that may be in the airstream.

19  Q.  Where does methane come from in a coal mine?

20  A.  Methane can come from the face of the coal as you're

21  mining it, from cracks in the floor, or from breaks in the

22  mine roof.

23  Q.  Okay.  And when you say Upper Big Branch liberated

24  methane, what does that mean?

25  A.  That means that they are -- they -- there was methane

Kevin Stricklin – Direct

1   that was liberated from one of those three areas that

2   basically caused MSHA to increase the number of inspections

3   that we would have there.  We call it a 103(i) spot

4   inspection because of methane.

5       But the point I want to make is when you asked me about

6   ventilation, ventilation is really important when you have

7   methane gas.  Other reasons for ventilation is to carry

8   respirable dust away from the area as well.

9   Q.   What happens if methane gas concentrates in an area in

10  a coal mine?

11  A.   If it concentrates in an explosive limit, you can have

12  an ignition.

13  Q.   You also mentioned rock dusting, Mr. Stricklin.  Could

14  you explain to us why that's important to safety?

15  A.   Rock dust is an inert component that's applied to coal.

16  And it's the last line of defense, basically, if there ever

17  was an ignition or an explosion.  What the rock dust is

18  supposed to do is quench the heat and keep the explosion or

19  the ignition from resonating through the rest of the mine.

20  Q.   Another thing you mentioned is cleaning up

21  accumulations of loose coal.  Why is that important to

22  safety?

23  A.   Well, you want to get all -- as, as odd as it sounds,

24  you want to get all the flammable material out of the mine.

25  You don't want it to sit there.  And while we all know coal

Kevin Stricklin - Direct

1  is a flammable material, you don't want it laying on the

2  mine floor.  If you have an ignition or an explosion, it

3  could cause that material to become, to get on fire and

4  cause another hazard as well.

5  Q.   Mr. Stricklin, as we talk about the importance of these

6  safety features and the importance of advance notice at

7  Upper Big Branch, I want to ask if it recently came to your

8  attention that a former UBB employee who was involved in the

9  practice of advance notice is now working for MSHA.

10 A.   Yes.

11 Q.   Who is that?

12 A.   The lady's name is Bobby Pauley.

13 Q.   When did you realize that Ms. Pauley had been involved

14 in advance notice?

15 A.   Well, I knew that she was involved in advance notice

16 when I testified in the hearing here because she testified

17 as well.  At that time, I was under the -- I thought she was

18 a shuttle car operator and I thought she was testifying

19 because she had overheard something.

20     About a week and a half ago, I learned that she was a

21 dispatcher on the surface and was actually calling

22 underground with advance notice.

23 Q.   What steps have you taken since you learned that?

24 A.   We've detailed her to a position outside of coal

25 enforcement until we've had the opportunity to conduct an

Kevin Stricklin – Direct

1  investigation.

2  Q.    Let me turn now, Mr. Stricklin, to the conclusions of

3  the investigation at UBB.  Can you summarize what MSHA

4  concluded about how the explosion started?

5  A.    In -- I guess in short words, it would be that UBB

6  cared more about production over safety.

7  Q.    What was the initial source of fuel for the explosion?

8  A.    It would have been methane that was liberated near the

9  shields and worked its way over to the face where the

10  cutting of coal was going on with the shearing machine.

11  Q.    What was the heat source that ignited that fuel?

12  A.    It would have been the bits that were generating heat

13  against the sandstone that was being mined at, near the

14  tailgate of the longwall face.

15  Q.    Tell us what the bits are.

16  A.    The bits are the pieces of equipment on the shearing

17  machine that actually bite into the coal or whatever is

18  being mined.  In this case, it was biting into the sandstone

19  as well.

20  Q.    Do those bits last forever?

21  A.    They don't last forever.

22  Q.    What happens when they wear down?

23  A.    They become a lot more worn and there's a lot more

24  sparking that goes on rather than having the carbide tips at

25  the end of those bits.

Kevin Stricklin – Direct

1  Q.   And you also mentioned the sprays.  How did the sprays

2  that were on the shearer help cause the explosion?

3  A.   Well, what we found here is there were sprays that

4  weren't even on the shearing machine, sprays that had been

5  removed from the shearing machine.  That is really important

6  to have in place to make sure you have, as we talked

7  earlier, the cooling effect of where that sandstone heat is

8  generated.

9  Q.   How long would it take to maintain the sprays and the

10 bits that are on a longwall shearer like the one in

11 Government's Exhibit 3?

12 A.   I would guess approximately 30 minutes.

13 Q.   If the sprays and the bits on the longwall shearer at

14 UBB had been maintained, would the explosion have happened?

15 A.   Probably not.

16 Q.   Was MSHA able to determine, then, why the sprays and

17 the bits weren't maintained?

18 A.   As far as the sprays, there was a lot of dirt and grit

19 in the water that was pumped from the river.  And the

20 filtering system in place didn't filter out enough of that

21 dirt and grit.

22     So, to keep the drums cool and to keep the water

23 flowing, sprays were removed from the shearing machine.

24 What that did, that allowed three or four of the opening

25 ports to look like water hoses and no other water come out

Kevin Stricklin - Cross

1  behind any of those other bits.

2  Q.   Did the practice of advance notice at Upper Big Branch

3  allow the maintenance on the sprays and the bits to be

4  foregone?

5  A.   That would be an easy thing to be able to fix before

6  the inspector got to the section if advance notice was

7  given.

8  Q.   You told us at the very beginning of your testimony

9  that MSHA reached a conclusion about the role of advance

10  warning of inspections in the explosion.  Tell us again what

11  that was.

12  A.   Well, I believe we had 12 contributory violations, one

13  of them being advance notice was a contributory violation to

14  this explosion.

15  Q.   And just tell us why MSHA reached that conclusion.

16  What would have been different at UBB if the practice of

17  advance notice had not existed?

18  A.   Inspectors would have been able to go onto the section

19  unannounced and find the conditions as they actually were

20  rather than allowing the company an opportunity to correct

21  some of these conditions before we got there.

22          MR. RUBY:  No further questions right now, Your

23  Honor.

24          THE COURT:  Cross-examination, counsel?

25                      CROSS EXAMINATION

Kevin Stricklin - Cross

1   BY MR. WILMOTH:

2   Q.   Good afternoon, Mr. Stricklin.  I had to check and see

3   whether it was afternoon or morning.  You testified at the

4   trial that advance notice is a problem that MSHA focuses on;

5   correct?

6   A.   I don't recall my exact words, but if that's -- that's

7   one of the things that we focus on, yes, sir.

8   Q.   Okay.  And I think you and I agreed that up to the time

9   of the trial, OSHA had only issued three or four advance

10  notice citations; correct?

11  A.   I believe you mean MSHA not OSHA, but, yes.

12  Q.   Oh, I'm sorry.  Yes.  Thank you.  Wrong agency.  Yes.

13  Is that correct?

14  A.   That is correct.

15  Q.   All right, sir.  I know that you have -- by "you" I

16  mean MSHA.  I know you have issued a citation to the

17  companies here as a group for advance notice since that

18  time; correct?

19  A.   I'm not sure I know what you mean by the companies as a

20  group.

21  Q.   Well, as I understood the, the citation which I've been

22  provided, it says the citation is being issued to the

23  following entities as a unitary operator.  And then it lists

24  Performance Coal, Massey Coal, A.T. Massey Coal Company, and

25  Massey Energy Company.  That's what I was referring to.

Kevin Stricklin - Cross

1    A.    Okay.  Yes, I'm aware of that.

2    Q.    Okay.  And it was issued December 6th, 2011, which was

3    after the trial in this case; correct?

4    A.    I believe it was.

5    Q.    Okay.  It was in October.

6    A.    Okay.

7    Q.    Other than that one, has MSHA issued any other advance

8    notice citations across the country since the trial?

9    A.    Yes.

10   Q.    How many?

11   A.    I don't know the number.  I'm going through one right

12   now down in Kentucky where we issued it approximately about

13   a month ago.  It would have -- I, I can't give you the exact

14   name of the company that we issued it to, but there, there

15   was one issued about a month ago.  That was the latest.

16   Q.    So, since the trial, in addition to this unitary

17   citation that you and I just discussed, there have been

18   others that MSHA has issued; --

19   A.    Yes, sir.

20   Q.    -- correct?  Okay.  As the security director for

21   Performance Coal, the defendant, Mr. Stover, did not work

22   underground, did he?

23   A.    Not that I'm aware of.

24   Q.    You, you said, I believe, that MSHA had reviewed some

25   88,000 pieces of paper?

Kevin Stricklin - Cross

1   A.   Yes, sir.

2   Q.   All right.  I believe I've done about 80,000 and I

3   haven't seen any evidence that Mr. Stover himself called

4   underground.  Would you agree with me on that?

5   A.   I probably -- I think I would, yes, sir.

6   Q.   At the trial, however, as you alluded to a minute ago,

7   there was evidence that Bobby Pauley did actually call

8   warnings underground from the mine office; isn't that right?

9   A.   That's what I hear.  I've never seen that in writing,

10  but that's what I've been told.

11  Q.   Am I to understand your testimony that Ms. Pauley was

12  hired by MSHA as an inspector despite the fact that she

13  called advance warning underground?

14  A.   She was hired that way, but I don't think everybody

15  knew the whole picture when she was hired.

16  Q.   Okay.

17  A.   That is correct.

18  Q.   And had, had you as the administrator known that she

19  actually called underground, would you have allowed her to

20  be hired?

21  A.   I would have probably sat down with my legal folks and

22  made a determination -- and do an investigation before we

23  make that decision because I'm, I'm mandated by my job fairs

24  I'll call them; basically, whoever is the next name on the

25  list.  As I go down through the most qualified, I have to

Kevin Stricklin - Cross

1  have a reason for not selecting someone.

2      And my understanding was she was the next name on the

3  list.  And before we would have hired her, I would have

4  preferred that we had done our investigation then rather

5  than doing it now.

6  Q.  All right.  It's correct, is it not, that the Upper Big

7  Branch mine was considered a large mine or a major mine by

8  MSHA?

9  A.  Yes, sir.

10  Q.  It's also true, is it not, that your inspectors were at

11  that mine virtually every day for several years?

12  A.  Yes, sir.

13  Q.  Okay.

14      THE COURT:  Prior to the explosion or after,

15  counsel?

16      MR. WILMOTH:  Prior.  Actually, both, but prior

17  was what I was looking at.

18      THE COURT:  All right.

19      THE WITNESS:  Let me just -- when I say every day,

20  I would say every week day.  I don't think we were there

21  seven days a week typically.

22  BY MR. WILMOTH:

23  Q.  Okay.  And that's why I phrased the, the question with

24  the word "virtually" in it.

25  A.  Okay.

Kevin Stricklin - Cross

1    Q.   I realized that there wouldn't be every day.  But

2    virtually every day, there was someone from MSHA at that

3    mine; correct?

4    A.   Yes, sir.

5    Q.   And MSHA allowed the mine to continue to operate up

6    until April of 2010 because MSHA believed that it was safe

7    enough to operate; isn't that right?

8    A.   Well, I think we let them operate when there wasn't any

9    orders in place that we had to shut the mine down.

10   Q.   Okay, fair enough.

11             THE COURT:  Who would give that order?

12             THE WITNESS:  The inspector if he found conditions

13   that --

14             THE COURT:  From MSHA?

15             THE WITNESS:  Yes, yes, ma'am.

16             THE COURT:  All right.  Go ahead, please.

17   BY MR. WILMOTH:

18   Q.   Let's talk a little bit about, about ventilation.  You

19   testified in response to Mr. Ruby's questions that

20   ventilation is necessary because it -- among other things,

21   it takes methane out of the, out of the mine, out of the

22   area of mining and liberates it to the surface; correct?

23   A.   Yes.

24   Q.   And you also said that, that ventilation is necessary

25   to take respirable dust out of the air that the miners are

Kevin Stricklin – Redirect

1   breathing; is that correct?

2   A.   Yes, sir.

3   Q.   And respirable dust just means that I breathe it in if

4   I'm there.

5   A.   Yes, sir.

6   Q.   And part of the function of the ventilation plan is to

7   take that dust out of the mine so that it doesn't go in to

8   the miners.

9   A.   That is correct.

10  Q.   Okay.  Is it true that, that ventilation at any mine,

11  including Upper Big Branch, is done pursuant to a

12  ventilation plan that is at least approved by MSHA itself?

13  A.   Yes, sir.

14  Q.   Okay.

15          MR. WILMOTH:  I think that's all I have, Your

16  Honor.  Thank you.

17          THE COURT:  Redirect, Mr. Ruby?

18          MR. RUBY:  Briefly, Your Honor.

19                  REDIRECT EXAMINATION

20  BY MR. RUBY:

21  Q.   Mr. Stricklin, Mr. Wilmoth asked you about inspections

22  at UBB and whether the mine was allowed to keep upgrading by

23  MSHA.  Let me ask you, was MSHA ever able to see UBB in the

24  condition that it ran in when no inspectors were looking?

25  A.   Could you repeat that?

Kevin Stricklin - Redirect

1  Q.   Was MSHA, MSHA's inspectors ever able to see the UBB

2  mine in the condition in which it ran when inspectors

3  weren't there?

4  A.   No.

5  Q.   Let me also ask you, Mr. Stricklin, do you now know as

6  a result of MSHA's investigation that there were violations

7  of the ventilation plan at the Upper Big Branch mine that

8  were covered up because, because warnings were given there

9  when inspectors were coming?

10 A.   Yes.

11        MR. RUBY:  Nothing further, Your Honor.

12        THE COURT:  They were never able to see the mine

13 in the condition it would have been had inspectors not been

14 present.  And that's leading right up until the time of the

15 explosion or not, sir?

16        THE WITNESS:  What I heard Mr. Ruby ask me was

17 would our inspectors have any way to see the conditions

18 underground when our inspectors were not there.

19        THE COURT:  Right.

20        THE WITNESS:  And I said, no, they would not have

21 a way to be able to see that when they were not there.

22        THE COURT:  And they were there five days a week

23 leading up to the time of the explosion.

24        THE WITNESS:  Yes.  They -- and I guess the best

25 way to --

1          THE COURT:  You can be seated, counsel.

2     Go ahead.

3          THE WITNESS:  The best way to explain it is this

4     was a large mine.

5          THE COURT:  Uh-huh.

6          THE WITNESS:  And our inspectors was only at one

7     finite location during that shift.  In other words, if we

8     were on the barrier section, there was no way of us to know

9     what was going on on the longwall or vice versa.  And we

10    were probably only there one of the shifts that the coal

11    operated on on three coal producing shifts.

12         THE COURT:  And it's my recollection from the

13    trial testimony that as a ground mine, there were surprise,

14    for lack of a better way of putting it, inspections of the

15    ground mine either three or four times a year.

16         THE WITNESS:  I'm not sure I follow the, the

17    ground mine.

18         THE COURT:  My understanding was that there was a

19    certain number -- or my recollection, and perhaps I am

20    remembering incorrectly, Mr. Stricklin, that the testimony

21    during the course of the trial was that there was a policy

22    of MSHA that there were surprise inspections of surface

23    mines a certain number of times per year, and the same true

24    for underground mines.  And my recollection is that there

25    were such visits for underground mines four times a year.

Gary May – Direct

1    Am I remembering incorrectly?

2          THE WITNESS:  You are not.  There's four mandated

3    inspections that are required of underground mines and two

4    of surface mines.  We would hope that they're all surprise

5    visits.

6          THE COURT:  Uh-huh.

7          THE WITNESS:  But that's mandated by Congress to

8    complete that number of complete inspections.

9          THE COURT:  All right.  Thank you, sir.  You can

10   step down.

11       Call your next witness.

12          MR. RUBY:  Yes, Your Honor.  The United States

13   calls Gary May.

14          **GARY MAY**, GOVERNMENT'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16   BY MR. RUBY:

17   Q.   Good morning, sir.  Would you please tell the Court who

18   you are and what you do.

19   A.   I'm Gary May.  I work at the UBB mine.  I'm currently

20   off on administrative leave.

21   Q.   How long have you been a coal miner, sir?

22   A.   Around 20 years.

23   Q.   And you said you work at the UBB mine.  Was that in the

24   past that you worked there?

25   A.   Yes.

Q. When did you work there?
A. I worked there in, around '08 to after the explosion.
Q. What was your job at UBB?
A. I was mine foreman for a while, and then I was a block superintendent.
Q. Okay. Let's start with mine foreman. When did you become the mine foreman at Upper Big Branch?
A. Somewhere in '08.
Q. What responsibilities did you have in that job?
A. I had responsibility from outside to the tailpiece of the feeder on the section.
Q. Does that mean that you were responsible for most of the, most of the parts of the mine that were underground?
A. Yes.
Q. And what responsibilities did you have over that area of the mine?
A. The every day in and outs, the belt moves to production, everything of that nature.
Q. Did there come a time when you were promoted?
A. Yes.
Q. When was that?
A. It was approximately a year later. I was promoted to a block superintendent. The mines was divided up into two parts, UBB north and UBB south.
Q. How did your responsibilities change after your

Gary May - Direct

1    promotion?

2    A.    It was more of an outside job versus inside.

3    Q.    Is it correct to say that as both mine foreman and mine

4    superintendent you were in charge of the areas of the mine

5    that were under your responsibility?

6    A.    Yes.

7    Q.    Mr. May, while you were at the Upper Big Branch mine,

8    was there a practice of providing warnings when MSHA

9    inspectors were coming at the mine?

10   A.    Yes.

11   Q.    Can you tell us from beginning to end how those

12   warnings were communicated?

13   A.    It would start -- usually if someone come through the

14   guard shack, there would be a phone call or it would be

15   announced over the radio.  It would be "company on the

16   property."

17   Q.    Now --

18   A.    And --

19   Q.    I'm sorry.  Go ahead, sir.

20   A.    From that point, it would be received at the office.

21   From the office, they would call underground and let them

22   know we had company outside.

23        And when the production crews would get to the section,

24   when the section foreman would start his, load his first

25   buggy in the morning, he was required to call outside and

Gary May – Direct

1  tell us.  And once he did that, he would usually ask, "Is

2  there any company outside?"

3       And from that, he would have to call out at 9:00,

4  11:00, and 1:00 with his production report.  And usually the

5  same statement was in there, "Is there any company outside?"

6  Q.  What was meant by "company"?

7  A.  Company meaning in-house company, mine inspectors,

8  state inspectors, anyone going to that area or any area in

9  the mine.

10  Q.  Can you give us some examples of other phrases that

11  were used when inspectors came to the mine?

12  A.  One that I had talked to another foreman about was it

13  was a hail storm if it was more than one.

14  Q.  More than one what?

15  A.  Inspector.

16  Q.  Are there requirements, Mr. May, that govern the

17  ventilation of the areas of the mine where coal is being

18  cut?

19  A.  Yes.

20  Q.  Could you tell us what some of those are, please?

21  A.  You're required to keep line curtain up within ten foot

22  of the deepest point.  And you're required to keep a certain

23  amount of air specified in your ventilation plan in the area

24  deepest being mined.

25  Q.  What's line curtain, Mr. May?

Gary May – Direct

1    A.   Line curtain is what guides your air from the mouth of

2    the entry up into the deepest point.

3    Q.   Why is it important to have line curtain within

4    ten feet of the face?

5    A.   To help render and dilute harmless gases.

6    Q.   And then why is it important to render and dilute

7    harmful -- first of all, do you mean harmful?

8    A.   To keep them from building up and causing an explosion.

9    Q.   Do you mean harmful gases, Mr. May?

10   A.   Yes.

11   Q.   And -- I'm sorry.  I interrupted you there.  What's the

12   importance of diluting harmful gases?

13   A.   To sweep them away.

14   Q.   Are there rules, Mr. May, that require coal mines to be

15   kept cleaned up and free of accumulations of loose coal?

16   A.   Yes.

17   Q.   What's the reason for those rules?

18   A.   To keep them from piling up, tripping hazards,

19   explosions.

20   Q.   And are there rules, Mr. May, that require rock dust to

21   be spread in coal mines?

22   A.   Yes.

23   Q.   What's that?

24   A.   Within 40 feet of the deepest point to keep -- if an

25   explosion would happen, to keep it from spreading.

Gary May - Direct

1   Q.    Thank you, sir.  Were there times at the Upper Big

2   Branch mine when ventilation to an area where coal mining

3   was taking place fell short of the legal requirements?

4   A.    Was there times?  Yes.

5   Q.    Were there times at the Upper Big Branch mine when

6   workers got a warning that an inspector was coming and they

7   responded by correcting ventilation violations?

8   A.    Yes.

9   Q.    Was the purpose of those corrections to cover up the

10  fact from the MSHA inspector that a ventilation violation

11  was taking place?

12  A.    Yes.

13  Q.    Were there times at the Upper Big Branch mine when

14  workers were warned that inspectors were coming and they

15  responded by cleaning up the accumulations of loose coal

16  that you talked about a minute ago?

17  A.    I don't know if it was.  But when I was section boss,

18  if I got a warning, that's the things I did.  I went across

19  and made sure my ventilation was up the way it was supposed

20  to and curtains and fly pads hadn't gotten tore down.

21  Q.    What about rock dust?

22  A.    Rock dust was spread.  I always spread extra rock dust

23  if I knew someone was coming to make everything look good.

24  Q.    How often at the Upper Big Branch mine were warnings

25  given of inspectors coming onto the property?

Gary May - Direct

1   A.   A lot.

2   Q.   Was it most of the time --

3   A.   Yes.

4   Q.   -- when an inspector did come on the property?

5   A.   Most of the time.

6   Q.   And how often did the crews that were underground cover

7   up whatever violations they had on their section when they

8   got that announcement?

9   A.   I don't know how often, but if I knew -- like I said,

10  when I was section boss I would go across and make sure that

11  my ventilation was up the way it was supposed to be.

12  Q.   Because of that, was it difficult at the Upper Big

13  Branch mine for inspectors to see a working section in the

14  same condition that it existed in just before they got

15  there?

16  A.   Yes.

17  Q.   Was the Upper Big Branch mine able to avoid citations

18  from MSHA because of the practice of advance warnings and

19  inspections?

20  A.   Yes.

21  Q.   Did you know, Mr. May, that it was illegal to give

22  advance notice of a mine inspection?

23  A.   I knew it was unlawful, yes.

24  Q.   Did your superiors at the Upper Big Branch mine know

25  about this practice of giving advance notice of inspections?

Gary May – Direct

1   A.   Yes.

2   Q.   Did they encourage it?

3   A.   They did.

4   Q.   Let me ask, Mr. May, you're appearing here today under

5   a plea agreement with my office; is that right?

6   A.   Yes.

7   Q.   What does that plea agreement require you to plead

8   guilty to?

9   A.   Conspiracy to -- 371 conspiracy to impede the Federal

10  Government.

11  Q.   All right.  Let me ask, Mr. May, are you aware -- and I

12  know this seems like a silly question.  But are you aware of

13  an explosion that took place at the Upper Big Branch mine in

14  April of 2010?

15  A.   Yes.  I was there.

16  Q.   How did you first learn of the explosion?

17  A.   I had just got outside and been upstairs maybe ten

18  minutes.  A big roar from the fan started.  Dust started

19  pouring out of the portals.  And -- do you want me to go all

20  the way in detail?

21  Q.   Just tell us, tell us very briefly what you remember

22  about the explosion, sir.

23  A.   And when that happened, I threw my belt and stuff on

24  and I started walking toward the portals.  I took my spotter

25  with me.  I knew that one my coal crews hadn't been

Gary May - Direct

1    accounted for.  And I knew the other one had called from a

2    78 break switch.

3        So, I left on foot going that way and through the dust

4    and everything.  I walked up the track entry part of the way

5    and then over into the belt entry.  And then I heard a

6    mantrip coming.

7        By that time, it was my barrier section crew.  I

8    stopped them, talked to them to make sure everybody was

9    accounted for.  And from that point, I proceeded on up the

10   track entry.

11       When I got to the mouth of that section, the dust had

12   cleared and I could see pretty good.  There was some guys

13   coming in behind me on a mantrip also, but I knew I had

14   another crew that was coming down that direction.

15       So, I proceeded on and called -- every time I'd come to

16   a phone, I would call outside and tell them what I had and

17   make sure I didn't have no methane or nothing on my

18   detector.

19       And I proceeded on up to what we call Ellis switch.  We

20   come through the doors right there.  And I talked to them on

21   the phone there, and they said some other guys was already

22   ahead of me.

23       From there, me and a couple more guys went on up the

24   track with a mantrip following us.  We come to the next

25   phone and I hollered outside.  It seemed like at that point

Gary May - Direct

1   I saw Timmy Blake and Jack Roles coming down the entry.  I

2   talked to them for a few minutes, and I proceeded on up the

3   line.

4       And from that point, there was a mantrip coming.  When

5   the mantrip come, it was Wayne Persinger and -- I forget the

6   guy's name, I'll think of it in a minute -- that were

7   driving the mantrip.  They had several people in the

8   mantrip.  They hollered, "Hurry up.  Somebody get over here

9   and help."

10      Wayne and Woodsy was on one side of the mantrip.  Me

11  and Steve Harrah -- I jumped over there and started doing

12  CPR on him immediately on the way out.  And there were some

13  more people in the other end of the mantrip.

14      We got outside as quickly as we could.  I was doing

15  CPR.  We got outside.  The paramedics took it from there

16  when I got out.

17      And I went to the back of the mantrip.  I think it was

18  Berman Cornett.  Me and him started working on Mr. Clark.

19  And there were -- Woody was the only one that survived.

20  Q.   Mr. May, were you aware that there was an

21  investigation, or several investigations conducted after the

22  explosion at the Upper Big Branch mine?

23  A.   Yes.

24  Q.   As a coal miner, and particularly a coal miner who had

25  worked at Upper Big Branch, was it important to you that the

Gary May – Cross

1    investigation, or the investigations be able to reach

2    accurate answers about what had caused the explosion?

3    A.    Yes.

4              MR. RUBY:  Nothing further, Your Honor.

5              THE COURT:  Cross-examination?

6                        CROSS EXAMINATION

7    BY MR. WILMOTH:

8    Q.    Good afternoon, Mr. May.  I have read the information

9    that, that the United States Attorney has filed against you.

10   It's, what, ten pages.  I, I didn't see the name Elbert

11   Stover in that information anywhere.  Did you?

12   A.    No, sir.

13   Q.    Do you know Mr. Stover?

14   A.    Yes.

15   Q.    How do you know him?

16   A.    I knew he was over the security guards.  I probably

17   haven't talked to him maybe half a dozen times, just maybe

18   on the phone or sometimes he would be up to the office.

19   Q.    Five or six times during your entire acquaintance?

20   A.    Yes.

21   Q.    Okay.  Were you ever told by Elbert Stover to call down

22   into the mine?

23   A.    No.

24   Q.    You did, in fact, call down into the mine, though, did

25   you not?

Gary May - Cross

1    A.    Yes.

2    Q.    Several times?

3    A.    Yes.

4    Q.    And you directed others in the mine office to do so,

5    did you not?

6    A.    Yes.

7    Q.    So -- and I'm not trying to lean on you here.  But you

8    actually did advance notice; right?

9    A.    Yes.

10   Q.    Okay.  To your knowledge, did Elbert Stover ever call

11   underground himself?

12   A.    Not to my knowledge.

13   Q.    And after 1999 or so, isn't it true that the way you

14   folks in the mine office would learn that an inspection had

15   begun is that you would hear it called over the radio?

16   A.    Called over the radio or by phone, yes.

17   Q.    Even after 1999 were there calls by phone?

18   A.    Yes.  I was only there in 2008 to 2010.

19   Q.    Okay.  But there were calls even then?

20   A.    Yes.

21   Q.    Were any of them from Elbert Stover himself?

22   A.    Not to my knowledge.

23   Q.    Okay.  That's all I have.  Thank you, sir.

24          THE COURT:  Redirect, Mr. Ruby?

25          MR. RUBY:  No, Your Honor.

Gina Jones – Direct

1      THE COURT:  You can step down, sir.

2    Call your next witness.

3      MR. RUBY:  Yes, Your Honor.  The United States

4  calls Gina Jones.

5      **GINA JONES,** GOVERNMENT'S WITNESS, SWORN

6            DIRECT EXAMINATION

7  BY MR. RUBY:

8  Q.   Ms. Jones, I know the subject that you're here to talk

9  about today is not an easy one for you.  So, know that we

10  appreciate you being here and just take the time that you

11  may need to testify.  All right?

12  A.   Okay.

13  Q.   Could you please introduce yourself to the Court.

14  A.   My name is Gina Jones.

15  Q.   Ms. Jones, did you have a loved one who worked at the

16  Upper Big Branch mine?

17  A.   Yes.

18  Q.   Who was it?

19  A.   Dean Jones.

20  Q.   And how was he related to you?

21  A.   He was my husband.

22  Q.   What did your husband do at UBB?

23  A.   He was the section foreman on headgate 22.

24  Q.   Was he there on April the 5th of 2010?

25  A.   Yes.

Gina Jones - Direct

1  Q.  Can you tell us what happened that day and in the days

2  after?

3  A.  What do you mean?

4        THE COURT:  Counsel, let me see you-all here at

5  the bench.

6        MR. RUBY:  Yes, Your Honor.

7        (Bench conference on the record)

8        THE COURT:  She is the widow of a victim?

9        MR. RUBY:  Yes, Your Honor.  And she's going to

10  testify as to the importance of the investigation to her as

11  a family member.

12        THE COURT:  I will hear her on that issue.  I do

13  not -- I will exclude any testimony regarding emotional

14  impact.  In other words, I want to make sure that the

15  sentence is based on those relevant matters, and I don't

16  want any inflammatory -- and I called you because I don't

17  know what she's going to testify to.

18        MR. RUBY:  I understand, Your Honor.

19        THE COURT:  -- type evidence with respect to the

20  effect on her as we would expect it to be.  But I think that

21  given the convictions, it's appropriate for her to testify

22  if she has evidence to present on the importance of a valid

23  investigation.

24        MR. RUBY:  Absolutely, Your Honor.

25        THE COURT:  And a truthful investigation.

Gina Jones - Direct

1    Anything you have while we're here?  I apologize for

2  the interruption.  I just did not know where we were going

3  and I don't want to go there.

4         MR. RUBY:  I understand, Your Honor, and it will

5  be limited strictly to the investigation.

6         THE COURT:  Anything further?

7         MR. WILMOTH:  No, Your Honor.

8         THE COURT:  Thank you, Mr. Ruby.

9         (Bench conference concluded)

10  BY MR. RUBY:

11  Q.   Ms. Jones, you told us before we paused there that your

12  husband was at the Upper Big Branch mine on April the 5th,

13  2010?

14  A.   Yes.

15  Q.   And did he lose his life that day?

16  A.   Yes.

17  Q.   Did you follow the investigation that took place after

18  the explosion at UBB?

19  A.   Yes.

20  Q.   Was it important to you to find out what had happened?

21  A.   Very important.

22  Q.   Have you read all or most of the transcripts of the

23  interviews of the investigation at UBB?

24  A.   Yes.

25  Q.   Have you read the reports that have been issued about

Gina Jones - Cross

1   the disaster?

2   A.   Yes.

3   Q.   Have you attended the meetings of the families who lost

4   loved ones in the explosion?

5   A.   Yes.

6   Q.   Is it your hope that the investigation will be able to

7   prevent something like this from happening again?

8   A.   Yes.

9   Q.   Do you believe, Ms. Jones, given your position and the

10  attention that you've paid to the investigation, that it is

11  and was important for witnesses to be truthful when they

12  testify in the investigation?

13  A.   Yes.

14           MR. RUBY:  Nothing further, Your Honor.

15           THE COURT:  Cross-examination?

16                    CROSS EXAMINATION

17  BY MR. WILMOTH:

18  Q.   Ms. Jones, I'm very sorry for your loss and I'll just

19  keep you a second.  Do you know Elbert Stover personally?

20  A.   No.

21  Q.   Did you ever hear your husband talk about him?

22  A.   No.

23  Q.   Thank you, ma'am.  That's all I'll ask you.

24           THE COURT:  Mr. Ruby.

25           MR. RUBY:  Nothing, Your Honor.

1          THE COURT:  You can step down, ma'am.  Thank you.

2          THE WITNESS:  Thank you.

3          THE COURT:  Call your next witness.

4          MR. RUBY:  The United States has no further

5     witnesses, Your Honor.

6          THE COURT:  Any additional evidence to present?

7          MR. WILMOTH:  No, Your Honor.

8          THE COURT:  All right.  Thank you, counsel.

9          Having reviewed the sentencing memoranda submitted by

10    the parties and the Pre-Sentence Investigation Report,

11    having also given consideration to the stipulation of the

12    parties and the evidence that has been presented here, I'll

13    make the following findings with respect to the Section

14    3553(a) factors.

15         As previously stated here today, on October the 26th

16    following a three-day jury trial, Mr. Stover was found

17    guilty of Counts One and Three of the superseding

18    indictment.

19         The charge against the defendant in Count One of that

20    indictment involved false statements.  He was the chief of

21    security for several of Performance Coal Company mines,

22    including the Upper Big Branch mine in Montcoal, West

23    Virginia.  As the chief of security, Mr. Stover supervised

24    the security guards at both of those mines and trained the

25    guards on the practices and procedures at the Upper Big

1    Branch mine.

2        Following the April 5th, 2010, explosion there, several

3    agencies, including the Mine Safety and Health

4    Administration, the Federal Bureau of Investigation, the

5    West Virginia Office of Miners Health, Safety, and Training,

6    and the independent investigative team appointed by the

7    former Governor of West Virginia initiated investigations

8    into that mine's practices and policies.  As part of their

9    investigations, the team interviewed various employees,

10   including this defendant, Stover.

11       During interviews, agents asked guards about the

12   procedures followed when visitors, including mine

13   inspectors, arrived at the mine.  Agents learned that guards

14   announced the presence of both state and federal mine

15   inspectors over a radio that was kept in the UBB guard

16   shack.

17       These guards explained that the announcements were made

18   over two radio channels.  One channel known as the security

19   channel was accessible to the security guards and, of

20   course, to the defendant.  The other channel known as the

21   Montcoal channel was available more broadly on the mine

22   site.

23       The guards further explained that the defendant trained

24   them to call out the inspectors' presence on both channels.

25   Evidence here today has confirmed that the practice of prior

1   notification at UBB mine was commonly used.

2       The defendant was interviewed on November the 3rd,

3   2010.  He explained that his duties included ensuring that

4   all the rules and regulations of Massey were followed by the

5   security guards he supervised, and said that the guards'

6   duties included maintaining control of the entry gates and

7   overseeing people that came in and out of the property.

8       Also discussed during the interview were the procedures

9   security guards followed and the types of communications the

10  guards used, including radio and telephone.

11      Mr. Stover explained the process for logging in

12  visitors, including inspectors.  He indicated that only he

13  was notified when an inspector was on the property, and told

14  agents that if he knew of a guard making an announcement or

15  notification of an inspector arriving on the property, he

16  would fire the guard.

17      After the November, 2010, interview with the defendant,

18  the FBI conducted interviews during November and December

19  with guards who worked for the defendant at the UBB and Ed

20  White mine.

21      The guards confirmed that the defendant had trained

22  them to announce the presence of inspectors at the mine by

23  calling out the information over the security channel and

24  the Montcoal channel.

25      Agents also interviewed dispatchers and others who

1  worked at the UBB mine office who confirmed that they heard

2  announcements from security guards over the radio on the

3  Montcoal channel in the mine office.

4       Managers and other mine personnel instructed them that

5  when they heard the information over the radio channel, they

6  were to inform the sections underground that an inspector

7  was on the property.

8       In a November 30th, 2010, deposition when asked about

9  instructions for visitors, the defendant stated, and I

10  quote, "One thing that is hammered in your head, you do not

11  ask inspectors where they're going and you do not call the

12  mine.  You do not notify no one when inspectors come on that

13  property.  In fact, that is in our SOP that you do not

14  notify no one," end of quote.

15       When asked about inspectors, the defendant confirmed

16  the rule that there was a standard operating procedure

17  prohibiting notification of inspectors on the property and

18  that he was told to enforce the policy.

19       When asked what information he had received from Massey

20  Coal Services regarding notification issues, the defendant

21  stated, and I quote, "It says when inspectors come on the

22  property, you do not call the mines.  You do not notify no

23  one."

24       Agents asked a final time if there were any other

25  related instructions regarding inspectors, and the defendant

1    said, quote, "That's it.  When inspectors come on the job,

2    we do not call the mines, do not notify," end of quote.

3         The charge against the defendant contained in Count

4    Three of the superseding indictment involved the disposal of

5    documents.

6         The defendant stored security documents from previous

7    years in a building located across the road from the main

8    UBB site and referred to during the course of the trial as

9    the barracks.  The garage of the barracks was used to store

10   security documents, including visitor logs, inspector logs,

11   incident reports, and duty logs, as well as other junk

12   including old electronics.

13        After the explosion at UBB, the defendant, Stover,

14   became aware that the FBI was conducting an investigation.

15   In fact, it's my recollection, based on the testimony, that

16   they conducted a search in his very office.

17        In April, 2010, Massey sent a litigation hold notice to

18   employees, including the defendant, directing them not to

19   throw out any documents related to the UBB mine.  The

20   defendant received and read the notice and understood it to

21   mean that he was not to throw any documents away related to

22   the UBB mine explosion.

23        In early January, 2011, he instructed security guard

24   Jonathan Williams to clean out the barracks and throw out

25   documents except that Mr. Williams was supposed to keep old

1  property and equipment transfer records.

2      He instructed Williams that when he threw out documents

3  to place them into garbage bags before putting them in the

4  trash compactor.

5      Approximately a week after the instruction, Williams

6  informed the defendant that the task had been carried out.

7  At the defendant's direction, Williams threw away thousands

8  of pages of security documents.

9      On that same date, the defendant received another

10  notice from Massey instructing him not to throw away any

11  documents.  The defendant acknowledged that he received the

12  notice and that he assumed that it reiterated that he was

13  not supposed to throw anything away.

14      The documents totaling over 50,000 pages were recovered

15  and turned over to the FBI for review.  They included

16  visitor logs, inspector logs, duty logs, and incident

17  reports from 2001 to 2009, and contained information

18  important to the on-going investigation.

19      The defendant is appearing before the Court on his

20  first felony conviction.  His only prior conviction is for a

21  speeding ticket from 1999.  He has zero criminal history

22  points.

23      He was born on August the 22nd, 1951, in Clear Creek,

24  West Virginia.  Both of his parents are now deceased.  He

25  reported having two full siblings living and one paternal

1   half sibling living.  He does not maintain close

2   relationships with them.

3       He further reports that he grew up very poor having

4   only basic food, shelter, and clothing.  Mr. Stover left

5   home to join the United States Marine Corps ten days after

6   his high school graduation.

7       Although honorably discharged, he was, in fact,

8   court-martialed and sentenced to hard labor as a result of a

9   six-month desertion.

10      He reported suffering physical abuse at the hands of

11  his stepfather.  He further indicates that his mother and

12  stepfather separated because his stepfather was physically

13  abusive to him and emotionally abusive to everyone else in

14  the household.

15      Mr. Stover was first married in 1972 and subsequently

16  divorced in '74.  That marriage produced no children.  He

17  was married a second time to his current wife in 1978.  The

18  couple has one daughter, now an adult.  The defendant's wife

19  describes the defendant as a very good husband and father,

20  and describes their marriage as good and stable.

21      Mr. Stover suffers from high blood pressure, a heart

22  blockage, two slipped discs in the lumbar region of his

23  back, and a recurring pulled muscle in his lower back.  He

24  reports that he's in good mental health and denies any

25  history of mental or emotional problems or related

1    treatment.

2        He denies any addictions to alcohol, drugs, or gambling

3    and indicates that he drinks only on a social basis about

4    once a month.

5        He graduated from high school in 1969. He was in the

6    United States Marine Corps from '69 to '71. He completed

7    the West Virginia Basic Police Training Course at the West

8    Virginia State Police Academy in Institute, West Virginia.

9    He was a Raleigh County Deputy Sheriff in Beckley, West

10   Virginia, from '77 to 1983.

11       Witnesses would indicate that as a Raleigh County

12   deputy, he arrested defendants, cuffed them, forced them to

13   their knees at times, and beat them. They indicate further

14   that this defendant admitted that he targeted

15   African-American defendants for that particular practice.

16       He was a Mabscott police officer from January, 1998, to

17   January, 1999. He has been consistently employed since he

18   graduated from high school in 1969.

19       He has assets totaling $359,930 in his name, but a

20   negative monthly cash flow of $876.

21       Mr. Goodwin, anything that the Government wants to

22   proffer prior to the Court imposing sentence?

23            MR. GOODWIN: Your Honor, the United States would

24   offer an argument, but nothing further to proffer.

25            THE COURT: All right. I'm prepared to hear you

1   now.

2          MR. GOODWIN:   Thank you, Your Honor.

3          May it please the Court, it's been a year and four days

4   since the defendant was charged in this matter.   He was

5   charged well before we had gathered and analyzed all of the

6   evidence in our investigation, much less the other

7   investigations into the causes of the explosion at Upper Big

8   Branch.   And what has become apparent is that the 3553(a)

9   factors cannot be satisfied with a guideline sentence.

10         We recognize that the sentencing process is perhaps the

11  most difficult, but also the most important role of a Court.

12  It is especially difficult where the facts of the case in

13  3553(a) necessitate a sentence outside the Sentencing

14  Guidelines.   While the guidelines arrive at a sentence

15  consistent with the 3553(a) factors in the vast majority of

16  the cases, the case before this Court is an extraordinary

17  one.

18         Historically, my office has rarely advocated for a

19  sentence outside of the guidelines, and we do not do so

20  lightly in this case.

21         We thought long and hard about what would be an

22  appropriate sentence in this case.   And based on everything

23  we know, including what we knew at the time of the

24  indictment, at trial, and what we have learned since with

25  really nothing weighing against it other than perhaps

1   defendant's age, the maximum sentence is what we decided was

2   sufficient but not greater than necessary.

3       Of course, we started first with the Sentencing

4   Guidelines.  The Sentencing Guidelines deal well with the

5   ordinary case.  This couldn't be farther from the ordinary

6   case.

7       We have multiple investigations into the worst mining

8   disaster in a generation.  In the midst of critical parts of

9   those investigations, defendant continued to engage in the

10  culture of concealment that existed at that company, and

11  repeatedly lied to investigators, and then sought to destroy

12  valuable evidence.  It is difficult to imagine a more worthy

13  case of a variance.

14      Now, to be sure, the Court must properly calculate the

15  guidelines and consider them, and it has.  But having done

16  so, the Court is now no longer constrained by them, as the

17  Court has referenced.

18      Indeed, in this case, there is ample reason, and our

19  sentencing memorandum highlights precedent, to support

20  sentencing outside the guidelines.

21      Because this -- because this case falls so

22  significantly outside the heartland of the guidelines, there

23  really isn't a plausible departure analysis.  Therefore, the

24  Court must resort to a 3553(a) analysis.

25      Defendant will no doubt latch on to the phrase that

1    begins 3553, "sufficient but not greater than necessary."

2    Defendant will say that such a sentence is greater than

3    necessary.

4         However, the reason we are advocating for the maximum

5    is because after looking at it from several different

6    angles, we could not settle on a sentence short of that

7    maximum that was sufficient.  Here's how we arrived at that

8    conclusion.

9         First, we looked at the nature and circumstances of the

10   offenses.  Defendant directed a long-standing practice of

11   ensuring that advance notice of inspectors was given, thus

12   concealing the true condition of the Upper Big Branch mine.

13        Defendant continued to engage in a pattern and practice

14   of concealment and lies even after he knew what had

15   happened, after he knew how important the investigations

16   were to the families, to the industry, and to the nation.

17   And in an effort to conceal his part in the tragedy, he lied

18   and obstructed an investigation of the highest national

19   priority.

20        Next we looked at the history and characteristics of

21   the defendant.  Defendant would have the Court believe and

22   has been -- that he has been and continues to be a model

23   citizen.  Well, as the Court is aware and has referenced in

24   its findings, there is certainly evidence to the contrary.

25        Third, recognizing that the sentence needs to reflect

1   the seriousness of the offense, we looked at his offense.

2   Defendant directed and engaged in a pattern of concealment

3   that culminated in him lying, and then concealing records

4   that were material to investigations of the highest national

5   priority.

6      It's hard to imagine a more serious type of

7   obstruction, an obstruction that not only sought to conceal

8   a serious matter affecting the 29 grieving families, but

9   which also aimed to block investigations that were

10   enormously important to the more than 50,000 coal miners

11   that go underground every day.

12      Fourth, the sentence also must promote respect for the

13   law.  Defendant's conduct reflected the ultimate disrespect

14   of the law.  A serious sentence is necessary to send a

15   message that such disrespect will be dealt with harshly.

16      Fifth, the sentence must provide just punishment.  The

17   punishment that Congress has set forth for such offenses is

18   25 years.  It is difficult to comprehend a case more worthy.

19      Sixth, it is necessary that the sentence afford

20   adequate deterrence.  Deterring others from engaging in

21   similar conduct was one of the chief reasons that the

22   defendant was charged when he was charged.

23      It is critical for everyone involved to understand that

24   individuals who obstruct investigations, especially one as

25   important as this one, will be prosecuted to the fullest

1   extent of the law.  Perhaps as important is to encourage the

2   unequivocal cooperation in matters of the utmost

3   seriousness.

4        And, finally, the sentence needs to protect the public

5   from future crimes of the defendant.  One of the reasons we

6   had to charge him when we did was his continued efforts to

7   lie and obstruct.  Indeed, he has never come clean.

8        We don't believe that anyone intended to blow up the

9   Upper Big Branch mine.  But defendant knowing it had blown

10  up, rather than doing everything in his power to make sure

11  that it never happened again, he did the exact opposite.  He

12  chose to continue a long-standing culture of lies and

13  concealment, and chose to lie and obstruct in the

14  investigations into this horrible tragedy.

15       This is made even worse by the fact that he played a

16  critical role in the systematic pattern and practice of

17  providing advance notice, a practice that the Court has

18  heard that was found to be a contributing cause of the

19  disaster.  It's apparent that because he also knew he played

20  such a role, he knew he needed to cover his tracks.

21       Thank goodness we were able to retrieve the documents

22  he had tossed.  We may never have known just how important

23  they really are.  They included critical documents about

24  advance notice, to be sure.  But they also included critical

25  evidence about what occurred at the mine and on the mine

1   property in the months leading up to the explosion.

2       That evidence would have been lost forever had

3   defendant been successful.  The result would have left us

4   several steps farther away from knowing what contributed to

5   causing the explosion and how to prevent it from happening

6   again.

7       The defense has repeatedly maintained the defendant was

8   a so-called scapegoat; that he was a lower-level pawn and

9   that individuals who are really responsible were going to

10  walk.  Well, that's simply false on all accounts.

11      First, he had to be charged at the time he was charged

12  because it was apparent that he had and would likely

13  continue to obstruct the investigations into the matters

14  surrounding the explosions.

15      His misdeeds required directing precious resources away

16  from the efforts aimed at finding out what happened at Upper

17  Big Branch.  And as is apparent from recent events, he is

18  not the only one to have been charged and the investigation

19  is not over.

20      Families of the miners know they can't bring their

21  loved ones back.  They want to make sure that those loved

22  ones didn't die in vain.  Defendant sought to deny them that

23  purpose.  And this Court, through this sentence, can send an

24  unmistakable message that those who gamble with miners'

25  lives will face significant punishment.

1          Thank you, Your Honor.

2               THE COURT:  Thank you, counsel.

3          Mr. Wilmoth, any comments prior to the Court imposing

4     sentence?

5               MR. WILMOTH:  I'm sorry, Your Honor, I didn't hear

6     you.

7               THE COURT:  I just wanted to know if you had

8     comments you wanted --

9               MR. WILMOTH:  Yes, Your Honor.

10              THE COURT:  -- to make prior to the Court imposing

11    sentence.

12              MR. WILMOTH:  Yes, ma'am.  Indeed, I do.

13         May it please the Court, when I was the United States

14    Attorney for the Northern District of West Virginia, I had

15    framed and on the wall behind my desk a quote from a case

16    titled, ironically enough, *Berger* vs. *The United States* from

17    1935.  And the language that I had framed is the following:

18         "The United States Attorney is the representative not

19    of an ordinary party to a controversy, but of a sovereignty

20    whose obligation to govern impartially is as compelling as

21    its obligation to govern at all, and whose interest,

22    therefore, in a criminal prosecution is not that it shall

23    win a case, but that justice shall be done."

24         With that backdrop, Your Honor, we have to look at, I

25    believe, the entirety of this investigation.  And no one

1   could be more pleased than I am that others are being

2   charged, that others who actually did advance notice, for

3   example, like Mr. May, are being charged.

4       They are, however, being charged with conspiracy,

5   Section 371 of Title 18 of the United States Code, which

6   carries with it a potential penalty far lower than the

7   penalty that the United States Attorney is asking for in the

8   case of Mr. Stover.

9       And another of the people who were actually

10  participating in advance notice was actually hired by MSHA

11  and is operating under an immunity agreement. And she, like

12  the others who actually did the advance notice, are immune

13  from prosecution.

14      The Government said in its, one of its sentencing

15  memoranda that it was important that the public know that

16  MSHA and the Department of Justice are not soft on crime

17  when it comes to mine safety. And with the request that

18  Mr. Goodwin has made to Your Honor, clearly no one will

19  think that ever again if they do now.

20      But since the Government wins whenever justice is done,

21  let's look at the factors in Section 3553(a) that must be

22  considered equally to determine the appropriate sentence.

23      The Sentencing Guidelines, as Mr. Goodwin has correctly

24  said, are only one factor in the, the sentence that the

25  Court should impose.

1    First, you need to look at the nature and circumstances

2  of the offense.  And it seems important that we all remember

3  that the offenses of conviction here are not ones that

4  actually caused the, the explosion itself.

5    Most importantly, the Court must look at the history

6  and characteristics of this defendant.  As you have already

7  found, he was beaten by his stepfather.  He was brought up

8  very poor.  He joined the service, has a long history of

9  consistent employment, as Your Honor has found.

10    Well, no more.  He has lost his job at, at Massey and

11  has been forced to retire.  All that's left to him is the

12  church, the lodge, the volunteer fire department, and his

13  family.

14    He's 60 years old.  He has begun to suffer from the

15  health problems that 60-year-olds suffer from.  Although

16  none of them is dire, they are there and that's a

17  circumstance that the Court should acquire some attention

18  to.

19    He's been a positive role in his grandchildren's lives.

20  And he's told me that the thing he loves best is to spoil

21  his grandbabies.  He's under treatment for hypertension and

22  is, is someone who, if given the sentence that Mr. Goodwin

23  recommends, will die in prison.

24    And we submit to you, Your Honor, that that is not

25  justice, and the Government does not win despite its

1    protestations if that were to happen.

2        Mr. Stover poses no threat to the public.  And the

3    deterrence situation that the, that the Court must consider

4    has already been taken care of.  There's no chance that this

5    defendant will, will re-offend.

6        It seems to us, Your Honor, though I know how zealously

7    and jealously judges guard the sentencing function, it seems

8    to us that a sentence far below the guideline of some level

9    is called for; a split sentence, a sentence of probation or

10   home confinement, something that represents this person and

11   not the exciting media frenzy that this case has become.

12       Your Honor is charged with the responsibility of

13   looking at the 3553 factors and determining how to apply

14   them to this defendant.  And we urge Your Honor to be

15   lenient.

16            THE COURT:  Is there anything, Mr. Wilmoth, that

17   your client, Mr. Stover, wants to state prior to this Court

18   pronouncing sentence?

19            MR. WILMOTH:  Your Honor, he does want to briefly

20   address the Court, yes.

21            THE COURT:  Mr. Stover.

22            THE DEFENDANT:  Your Honor, I would like to

23   apologize to the Court.  To say I'm sorry would be an

24   understatement, but I am truly sorry.  I'd like to offer my

25   condolences and prayers to the victims' families.  Some of

1   the victims were my friends.

2       After I was arrested, some of the family members of the

3   victims has come to me and has called me and offered their

4   condolences and their prayers for me during this hard time

5   that I'm having.

6       Like my attorney said, I'm 60 years old and I'm not a

7   threat to the community or to anybody else.  I'd like for

8   you to consider my family when you hand down your sentence.

9       Thank you.

10          THE COURT:  All right.  After giving careful

11  consideration to the Pre-Sentence Investigation Report, to

12  the stipulation that was submitted here today, to the

13  Section 3553(a) factors, the statements made in the

14  sentencing memoranda offered by these lawyers, and the

15  testimony and statements made by counsel today, I find,

16  Mr. Stover, that you should be committed to the custody of

17  the Federal Bureau of Prisons for a term of 36 months.  And

18  upon your release from prison, you should be supervised, on

19  supervised release for a term of two years.

20      Within 72 hours of your release from custody, it's

21  ordered that you report in person to the United States

22  Probation Office in the district in which you are released.

23      While on supervised release, you must not commit

24  another federal, state, or local crime.  You must not

25  possess a firearm or other dangerous device.  And you must

1    not unlawfully possess a controlled substance.

2         You also must comply with the standard terms and

3    conditions of supervised release as recommended by the

4    United States Sentencing Commission and as adopted by this

5    Court.

6         I find that the Pre-Sentence Investigation Report

7    indicates a low risk of any future substance abuse.  And,

8    therefore, I suspend the requirement that you submit to drug

9    testing as a condition of your supervised release.

10        I further order, having given consideration to your

11   financial situation, that you pay a fine of $20,000.

12        Given your financial situation, given the nature and

13   circumstances of this offense, I further find that you have

14   the ability to pay such a fine.  I order that you do so

15   immediately.  And if not paid immediately, I order that the

16   same be paid in full within 18 months of your release.  I

17   further find that the interest on that fine is to be

18   applied.

19        Further, I will note for the record that there has been

20   no identifiable victim, and I use that term as it is, as it

21   is legally used, as a result of the conduct for which you

22   were convicted.  And, so, I order, or impose no order of

23   restitution.

24        I further order that you pay a special assessment of

25   $200 which is due immediately if not so paid.  I order that

1   you pay that special assessment by participating in the

2   Inmate Responsibility Program of the BOP.

3       Having given consideration to the advisory guideline

4   range, to the Section 3553(a) factors, to the statements of

5   counsel, and the testimony here, I find that this sentence

6   of 36 months to be followed by two years of supervised

7   release is an appropriate and a reasonable sentence.

8       I further find that this sentence provides just

9   punishment, considering the seriousness of the offense and

10  considering your personal history and characteristics.

11      Make no doubt, Mr. Stover, I do not believe -- I did

12  not believe that a sentence as requested by the Government

13  of 25 years was appropriate.  But this is a very, very

14  serious conviction.

15      We heard testimony today both from a representative

16  from MSHA as well as from a member of a family how your

17  type -- the conduct for which you were convicted, that type

18  of conduct prevents one from conducting an honest

19  investigation.  And that, in turn, prevents or obstructs or

20  impedes the prevention of future mine tragedies.

21      Every time they are able to inspect and find out a

22  cause of an explosion, it presents the opportunity for

23  prevention in the future.  So, your offenses are serious,

24  both the lying as well as the attempt to destroy documents.

25  Make no mistake about that.

1       However, giving consideration to all of the 3553(a)

2   factors, as this Court is required to do, I find that the

3   term of 36 months, which is not a minor sentence, is an

4   appropriate and just sentence in this situation.

5       I've taken into consideration, Mr. Stover, that at 60

6   years old, you have no prior felony convictions.

7       I further have taken into consideration, however, that

8   the seriousness of these offenses must, in fact, have

9   consequences.  Not only are they serious in and of

10  themselves, but the impact of these types of offenses are

11  very serious and have serious results and potentially

12  dangerous results.

13      I further find that this sentence of 36 months to be

14  followed by two years of supervised release reflects the

15  totality of the circumstances.

16      I gave consideration to, as I've indicated, the

17  Government's request for a maximum term of 25 years.  I gave

18  consideration to your counsel's request for a sentence below

19  the applicable guideline range.  And I find that neither

20  would be appropriate or just under the circumstances of this

21  case.

22      I also would indicate to you that although there is in

23  evidence that there is a practice of advance notification

24  which you participated in in the UBB mine, I further took

25  into consideration that I wanted to ensure that I was

1    sentencing on the offenses of conviction.  I am charged with

2    sentencing on facts, not on passion, not on public opinion.

3        I gave consideration to the fact that although your

4    lies and your attempt to destroy documents in the face of an

5    awful, awful tragedy are very serious, that there was

6    nothing in this case to indicate that your actions, or your

7    particular actions resulted in this particular explosion.

8        In other words, I find that there's no evidence that

9    any actions on your part at or near the time of this

10   explosion resulted in the loss of lives of these miners.

11   That was important to me, although I find that your lying

12   about it after knowing that it caused the deaths of these

13   people is an abhorable action in and of itself.

14       I further gave consideration to the testimony that I

15   heard here today.  And there is no evidence that anyone

16   knows of your calling the mine at any time close to or near

17   the explosion to give an opportunity for there to be an

18   alteration of the conditions of the mine, as well as taking

19   into consideration the testimony of the guards who indicated

20   that you trained them in that particular practice.

21       It is a very serious thing to hang death on anyone.

22   And it should only be done where there is evidence to

23   support it.  In this particular case, your offenses are

24   serious.  Your convictions are serious.  But there's no

25   evidence in terms of cause or causation that directly links

1    your conduct to this explosion in April that resulted in the

2    deaths of 29 people.

3         I also have taken into consideration the statements

4    that I heard during the course of the trial, and even today,

5    from the MSHA representative about the fact that prior

6    notification was one of 12 contributing factors.

7         That is the report of MSHA.  That's their finding.

8    MSHA's not on trial.  And, so, I won't go into my opinions

9    about that given the evidence that I've heard.  But it

10   does -- in fact, the report at least indicates that it

11   was -- the practice was a contributing factor.

12        So, lying about it is serious.  Destroying documents

13   when, by your own admissions, you knew that you were not to

14   destroy any documents is very, very serious.

15        I find that the Government's argument, Mr. Goodwin,

16   Mr. Ruby, that a guideline range sentence would not serve

17   the seriousness of the offense is not accurate.  I have

18   imposed a sentence of 36 months which is not a short amount

19   of time and which I find, based on all of the circumstances

20   here, to be just.

21        I've also given consideration to the statistics that

22   tell us that when someone is 60 years old, that there is a

23   less likelihood of recidivism or someone committing an

24   offense in the future.  And giving consideration to

25   deterrence and promoting respect for the law, I considered

1    that particular issue as well.

2         I find that this sentence is appropriate.  I find that

3    it's just.  I find that three years to be followed by two

4    years of supervised release is an extensive sentence, but

5    certainly not more than necessary to accomplish the goals of

6    sentencing.  I do believe it to be sufficient, however.

7         I further find that this sentence on the facts of the

8    convictions in this case will promote respect for the law,

9    will deter further crimes by this defendant.  I also find

10   that it will avoid -- serve to avoid unwarranted sentence

11   disparities among defendants with similar history and

12   characteristics who have been convicted of the same or

13   similar offense.

14        Having given consideration to all of the 3553(a)

15   factors, again, I find this sentence to be appropriate and

16   will serve to protect the public from any further crimes of

17   this particular defendant.

18        You have a right to appeal this Court's sentence,

19   Mr. Stover.  If you want to appeal, you are required to file

20   a written notice of appeal with the clerk of this court

21   within 14 days of the clerk's entry of this Court's order of

22   sentence and judgment.  If you fail to file a written notice

23   of intent to appeal within that time period, your right to

24   appeal will expire.

25        Do you understand that?

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  If the Court finds that you do not

3   have the money to procure transcripts or other documents

4   necessary to effect your appeal or to pay for the services

5   of an attorney, those costs will be borne by the United

6   States.

7        Do you understand that?

8        THE DEFENDANT:  Yes, ma'am.

9        THE COURT:  Your sentence is a final judgment.

10  Once it becomes final, I cannot change, reduce, or modify

11  that sentence unless the Director of the Bureau of Prisons

12  makes such a request or unless the Government files a motion

13  for substantial assistance.

14       Therefore, any letters written to me asking me to

15  change, reduce, or modify your sentence will be of no

16  consequence.

17       Do you understand that as well?

18       THE DEFENDANT:  Yes, ma'am.

19       THE COURT:  I will note for the record that the

20  only remaining count of the superseding indictment was

21  dismissed prior to trial on October the 21st.

22       Is there any position that the Government wants to

23  take, Mr. Goodwin, regarding his voluntary surrender?

24       MR. GOODWIN:  The United States has no objection

25  to the defendant voluntarily surrendering to an institution

1    as designated by the Bureau of Prisons.

2            THE COURT:  Mr. Wilmoth, any comment with respect

3    to that particular issue?

4            MR. WILMOTH:  I obviously agree with Mr. Goodwin

5    that, that Mr. Stover is a good candidate for self-report.

6    And I, I hope that you will take that recommendation to

7    heart.

8        I also know that Your Honor has no control over exactly

9    where the Bureau of Prisons will place Mr. Stover, but I do

10   know that the Bureau of Prisons considers strongly the

11   recommendations of sentencing courts.  And we would ask that

12   you recommend to the Bureau of Prisons that Mr. Stover be

13   incarcerated in Beaver, West Virginia, nearest to his family

14   to allow them to, to visit him as often as possible.

15           THE COURT:  I will attach such a recommendation

16   simply because I believe if an inmate can maintain family

17   and other relationships while he's incarcerated, it's

18   helpful when they're trying to get back into the community.

19       With respect to the issue of detention, I have received

20   a report from probation which indicates that he has followed

21   the terms and conditions of his release.

22       And, therefore, I'm going to allow you to self-report.

23   You will continue on the bond that you've previously posted

24   with the condition that you report when requested to do so.

25           Is that agreeable?

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Let me advise you of two things.

3     First, if you knowingly fail to report, this Court then

4  can impose an additional sentence of up to 10 years and a

5  fine up to $250,000.

6     If you commit an offense while you're waiting to

7  report, the Court can also impose an additional sentence.

8     If you commit a misdemeanor, the Court can impose a

9  sentence up to one year.  If you commit a felony, the Court

10  can impose a sentence up to 10 years.

11     In either case, Mr. Stover, that sentence would run

12  consecutively to, not concurrently with, the sentence that

13  I've imposed today.

14     Do you understand that?

15        THE DEFENDANT:  Yes, ma'am.

16        THE COURT:  Anything further, counsel?

17        MR. GOODWIN:  Not on behalf of the United States.

18        MR. WILMOTH:  Not from me either, Your Honor.

19  Thank you.

20        THE COURT:  All right.  You-all have a good

21  evening.

22     (Proceedings concluded at 1:45 p.m.)

23

24

25

```
 1          I, Lisa A. Cook, Official Reporter of the United

 2    States District Court for the Southern District of West

 3    Virginia, do hereby certify that the foregoing is a true and

 4    correct transcript, to the best of my ability, from the

 5    record of proceedings in the above-entitled matter.

 6

 7

 8          s\Lisa A. Cook                      March 7, 2012

 9            Reporter                              Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```